IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GRAY CONSTRUCTION, INC.,

      Plaintiff / Counterclaim Defendant,

v.

MEDLINE INDUSTRIES, INC.,

      Defendant / Counterclaim Plaintiff.

           Civil Action No.: GLR-19-3405

MEDLINE INDUSTRIES, INC.,

      Counterclaim Plaintiff,

v.

YORK BUILDING PRODUCTS
CO., INC., ET AL.,

      Counterclaim Defendants.

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on Defendant/Counterclaim Plaintiff Medline Industries, Inc.'s ("Medline") Motion to Join Counterclaim Defendants York Building Products Co., Inc. ("York"), Geo-Technology Associates, Inc. ("GTA"), Morris & Ritchie Associates, Inc. ("MRA"), Allan Myers, L.P. ("Allan Myers"), and DGS Construction, LLC ("Schuster") (ECF No. 53); Counterclaim Defendants GTA's and MRA's Omnibus Response to Medline's February 26, 2020 Filings, and Motion to Dismiss Amended Pleading (ECF No. 69); Counterclaim Defendant Allan Myers' Motion to Dismiss the Counterclaim and Opposition to Medline's Motion For Joinder (ECF No. 72); Counterclaim Defendant Schuster's Motion to Dismiss First Amended Counterclaims or,

in the Alternative, Motion For Summary Judgment (ECF No. 73); and Counterclaim Defendant York's Motion to Dismiss, or, in the Alternative, Sever, Medline's Amended Counterclaims Against York (ECF No. 85).[1] The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant in part and deny in part Medline's Motion to Join Counterclaim Defendants York, GTA, MRA, Allan Myers, and Schuster; deny GTA's and MRA's Motion To Dismiss Amended Pleading; deny Allan Myers Motion to Dismiss the Counterclaim; and grant in part and deny in part York's Motion To Dismiss.

---

[1] Also pending before the Court are several motions responsive to Medline's Verified Answer to Complaint and Petition to Establish and Enforce Mechanic's Lien, Counterclaim Against Gray Construction, Inc., and Third Party Claims (ECF No. 17): GTA & MRA's Motion Dismiss Third-Party Complaint (ECF No. 32); York's Motion Dismiss and Strike Third-Party Complaint (ECF No. 44); and Schuster's Motion Dismiss Third-Party Complaint or, in the Alternative, Motion for Summary Judgment (ECF No. 50). These Motions will be dismissed as moot in light of Medline's Amended Counterclaims and Counterclaim Defendants' Responses thereto.

The Court will also deny Plaintiff/Counterclaim Defendant Gray Construction, Inc.'s ("Gray") Consent or Unopposed Motion for Telephonic Scheduling Conference (ECF No. 82) ) because a scheduling conference will come in due course following the disposition of the instant motions. As such, the Court will also deny Gray's prior Motion for Telephonic Scheduling Conference (ECF No. 15) as moot.

The Court will also grant nunc pro tunc York's Motion to Withdraw its Motion to Dismiss and Strike Third-Party Complaint (ECF No. 74); therefore, York's Motion to Dismiss and Strike Third-Party Complaint (ECF No. 44) will be denied as moot. Finally, the Court will deny as moot Schuster's Motion to Stay (ECF No. 93).

## I.  BACKGROUND[2]

**A. Factual Background**

Medline is a privately held manufacturer and distributor of medical supplies that operates more than forty distribution centers in North America. (Medline's Am. Answer and Countercls. Against Gray, York, GTA, MRA, Allan Myers, Schuster ["Am. Countercl."] at 10, ECF No. 51). In November 2017, Medline entered into a contract with York (the "Purchase and Sale Agreement") through which it purchased 128.5 acres of vacant land in Cecil County, Maryland (the "Property"). (Id. ¶ 12; see Ver. Answer Compl., Countercl. and Third Party Cls. ["Original Answer"] Ex. A ["P&S Agmt."], ECF No 17-3). The Purchase and Sale Agreement required York to complete certain work on the site in order to "deliver the Property in pad ready condition for [Medline's] proposed development" (the "Pad Ready Work"). (Am. Countercl. ¶ 14; see P&S Agmt. at 11). The Pad Ready Work included "installing erosion and sediment controls, performing mass grading and fill work in accordance with the draft site plan, and installing a modular retaining wall," and required that York perform the work in accordance with a geotechnical report prepared by GTA (the "GTA Report"). (Am. Countercl. ¶ 15). Medline and York subsequently entered into an amended agreement (the "Amended Agreement") in which Medline provided York additional time to complete the Pad Ready Work, which the

---

[2] Unless otherwise noted, the Court takes the following facts from Medline's Amended Answer and Counterclaims Against Gray and Additional Counterclaim Defendants York, GTA, MRA, Allan Myers, and Schuster, (ECF No. 51), and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted).

amended agreement referred to as the "Post-Closing Work." (Id. ¶¶ 16–17; see Original Answer Ex. B ["P&SA 1st Am."], ECF No. 17-4).

In February 2018, Medline and Gray entered into a contract wherein Gray agreed to design and construct the distribution facility Medline sought to build on the Property (the "Medline/Gray Contract").[3] (Am. Countercl. ¶ 18). In April 2018, Gray assumed responsibility for completing the Post-Closing Work set forth in the Amended Agreement. (Id. ¶ 19). In March 2019, Medline and Gray executed a "Certificate of Substantial Completion," which deemed the Project substantially complete and accepted by Medline as of February 26, 2019. (Id.). The Certificate noted, however, that several items remained uncomplete. (Id.).

Pursuant to the Purchase and Sale Agreement, York and Medline agreed that GTA would provide the "design, engineering, inspection and testing services necessary for the Pad Ready Work." (Id. ¶ 15). Moreover, GTA would provide the design of the modular retaining wall (the "Retaining Wall"), and was responsible for inspecting and approving York's installation of fills behind the Retaining Wall. (Id.). The Retaining Wall was "located along an area of mapped wetlands, which necessitated the construction of the wall in order to raise Site grades to accommodate the Site layout and support a main access drive for the Site." (Original Answer Ex. D ["SESI Report"] at 7, ECF No. 17-6). GTA also "oversaw construction of the wall and provided construction inspection and testing

---

[3] The work to be performed by York and the work to be performed by Gray and its subcontractors will hereinafter be collectively referred to as the "Project."

services initially to York and then to Gray for the remainder of the Project, including the construction of the distribution facility itself." (Am. Countercl. ¶ 21).

The Retaining Wall "was constructed in the fall of 2017. Less than 12 months later, cracks in the wall itself and in the driveway areas behind the wall were observed." (Id. ¶ 23). GTA conducted testing and determined that "the Retaining Wall was sliding away from the building and that the sliding caused dramatic settling and cracking of the paved driveway areas behind the wall." (Id. ¶¶ 24–25). Medline avers that the Retaining Wall's movement was "so dramatic" that it could result in "a collapse of the building itself." (Id. ¶ 26).

Following GTA's investigation, Medline retained SESI Consulting Engineers ("SESI") to investigate the failure of the Retaining Wall and recommend a path forward, resulting in a "Global Evaluation Report" created by SESI in August 2019. (Id. ¶¶ 28–29; see generally SESI Report). SESI discovered significant issues in the Retaining Wall, concluding that it had "experienced a sliding failure" and that "complete deconstruction, redesign, and reconstruction of the wall system" was required. (Am. Countercl. ¶¶ 30–32; SESI Report at 58). SESI assigned blame for these issues to GTA's design and failure to properly evaluate and adjust to the characteristics of the soil underneath where the Retaining Wall was built. (Am. Countercl. ¶¶ 34–40; SESI Report at 55–57).

SESI further concluded in its report that a "build-up of hydrostatic pressure," i.e., "water built up in soils behind the wall," contributed to the sliding and failure of the wall. (Am. Countercl. ¶ 41). SESI identified "multiple failings by Gray, its subcontractor Allan Myers and MRA that caused storm water to flow directly into the soils behind the Retaining

5

Wall, adding to the mass of the soils and increasing the hydrostatic pressures behind the wall that ultimately directly contributed to the failure of the wall." (Id.). MRA was responsible for designing the storm water management system pursuant to a contract with York and a separate agreement with Medline. (Id. ¶ 42; see Original Answer Ex. E ["MRA/Medline Contract"], ECF No. 17-7). Allan Myers was responsible for installing the storm water controls on the Project pursuant to a contract with Gray. (Am. Countercl. ¶ 43). Relying on the SESI Report, Medline catalogued a series of material deficiencies in the storm water control system installed for the Project. (Id. ¶¶ 44–49).

Gray and Allan Myers also provided and installed the asphalt pavement on the Project, which was meant to provide for "access and parking for hundreds of semi-trucks and additional parking and access for hundreds of employee and visitor vehicles." (Id. ¶¶ 54–56). The asphalt work was substantially completed by late 2018; however, by early 2019, the "asphalt base course began to show signs of distress including raveling, alligator cracking, delamination and water ponding in many areas." (Id. ¶ 57). Medline retained an engineering firm, Kimley-Horn and Associates, Inc. ("Kimley-Horn"), to conduct an investigation into the issue. (Id. ¶ 58). Kimley-Horn confirmed the issues with the pavement and further noted that the asphalt had not been installed to a grade that would allow it to meet the requirements set forth in Medline's contract with Gray. (Id. ¶¶ 59–61). SESI then conducted its own review of the pavement and identified numerous issues, including "storm water emerging from underneath the asphalt" and that the pavement was "highly permeable." (Id. ¶ 62–63; see Original Answer Ex. F ["SESI Pavement Report"], ECF No. 17-8). SESI concluded that the problems likely occurred because either the

asphalt was mixed with improper components or was compacted improperly. (Am. Countercl. ¶ 64).

Schuster was responsible for installing concrete flooring throughout the Medline distribution facility. (Id. ¶ 69). Beginning in spring 2019, Medline noticed that the floors were "sweating"—i.e., that water was collecting on the surface of the concrete flooring, which presented a dangerous condition for Medline's employees. (Id. ¶ 70). Medline did not allege any connection between the storm water control issue and the sweating in its concrete flooring.

When Medline notified Gray of the failures in the Project, Gray refused to perform the majority of the required corrections, forcing Medline to make the repairs at its own expense. (Id. ¶¶ 51–53, 65–68, 75–77). After Gray repeatedly refused to remedy the issues Medline identified, Medline notified Gray on November 4, 2019, that it was terminating their contract. (Id. ¶¶ 86–88). Medline avers that it spent more than $9 million to remove and replace the Retaining Wall and storm water controls and repair affected areas such as the paved parking and roadway areas. (Id. ¶ 50). Medline expects to spend over $3 million more to complete the repair of the issues caused by the Counterclaim Defendants. (Id. ¶ 93).

Under Medline's contract with Gray, changes to the scope of work must be made pursuant to a "Change Order," which Gray submits to Medline for its approval. (Id. ¶ 78). Over the course of the Project, Gray submitted more than seventy Project Change Documents ("PCDs") requesting various changes to the work it would provide. (Id. ¶ 79). While Medline approved the vast majority of the PCDs, it rejected all or portions of eight

PCDs. The disputed PCDs would have increased the sum Medline owed to Gray by more than $3 million, a sum Gray seeks to recover through the Complaint it filed in this action. (Id. ¶ 80; Compl. at 3). Medline seeks a declaration from this Court that the disputed PCDs are null and void. (Am. Countercl. ¶ 85).

## B. **Procedural Background**

On November 26, 2019, Gray filed a Complaint against Medline. (ECF No. 1). The four-count Complaint alleges: breach of contract for nonpayment (Count One); wrongful and bad faith termination (Count Two); and violation of Maryland's Prompt Payment Statute (Count Four). (Compl. ¶¶ 10–26, 30-32). The Complaint also includes a petition to establish and enforce a mechanic's lien (Count Three). (Id. ¶¶ 27–29). Gray sought damages in the form of a sum to be determined at trial, plus interest, costs, and reasonable attorneys' fees. (Id. at 8). On January 14, 2020, Medline filed an Answer to Complaint and Petition to Establish and Enforce Mechanic's Lien, Counterclaim Against Gray, and Third Party Claims. (ECF No. 17). The Court granted a Joint Motion for Consent Interlocutory Order Establishing Mechanic's Lien on on January 21, 2020. (ECF Nos. 20–21).

On February 26, 2020, Medline filed an Amended Answer and Counterclaims against York, GTA, MRA, Allan Myers, and Schuster. (ECF No. 51).[4] Medline's twenty-

---

[4] Several Counterclaim Defendants argue in their motions that Medline failed to seek the Court's leave to amend its Answer and Counterclaims, which they assert Medline was required to do pursuant to Federal Rule of Civil Procedure 15. Medline argues that its amendment was timely under Rules 15(a)(1)(B) and 15(c). Regardless, Medline submitted its Amended Answer and Counterclaims, which represent more of a procedural correction in its filing than a substantive rewriting of its claims, less than forty-five days after its initial Answer. "The court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a)(2). Medline's brief delay in appropriately styling its efforts to join the Counterclaim

five count Counterclaim alleges: as to Gray, breach of contract (Count One), negligence (Count Two), breach of express warranty (Count Three), and breach of implied warranty of fitness for intended purpose (Count Four), and seeks declaratory judgment (Count Five), (Am. Countercl. ¶¶ 94–121); as to York, breach of contract (Count Six), negligence (Count Seven), breach of express warranty (Count Eight), and breach of implied warranty of fitness for intended purpose (Count Nine), (id. ¶¶ 122–48); as to GTA, breach of contract (Count Ten), negligence (Count Eleven), breach of express warranty (Count Twelve), and breach of implied warranty of fitness for intended purpose (Count Thirteen), (id. ¶¶ 149–76); as to MRA, breach of contract (Count Fourteen), negligence (Count Fifteen), breach of express warranty (Count Sixteen), and breach of implied warranty of fitness for intended purpose (Count Seventeen), (id. ¶¶ 177–202); as to Allan Myers, breach of contract (Count Eighteen), negligence (Count Nineteen), breach of express warranty (Count Twenty), and breach of implied warranty of fitness for intended purpose (Count Twenty-One), (id. ¶¶ 203–26); and as to Schuster, breach of contract (Count Twenty-Two), negligence (Count Twenty-Three), breach of express warranty (Count Twenty-Four), and breach of implied warranty of fitness for intended purpose (Count Twenty-Five), (id. ¶¶ 227–50). Medline seeks judgment against all parties except for Schuster "in an amount to be determined at

---

Defendants in this action does not represent the sort of "undue delay, bad faith or dilatory motive" that would result in this Court denying Medline leave to amend. See Foman v. Davis, 371 U.S. 178, 182 (1962); see also Livera v. First Nat'l State Bank, 879 F.2d 1186, 1188 (3d Cir. 1989) (finding dismissal unwarranted where a third-party was improperly impleaded under Rule 14, but was neither misled nor prejudiced by the procedural error). Accordingly, the Court will not reject Medline's amended pleading on the basis of timeliness.

trial, but in excess of $10,000,000;" seeks judgment against Schuster "in an amount to be determined at trial, but in excess of $75,000"; and seeks attorneys' fees, costs, and expenses. (Id. at 70–73).

Also on February 26, 2020, Medline moved to join Counterclaim Defendants York, GTA, MRA, Allan Myers, and Schuster. (ECF No. 53). On March 23, 2020, GTA and MRA filed a Response, (ECF No. 69), and Medline filed a Reply on May 15, 2020, (ECF No. 79).[5] On March 23, 2020, Schuster filed a Response, (ECF No. 71), and Medline filed a Reply on April 21, 2020, (ECF No. 76). On March 23, 2020, Allan Myers filed a Response, (ECF No. 72), to which Medline filed a Reply on April 27, 2020, (ECF No. 77). On June 15, 2020, York filed a Motion to Dismiss or, in the Alternative Sever Medline's Amended Counterclaims Against York, (ECF No. 85), which the Court construes in part as a Response to Medline's Motion to Join. Medline filed a Reply to York's Motion on July 6, 2020. (ECF No. 88).

GTA and MRA filed a Motion to Dismiss on March 23, 2020. (ECF No. 69). Medline filed an Opposition on May 15, 2020, (ECF No. 79), and GTA and MRA filed a Reply on May 26, 2020, (ECF No. 81). Allan Myers filed a Motion to Dismiss on March 23, 2020. (ECF No. 72). Medline filed an Opposition on April 27, 2020, (ECF No. 77), and Allan Myers filed a Reply on July 31, 2020, (ECF No. 92). Schuster filed a Motion to

---

[5] The Court notes that due to the flurry of interrelated arguments in this case regarding the sufficiency of Medline's allegations and the propriety of its joinder of the Counterclaim Defendants, several of the filings in this matter did not clearly delineate between responding to the Motion to Join and the Motions to Dismiss. The Court is satisfied that no parties have filed an unauthorized surreply or otherwise prejudiced other parties in this action through their motion practice.

Dismiss or, in the Alternative, Motion For Summary Judgment on March 23, 2020. (ECF No. 73). Medline filed an Opposition on April 17, 2020, (ECF No. 75), and Schuster filed a Reply on May 1, 2020, (ECF No. 78). York filed a Motion to Dismiss or, in the Alternative, Sever, Medline's Amended Counterclaims against it on June 15, 2020. (ECF No. 85). Medline filed an Opposition on July 6, 2020, (ECF No. 88), and York filed a Reply on July 27, 2020, (ECF No. 91).

On September 4, 2020, Schuster filed a Motion to Stay this action with regard to Medline's claims against it. (ECF No. 93). Medline filed an Opposition to Schuster's Motion on September 22, 2020. (ECF No. 96).

## II.   DISCUSSION

### A.   <u>Motion to Join</u>

As set forth above, Medline has moved to join GTA, MRA, Allan Myers, York, and Schuster as Counterclaim Defendants. (ECF No. 53). A counterclaim plaintiff may join additional parties pursuant to Federal Rule of Civil Procedure 13(h), but the joinder must also satisfy the requirements of Federal Rule of Civil Procedure 20(a)(2). <u>See</u> 4 James Wm. Moore <u>et al.</u>, <u>Moore's Federal Practice</u> § 20.02 (3d ed. 1999) ("Plaintiff has the burden of demonstrating that the proposed restructuring of the litigation satisfies both requirements of the permissive party joinder rule.").

Under Federal Rule of Civil Procedure 20(a)(2), the Court can permissively join defendants to an action if "(A) any right to relief is asserted . . . with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." The Fourth

Circuit has held "that Rule 20(a) should be construed in light of its purpose, which is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits." Fangman v. Genuine Title, LLC, RDB-14-0081, 2015 WL 8315704, at *6 (D.Md. Dec. 9, 2015) (quoting Saval v. BL Ltd., 710 F.2d 1027, 1031 (4th Cir. 1983)).

However, "[j]oinder under the rule is only appropriate when both specific requisites are met: the claims must arise out of the same transaction, series of transactions, or occurrence, and some question of law or fact common to all parties must be present." Grennell v. W.S. Life Ins. Co., 298 F.Supp.2d 390, 397 (S.D.W.Va. 2004). "There is no clear rule or generalized test in considering whether a set of facts constitute a single transaction or occurrence, and courts have generally adopted a case-by-case approach." Stephens v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc., 807 F.Supp.2d 375, 382 (D.Md. 2011). "The propriety of joinder rests within the sound discretion of the trial court." LHF Prods. v. Does 1-25, No. 16-283, 2016 WL 7422661, at *4 (E.D.Va. Dec. 22, 2016).

### 1.    GTA and MRA

Medline argues that GTA is properly joined because it "provided for the design of the retaining wall, oversaw the construction of the wall, and provided construction inspection testing services initially for York, and then to Gray for the remainder of the Project." (Mot. Join Countercl. Defs.' York, GTA, MRA, Allan Myers, Schuster ["Mot. Join"] at 12, ECF No. 53). Medline further explains that MRA, first through a contract with Gray and then through a contract directly with Medline, "designed the storm water

management and control systems for the Project," which "added perched water and mass to the soils behind the wall" and "contributed to the failure to the Retaining Wall[.]" (Id. at 13).

GTA and MRA argue[6] that joinder is inappropriate because there is no single transaction or occurrence connecting their alleged wrongdoing with "the subject of the claims between Gray and Medline," which they assert "is the propriety of Medline's administration of the Construction Contract." (GTA and MRA Omnibus Resp. and Mot. Dismiss ["GTA/MRA Mot."] at 15, ECF No. 69). Citing cases from federal courts in Wyoming and Louisiana, GTA and MRA argue that the fact that a series of claims arose in connection with a single construction contract does not render those claims part of a "single transaction or occurrence." (Id. at 15 (citing Energy Drilling, LLC v. Pac. Energy & Mining Co., LLC, KHR-14-186, 2016 WL 7428013 (D.Wyo. Mar. 29, 2016); E. Cornell Malone v. Sisters of the Holy Family, 922 F.Supp.2d 550, 562 (E.D.La. 2013))).

The Court is not persuaded by GTA and MRA's argument. As an initial matter, the cases cited by GTA and MRA are distinguishable. Energy Drilling, LLC involved a plaintiff who sought to add several entities to the lawsuit following the close of discovery because it alleged that those entities had "substantial and direct ownership and economic control over" the defendant. 2016 WL 7428013, at *1. This situation bears little relationship to the facts at issue in this action. For its part, E. Cornell Malone involved a motion to sever, not a motion for joinder, and the court noted that it "may sever claims

---

[6] GTA and MRA have thus far jointly filed all pleadings in this matter.

even where the requirements of Rule 20(a) for permissive joinder have been satisfied." 922 F.Supp.2d at 561. The Court merely noted in its analysis that it would not be appropriate "to interpret the 'transaction or occurrence' the claims arise out of as the entire scope of the construction project . . . . Such an interpretation, in a case involving a construction project of such magnitude and involving so many components and parties, could yield completely unmanageable litigation." Id. at 562.

Here, GTA and MRA were not merely unrelated subcontractors working on the same project as Gray; they were intimately involved in the design and construction of the Retaining Wall and the storm water management system. (Am. Countercl. ¶¶ 15, 21, 42). The primary allegation in Medline's Counterclaims is that the failures of the Counterclaim Defendants to properly control and account for storm water on the Property caused a number of serious issues in the Project, perhaps most importantly the failure of the Retaining Wall. These alleged failures form the crux of Medline's Counterclaims against Gray, and GTA and MRA were intimately involved with those undertakings. As a result, the Court is satisfied that they meet both requirements of Rule 20(a) and will grant Medline's motion to join GTA and MRA as Counterclaim Defendants.

### 2.   Allan Myers

Medline avers that Allan Myers is properly joined because it "failed to properly install the storm water controls on the Project," which "added perched water and mass to the soils behind the wall, causing the failure of the Retaining Wall[.]" (Mot. Join at 13). Like GTA and MRA, Allan Myers relies on E. Cornell Malone for the proposition that not all claims arising from the same construction project necessarily arise out of the same series

of transactions or occurrences. Allan Myers further relies on a case from the District of South Carolina in which the court determined that plaintiff's claims against a contractor who allegedly failed to properly construct a dam, causing damage to the plaintiff's property, were not sufficiently related to plaintiff's claims against her insurer to justify joinder. Todd v. Cary's Lake Homeowners Ass'n, 315 F.R.D. 453, 457 (D.S.C. 2016).

Finally, Allan Myers points to Crandell v. Hardy County Development Authority, No. MJA-18-87, 2020 WL 1151064, at *2 (N.D.W.Va. Mar. 9, 2020), for the proposition that joinder should fail where the parties to be joined were not subject to the contract forming the basis for the litigation between plaintiff and defendant. That case involved a self-represented plaintiff who alleged that certain individuals who testified during a board meeting of a development authority may have misled the development authority into taking actions that harmed plaintiff at some later date. Id. at *1. The court noted that "Plaintiff's allegations and statements regarding minutes from Defendant HCRA meetings in the 90's bares only a tangential relationship between the proposed individual defendants to be joined and the breach of contract claims Plaintiff has against Defendant HCRA." Id. at *2.

These cases are inapposite and unpersuasive for the simple reason that the ties between Medline's claims against Gray and its claims against Allan Myers are far closer than those presented in any of the opinions Allan Myers cites. Medline alleges that Allan Myers was responsible for installing the storm water controls on the Project pursuant to a contract with Gray, (Am. Countercl. ¶ 43), and also provided and installed the asphalt pavement on the Project, (id. ¶¶ 54–56). Medline alleges that failures by Allan Myers "caused storm water to flow directly into the soils behind the Retaining Wall, adding to the

mass of the soils and increasing the hydrostatic pressures behind the wall that ultimately directly contributed to the failure of the wall." (Id. ¶ 41). Medline further alleges that the failures in the pavement were caused by "storm water emerging from underneath the asphalt" and likely occurred in part because the pavement was "highly permeable." (Id. ¶¶ 62–63). As noted above, the problems with the Project caused by storm water management, resulting in issues with the Retaining Wall and the pavement, form the crux of Medline's Counterclaims. It is not credible to cast Medline's claims against Allan Myers as simply occurring on the same construction project, as was the case in E. Cornell Malone. Nor is Allan Myers merely an insurer who played no role in the failures alleged by Medline, as was the case in Todd. And there is far more than the mere "tangential relationship" described in Crandell between Medline's claims against Gray and its claims against Allan Myers. Accordingly, the Court will grant Medline's motion to join Allan Myers.

### 3. York

Medline argues that York is properly joined because it "performed the general site-work and building pad preparation, and was responsible for both the design and the installation of the Retaining Wall." (Mot. Join at 11). Rather than directly opposing Medline's motion for joinder, York moves to sever Medline's claims against it from the instant action. York argues that its dispute with Medline should not be tried in conjunction with this litigation "because the sale of the Property and York's Work under the Purchase and Sale Agreement—which, as to the Retaining Wall, was completed prior to closing and before Medline and Gray entered into the Construction Contract—relate to an earlier contract that is separate from construction of the warehouse and the Construction

Contract." (York Mot. Dismiss Alt. Sever ["York Mot."] at 13, ECF No. 85). York adds that if the claims against it are not dismissed or severed, it will be forced "to assert mandatory counterclaims against Medline, including those related to $2 Million currently being held in escrow under the Purchase and Sale Agreement," which would "add yet another layer to the unrelated dispute regarding Medline's refusal to pay Gray under the Construction Contract." (Id. at 13–14). As York concedes, however, its work "included, inter alia, installing erosion and sediment controls; performing mass grading in accordance with a draft site plan prepared by MRA and a geotechnical report prepared by GTA; construction of the Retaining Wall; and various miscellaneous site preparation tasks identified in the GTA Geotechnical Report." (Id. at 3).

"Courts have recognized a presumption in favor of the nonmoving party that all claims in a case will be resolved in a single trial and not be severed, placing the burden on the party moving for severance to show that (1) it will be severely prejudiced without a separate trial; and (2) the issue to be severed is so distinct and separable that a trial of that issue alone may proceed without injustice." JM & GW Enters. v. Matworks Co. LLC, PJM-18-3650, 2019 WL 2436751, at *2 (D.Md. June 11, 2019) (quoting Equal Rights Center v. Equity Residential, 483 F.Supp.2d 482, 489 (D.Md. 2007)). Here, while it may well be right that York's escrow will introduce yet another complicating factor into this litigation, the fact remains that York's work—in particular, its work on erosion controls and the Retaining Wall—is closely intertwined with the primary contentions Medline makes in its Counterclaims: that poor storm water management led to serious issues in the Project, most prominently the failure of the Retaining Wall. "[T]he impulse is toward entertaining the

broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." Faust v. Comcast Cable Commc'ns Mgmt., LLC, WMN-10-2336, 2015 WL 628968, at *4 (D.Md. Feb. 11, 2015) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966)). Here, the Court cannot conclude, as York urges, that severing Medline's claims against it would serve the interests of judicial economy. As a result, the Court will grant Medline's Motion to Join as to York and deny York's Motion to Sever.

### 4. Schuster

Medline asserts that Schuster is properly joined because the allegations regarding the "defective concrete" Schuster poured "relate directly" to Medline's rejection of Gray's application for payment relating to the concrete flooring. (Mot. Join at 14). Critically, however, Medline has not alleged that its claims against Schuster have anything to do with the Project's storm water management or the Retaining Wall, which are the subject of Medline's claims against all of the other Counterclaim Defendants and which form the bulk of its claims against Gray. Instead, the only link between Schuster and any of the other Counterclaim Defendants is that Schuster was the subcontractor for Gray responsible for pouring the concrete floor, which Medline alleges was left in a "defective condition." (Am. Countercl. ¶ 74).

Schuster effectively catalogues the distinctions between the claims against it and the rest of the Counterclaim Defendants in its Opposition to Medline's Motion to Join. (See Schuster Opp'n Mot. Join ["Schuster Opp'n"] at 13–14, ECF No. 71). These distinctions are significant, and as the court noted in E. Cornell Malone, it would not be appropriate "to

interpret the 'transaction or occurrence' the claims arise out of as the entire scope of the construction project . . . ." 922 F.Supp.2d at 562. Moreover, as Schuster notes in its Opposition, unlike the storm water management issues and the related issues with the Retaining Wall and pavement, Medline's expert, SESI, did not conduct an investigation into Schuster's work or the issues relating to the concrete floor, obviating concerns about SESI needing to duplicate its testimony. Finally, Schuster and Medline are currently involved in litigation in the Circuit Court for Cecil County, Maryland, in a case that predates this action and in which the court has already denied Medline's motion to stay pending the outcome of this lawsuit. See Schuster v. Medline, No. C-07-CV-19-0256 (Cecil Cty. Cir. Ct. filed May 29, 2019).

Eschewing any generalized test, courts in the Fourth Circuit adopt a case-by-case approach as to whether a set of facts constitute a single transaction or occurrence. Stephens, 807 F.Supp.2d at 382. Moreover, as set forth above, the purpose of Rule 20 "is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits." Fangman, 2015 WL 8315704, at *6 (quoting Saval, 710 F.2d at 1031). Given the lack of commonality between the allegations against Schuster and the remaining Counterclaim Defendants, and given the existence of an ongoing litigation between Schuster and Medline, the Court finds that joining Schuster in this action would neither promote trial convenience nor prevent multiple lawsuits. Accordingly, the Court will deny Medline's motion to join Schuster, dismiss Medline's claims against Schuster (Counts Twenty-Two–Twenty-Five) without prejudice, and terminate Schuster from this action.

## B.    <u>Standard of Review</u>

The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."[7] <u>King v. Rubenstein</u>, 825 F.3d 206, 214 (4th Cir. 2016) (quoting <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. <u>Goss v. Bank of Am., N.A.</u>, 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting <u>Walters v. McMahen</u>, 684 F.3d 435, 439 (4th Cir. 2012)), <u>aff'd</u>, 546 F.App'x 165 (4th Cir. 2013).

---

[7] Schuster characterizes its motion as a Motion to Dismiss First Amended Counterclaims or, in the Alternative, Motion For Summary Judgment. While the Court could have considered the documents attached to Schuster's Motion without converting it to one for summary judgment, the issue is moot because the Court has denied Medline's motion to join Schuster to this action.

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cty., 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

C.     **Analysis**[8]

1.     **Negligence**

Medline asserts claims of negligence against all Counterclaim Defendants. GTA and Allan Myers argue that Medline's negligence claims against them are barred by the Economic Loss Doctrine. The Court of Appeals of Maryland has explained:

> The economic loss doctrine represents a judicial refusal to extend tort liability to negligence that causes purely economic harm in the absence of privity, physical injury, or risk of physical injury. Courts imposed this limitation on the recovery of purely economic losses in response to the elimination of the privity requirement in tort law. In Maryland, the economic

---

[8] Because the Court has denied Medline's Motion to Join as to Schuster, it will not consider the merits of Schuster's Motion to Dismiss, nor will it evaluate the applicability of any of the tenets of law discussed herein to Medline's claims against Schuster. The Court will deny as moot Schuster's Motion to Dismiss First Amended Counterclaims or in the Alternative Motion For Summary Judgment (ECF No. 73).

Further, GTA and MRA decline to make any substantive arguments as to why Medline's claims against MRA should be dismissed. Because the Court will not dismiss Medline's claims on the basis of timeliness, improper joinder, or some other procedural defect, and because GTA and MRA do not advance substantive arguments regarding why Medline's claims against MRA should be dismissed, the Court will deny GTA and MRA's Motion to Dismiss as to Medline's claims against MRA (Counts Fourteen–Seventeen).

loss doctrine bars recovery when the parties are not in privity with one another or the alleged negligent conduct did not result in physical injury or risk of severe physical injury or death.

Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP, 155 A.3d 445, 452 (Md. 2017) (citations and footnotes omitted). York frames its argument slightly differently, but comes to the same point: because Medline alleges purely economic harm and does not allege a physical injury, Medline's claims against it sound in contract, not tort.[9] At bottom, the Court finds that Medline adequately alleges that Counterclaim Defendants created an unreasonably dangerous condition that created the risk of property damage and the risk of serious physical injury or death, and will deny Counterclaim Defendants' motions to dismiss Medline's claims of negligence.

Medline argues that its negligence claims are not barred by the Economic Loss Doctrine because Counterclaim Defendants' actions created a risk of property damage and a risk of severe physical injury or death. Specifically, Medline points to its allegation that "[t]he movement of the [Retaining Wall] was so dramatic that it raised an immediate concern that there would be a catastrophic failure of the Retaining Wall which could result

---

[9] York also argues that Medline has failed to allege that York owed it a duty of care outside the bounds of the parties' contract. "[T]he duty of builders and architects to use due care in the design, inspection, and construction of a building extends to those persons foreseeably subjected to the risk of personal injury because of a latent and unreasonably dangerous condition resulting from that negligence." Council of Co-Owners Atlantis Condo., Inc. v. Whiting-Turner Contracting Co., 517 A.2d 336, 338 (Md. 1986). Medline alleges that York owed it "a duty of care to perform its work on the Property with a reasonable degree of care, skill and ability which is normally employed by contractors in their industry and duty to perform its work on the Property in accordance with applicable codes, product instructions and industry standards." (Am. Countercl. ¶ 133). Thus, the Court finds that Medline has adequately pleaded the existence of a duty of care that exists outside the bounds of the Purchase and Sale Agreement or the Amended Agreement.

in the collapse of not only the paved parking and driveway areas, the storm water controls and the various utilities that were installed in and on the retained zone behind the wall, but also a collapse of the building itself." (Am. Countercl. ¶ 26).

This Court's decision in Pacific Indemnity Co. v. Whaley, 560 F.Supp.2d 425 (D.Md. 2008), is instructive. That case involved an insurer who brought suit against a home contractor for negligence in removing and replacing the roof on an insured party's residence. Id. at 427. Judge Motz found that "[b]ecause the physical damage in the instant case was to 'tangible things' other than the roof under construction—specifically the [insured's] property inside the house—the Economic Loss Doctrine does not preclude tort liability." Id. at 430 n.5. Likewise, in another decision permitting a claim of negligence to proceed, the Maryland Court of Special Appeals found that the risk of harm in negligently performing roof replacement work "was not solely economic loss. Indeed, it was not economic loss at all. It was personal injury and death and damage to personal property." Cash & Carry Am., Inc. v. Roof Sols., Inc., 117 A.3d 52, 62 (Md.Ct.Spec.App. 2015); see also A.J. Decoster Co. v. Westinghouse Elec. Corp., 634 A.2d 1330, 1332–33 (Md. 1994) (reviewing cases and recognizing a plaintiff's ability to pursue a tort claim where plaintiff alleges harm outside the scope of the work done under the contract).

Similarly, the risk in the instant case is not just to the Retaining Wall or the storm management system, but, as alleged by Medline, to the entire building and to individuals therein. As Medline states, "[t]he imminent collapse of a 1,100,000 square foot building obviously raises a serious risk of severe physical injury to the hundreds of construction workers on the site." (Medline Opp'n York Mot. Dismiss ["Medline-York Opp'n"] at 16,

ECF No. 88). Viewing the facts in the light most favorable to Medline, the Court finds that it plausibly alleges that Counterclaim Defendants' negligence created the risk of severe physical injury and property damage. Accordingly, the Court will deny the motions to dismiss Medline's claims of negligence against York (Count Seven); GTA (Count Nine); and Allan Myers (Count Nineteen).

### 2.     Breach of Express Warranty

To establish a claim for breach of express warranty in Maryland, a plaintiff must show that: (1) a warranty existed; (2) the product did not conform to the warranty; and (3) the breach proximately caused the injury or damage. Fischbach & Moore Int'l Corp. v. Crane Barge R-14, 632 F.2d 1123, 1125 (4th Cir. 1980) (citing Mattos, Inc. v. Hash, 368 A.2d 993 (Md. 1977)).

The Counterclaim Defendants have different arguments as to why Medline's breach of express warranty claim should fail.[10] York asserts that Medline has not successfully articulated any express warranty that it failed to fulfill. York further argues that it disclaimed any such warranty as part of the Purchase and Sale Agreement. GTA argues that Medline is not a third-party beneficiary of its contract with York. Allan Myers argues that Medline is not a party to its subcontract with Gray, nor is it a third-party beneficiary

---

[10] To the extent any party argues that the Economic Loss Doctrine bars Medline's claims for breach, that argument must fail because (a) as set forth above, the Economic Loss Doctrine does not bar Medline's negligence claims, and (b) the Economic Loss Doctrine only restricts claims sounding in tort. See Cooper v. Berkshire Life Ins. Co., 810 A.2d 1045, 1068 (Md.Ct.Spec.App. 2002) (noting that the Economic Loss Doctrine is "a rule of law restricting tort theories of recovery").

of that contract, and therefore it could not have made any warranties to Medline. The Court reviews these arguments in turn.

### i. York

York contends that Medline has not specified any express warranty York made and violated in its contracts with Medline. At bottom, the Court agrees and will dismiss Medline's claims of breach of express warranty against York.

As an initial matter, York's position that it disclaimed liability for any issues with the Retaining Wall through the "AS-IS" language contained in the Purchase and Sale Agreement is unavailing. Specifically, York highlights language in the Purchase and Sale Agreement stating that "PURCHASER, ACKNOWLEDGES THAT PURCHASER IS PURCHASING THE PROPERTY IN 'AS-IS, WHERE-IS' CONDITION 'WITH ALL FAULTS' AS OF THE CLOSING . . . ." (P&S Agmt. at 14). The Amended Agreement, however, specifies that York would conduct "Post-Closing Work" to the Retaining Wall. (P&SA 1st Am. at 2–4, 8).[11] York further agrees to hold Medline harmless for, inter alia, any "damages, liabilities, [or] losses" arising from its Post-Closing Work. (Id. at 3). Finally, the "AS-IS" clause in the Purchase and Sale Agreement is expressly qualified in that same provision to except "THE WARRANTIES AND REPRESENTATIONS SET FORTH IN THIS AGREEMENT[.]" (P&S Agmt. at 14). As a result, the Court will not rely on the disclaimer language in the Purchase and Sale Agreement to abrogate any warranties set forth elsewhere in the Agreements between the parties.

---

[11] Citations to page numbers for the Amended Agreement refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

Next, York argues that it did not make the warranties Medline alleges. Medline asserts in the Amended Counterclaims that York "warranted to Medline that York would perform the Post-Closing Work, including, without limitation, the design and construction of the Retaining Wall, 'in full compliance with all applicable laws, ordinances, regulations and requirements,' and that the work would otherwise be free from defects." (Am. Countercl. ¶ 138). As an initial matter, there does not appear to be any language in either the Purchase and Sale Agreement or the Amended Agreement warranting that York's work would be "free from defects." In response to York's noting this discrepancy in its Motion to Dismiss, Medline bristles that York's argument "borders on absurd," noting that while the language may not be "precisely stated," the requirement flows from the mandate that the work be done "in full compliance with all applicable laws, ordinances, regulations and requirements." (Medline-York Opp'n at 21 n.5). The Court is unpersuaded by Medline's creative argument and concludes that Medline does not plausibly allege the existence of a warranty that York's work be "free from defects."

With respect to the requirement that York's work be done "in full compliance with all applicable laws, ordinances, regulations and requirements," Medline repeatedly asserts that the word "requirements" refers to requirements "of the [parties'] contract." (Id. at 21, 22, 23). This characterization is not at all obvious in the Amended Agreement, however, which does not specify what "requirements" are being referenced. (P&SA 1st Am. at 2–3). Every other term in the sentence relates to a form of law or governmental authority, suggesting that "requirements" also refers to governmental dictates, as opposed to requirements rooted in the parties' contracts.

Moreover, the contracts at issue do not appear to support Medline's characterization. When similar language is used elsewhere in the Purchase and Sale Agreement and the Amended Agreement, it refers to compliance with applicable laws. For instance, the Purchase and Sale Agreement requires that York provide to Medline "[a]ny notices received by Seller regarding . . . the compliance of the Property or any portion thereof with an applicable law, rule, order, regulation or other governmental requirement[.]" (P&S Agmt. at 3). Elsewhere, the Agreement mandates that any "restoration activities shall be performed in compliance with plans approved by Seller and all applicable laws, rules, regulations, orders and ordinances of applicable governmental authorities." (Id. at 6). The Court concludes that the lone warranty identified by Medline in its Amended Counterclaims did not constitute a warranty on the part of York to meet the requirements of either or both of its contracts with Medline. Medline does not identify in its Amended Counterclaims which laws or regulations it believes were violated by York's conduct. Accordingly, this Court finds that Medline has not stated a claim against York for breach of express warranty (Count Eight).

### ii.    GTA

GTA asserts that "Medline does not, and cannot, allege any facts to support the legal conclusion that it was a third-party beneficiary of the GTA Contract" with York. (GTA/MRA Mot. at 9). At bottom, the Court disagrees and finds that Medline alleges facts sufficient to support its contention that it was a third-party beneficiary of GTA's contract with York and, as a result, declines to dismiss Medline's breach of express warranty claim against GTA.

Privity "is necessary for [a] breach of express warranty claim." <u>Palmer v. CVS Health</u>, CCB-17-938, 2019 WL 6529163, at *6 (D.Md. Dec. 4, 2019). "The third party beneficiary theory of recovery is a 'limited exception' to the strict privity rule of contracts." <u>Sherwood Brands, Inc. v. Levie</u>, RDB-03-1544, 2006 WL 827371, at *15 (D.Md. Mar. 24, 2006) (citing <u>Flaherty v. Weinberg</u>, 492 A.2d 618, 624 (Md. 1985)), <u>aff'd,</u> 2007 WL 4622915 (4th Cir. Dec. 28, 2007). In Maryland:

> [A] person for whose benefit a contract is made can maintain an action upon it. But before one can do so it must be shown that the contract was intended for his benefit; and, in order for a third party beneficiary to recover for a breach of contract <u>it must clearly appear that the parties intended to recognize him as the primary party in interest and as privy to the promise</u>. An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee. "In order to recover it is essential that the <u>beneficiary shall be the real promisee</u>; i.e., that the promise shall be made to him in fact, though not in form. It is not enough that the contract may operate to his benefit.

<u>Gray & Son, Inc. v. Md. Deposit Ins. Fund Corp.</u>, 575 A.2d 1272, 1276 (Md.Ct.Spec.App. 1990) (alteration in original) (quoting <u>Marlboro Shirt Co. v. Am. Dis. Tel. Co.</u>, 77 A.2d 776, 777 (Md. 1950)); <u>see also</u> <u>Amaya v. DGS Constr., LLC</u>, TDC-16-3350, 2019 WL 3945933, at *4 (D.Md. Aug. 21, 2019) ("In assessing whether an individual is a third-party beneficiary, the court should look to 'the intention of the parties to recognize a person or class as a primary party in interest as expressed in the language of the instrument and consideration of the surrounding circumstances as reflecting upon the parties' intention.'" (quoting <u>CR-RSC Tower I, LLC v. RSC Tower 1, LLC</u>, 56 A.3d 170, 212 (Md. 2012))).

In general, standard contractor-subcontractor arrangements of this nature create incidental beneficiaries, but do not meet the requirements of the third-party beneficiary exception to the contractual privity requirement. <u>See</u> <u>Nat'l Labor Coll., Inc. v. Hillier</u>

Group Architecture N.J., Inc., 739 F.Supp.2d 821, 836 (D.Md. 2010) ("[S]tandard contractor-subcontractor contracts like the one seen here traditionally create incidental third-party beneficiaries.") (alteration in original); see also Restatement (Second) of Contracts § 302(1) (1981), cmt. e, illus. 19 ("A contracts to erect a building for C. B then contracts with A to supply lumber needed for the building. C is an incidental beneficiary of B's promise, and B is an incidental beneficiary of C's promise to pay A for the building."). Thus, Medline must identify specific allegations demonstrating that it was clearly intended to be the primary party in interest.

The Court is satisfied that Medline has done so here. Among other things, Medline alleges that the GTA subcontract required GTA to perform all work in accordance with the Purchase and Sale Agreement, of which Medline was the beneficiary. (Am. Countercl. ¶ 154). In addition, GTA was required under its contract to certify to Medline that its work met "the 'maximum design criteria' identified in Exhibit C to the Purchase and Sale Agreement." (Id. ¶ 15). The Court finds this is sufficient at the pleading stage to determine that Medline adequately alleges that it was a third-party beneficiary of GTA's contract with York. Accordingly, the Court will deny GTA and MRA's motion to dismiss Medline's breach of express warranty claim against GTA (Count Twelve).

### iii.   Allan Myers

Allen Myers argues that Medline's breach of express warranty, breach of implied warranty, and breach of contract claims against it should be dismissed because it did not contract with Medline and Medline is not a third-party beneficiary of Allan Myers' contract

with Gray. At bottom, the Court is unpersuaded and will deny Allan Myers' motion to dismiss Medline's claim of breach of express warranty.

As set forth above, Medline must allege that it "clearly appear[ed]" that Gray and Allan Myers intended to recognize it as the "primary party in interest" to the contract. See Marlboro Shirt, 77 A.2d at 777. Medline advances substantial evidence that it was the primary party in interest of the Allan Myers subcontract, including that the contract specifically identifies Medline as the "Owner" of the project; that Allan Myers agreed in the contract to "complete the Site Work for the Medline Distribution Center"; that Allan Myers was bound by "the conditions of the Contract Documents between Owner and Gray"; that Allan Myers assumed "all the obligations and responsibilities which Gray, by those documents, assumes toward the Owner"; and that Allan Myers specifically warranted to Medline that the materials and equipment it furnished would be of good quality, that its work would be performed in a "good, workmanlike manner" and "be free from defects," and that Allan Myers would indemnify Medline "from and against all claims, damages, losses and expenses . . . arising out of or resulting from" its work. (Am. Countercl. ¶ 206). Moreover, as Allan Myers itself conceded, "the project name is described as 'Medline' on three occasions." (Allan Myers Mot. at 10).

These allegations are more than sufficient to state that Medline was a third-party beneficiary of Allan Myers' contract with Gray. Accordingly, the Court will deny Allan Myers' motion to dismiss Medline's breach of express warranty claim (Count Twenty).

### 3.     Breach of Implied Warranty of Fitness for Intended Purpose[12]

Medline alleges that York breached the implied warranty of fitness for intended purpose "because, due to the defects and failings in the Pad Ready Work and the Post-Closing Work, as identified herein, the Work is not fit for its intended purpose," and that it "further breached the implied warranty of fitness for intended purpose by failing to correct said defects and failings and the resulting damages." (Am. Countercl. ¶ 147). Under Maryland law, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose." Md. Code Ann., Com. Law ["CL"] § 2-315(1).

Critically, however, the implied warranty of fitness for intended purpose applies to sales of goods, not services. See id. § 2-102 ("Unless the context otherwise requires, this title applies to transactions in goods[.]"). Medline spends several paragraphs explaining that the claim of breach of implied warranty of fitness for intended purpose can apply to hybrid claims, i.e., sales of goods and services, provided that the goods are the "predominant factor" in the transaction. (Medline-York Opp'n at 24–26). Medline further

---

[12] The only argument GTA and Allan Myers advance with respect to the claims against them for breach of express warranty, breach of implied warranty of fitness for intended purpose, and breach of contract is that Medline lacked privity because it was not a third-party beneficiary of their subcontracts. Because the Court has concluded that Medline has adequately pleaded third-party beneficiary status, the Court will deny GTA's and Allan Myers' motion to dismiss Medline claims against them for breach of implied warranty of fitness for intended purpose (Counts Thirteen & Seventeen, respectively).

argues that determining whether a claim is viable under the predominant factor test is a "question of fact." Medline has failed entirely, however, to allege that York provided goods to Medline. In the absence of such allegations, its claim cannot survive. See Coakley & Williams, Inc. v. Shatterproof Glass Corp., 706 F.2d 456, 459 (4th Cir. 1983) ("[U]nless there has been a buyer of goods, the U.C.C. warranties of merchantability and fitness for a particular purpose do not apply."); see also Sheeskin v. Giant Food, Inc., 318 A.2d 874, 881 n.2 (Md.Ct.Spec.App. 1974) (finding that implied warranties do not apply to "transactions in which title to real property passes for a price" because they "do not involve movable things"), aff'd sub nom., Giant Food, Inc. v. Washington Coca-Cola Bottling Co., 332 A.2d 1 (Md. 1975); White v. Peabody Construction Co., Inc., 434 N.E.2d 1015 (Mass. 1982) (finding that a contract for the construction of a housing project was one for services so that there was no warranty implied under the U.C.C. as to the windows or frames).

Here, Medline repeatedly frames its claim that York breached its implied warranty of fitness for intended purpose around York's failures to properly complete the "Pad Ready Work" and the "Post-Closing Work," i.e., services. (See Am. Countercl. ¶¶ 143–47 (emphasis added)). Nowhere in the Amended Counterclaims or, indeed, its Opposition to York's Motion to Dismiss does Medline attempt to describe the movable goods that were purportedly the "predominant factor" in its transaction with York. Accordingly, the Court will dismiss Medline's claim against York for breach of implied warranty of fitness for intended purpose (Count Nine).

####     4.       Breach of Contract

York has not moved to dismiss Medline's breach of contract claim, except on the basis that Medline's claims against it should be severed entirely, which this Court declines to do. Similarly, as set forth above, the only argument GTA and Allan Myers advance with respect to the claims against them for breach of express warranty, breach of implied warranty of fitness for intended purpose, and breach of contract is that Medline lacked privity because it was not a third-party beneficiary of their subcontracts—an argument this Court rejects. Thus, there are no surviving arguments from Counterclaim Defendants to dismiss Medline's claims for breach of contract. Accordingly, to the extent such parties have moved to dismiss Medline's claims for breach of contract, the Court denies York, GTA, and Allan Myers' motions to dismiss Medline's claims for breach of contract (Counts Six, Ten, & Eighteen).

####     5.       Petition to Establish and Enforce Mechanic's Lien

Allan Myers filed a Verified Petition to Establish and Enforce Mechanic's Lien on May 19, 2020. (ECF No. 80). Medline filed its Opposition on June 8, 2020. (ECF No. 83). Before making a determination regarding the Petition, the Court requests that Medline submit supplemental briefing within fifteen days of this Order setting forth the specific deficiencies it has identified in Allan Myers' Petition and the applicable procedures for disposing of the Petition. See Md. Code Ann., Real Prop. § 9-106(a). The Court will grant Allen Myers seven days to submit a reply to Medline's supplemental brief.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Medline's Motion to Join Counterclaim Defendants York, GTA, MRA, Allan Myers, and Schuster (ECF No. 53); deny Counterclaim Defendants GTA and MRA's Omnibus Response to Medline's February 26, 2020 Filings, and Motion To Dismiss Amended Pleading (ECF No. 69); deny Counterclaim Defendant Allan Myers' Motion to Dismiss the Counterclaim and Opposition To Medline's Motion For Joinder (ECF No. 72); deny as moot Counterclaim Defendant Schuster's Motion to Dismiss First Amended Counterclaims or, in the Alternative, Motion For Summary Judgment (ECF No. 73); and grant in part and deny in part Counterclaim Defendant York's Motion To Dismiss, or, in the Alternative, Sever, Medline's Amended Counterclaims Against York (ECF No. 85). A separate Order follows.

Entered this 30th day of September, 2020.

_____/s/_____
George L. Russell, III
United States District Judge