## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **GRAY CONSTRUCTION, INC.** | * | |
| | * | |
| **Plaintiff** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **MEDLINE INDUSTRIES, INC.** | * | |
| | * | |
| **Defendant** | * | **Civil Case No.: SAG-19-03405** |

---

|  |  |
|---|---|
| **MEDLINE INDUSTRIES, INC.** | * |
| | * |
| **Third-Party Plaintiff** | * |
| | * |
| **v.** | * |
| | * |
| **YORK BUILDING PRODUCTS CO., INC.,** | * |
| *et al.* | * |
| **Third-Party Defendants** | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

This case arises from a dispute between Medline Industries, Inc. ("Medline"), the entity who sold Medline a property, York Building Products Co, Inc. ("York"), and various contractors and subcontractors, seeking to apportion costs relating to a failed retaining wall.  Gray Construction, Inc. ("Gray"), a contractor hired by Medline to construct a distribution facility, sued Medline for breach of contract to recover payment owed.  ECF 1.  Medline filed counterclaims against Gray, along with third-party claims against Gray's subcontractors, Allan Myers, L.P. ("Allan Myers") and DGS Construction, LLC T/A Schuster Concrete Construction ("Schuster"), York, and York's subcontractors, Morris & Ritchie Associates, Inc. ("MRA") and

Geo-Technology Associates, Inc. ("GTA").  ECF 51.  York also filed a third-party counterclaim against Medline.  ECF 106.

Now pending before this Court are three motions in limine filed by certain third-party defendants seeking to exclude the expert testimony of Medline's expert witness, Justin M. Protasiewicz.[1]  *See* ECF 196 (York); ECF 198 (GTA and MRA); ECF 204 (Allan Myers). Medline has responded to each motion.  *See* ECF 254, 215, 231, *respectively*.  Each moving third-party defendant has replied.  *See* ECF 260, 258, 263, *respectively*.  Medline has also moved for leave to file a surreply to Allan Myers's reply, ECF 267, and Allan Myers has opposed, ECF 272. This Court has reviewed the filings and finds that no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2021).  For the reasons explained below, the third-party defendants' motions to exclude will be DENIED in part and GRANTED in part, and Medline's motion for leave will be DENIED.

I.    **BACKGROUND**

Medline is a privately held manufacturer and distributor of medical supplies, operating more than forty distribution centers in North America.  On September 1, 2017, Medline purchased from York a 128.5-acre property in Cecil County, Maryland for the purpose of constructing a medical distribution facility.  ECF 196-3.  The Purchase and Sale Agreement required York to complete certain on-site work.  *Id.* at 11.  As later amended, this work included the design and construction of a retaining wall, mass grading, and installation of erosion and sediment controls. ECF 196-4 at 9–11.  Medline and York agreed that the retaining wall would be constructed in accordance with a geotechnical report drafted by GTA.  *Id.* at 9; *see also* ECF 196-8.  York brought in a subcontractor, MRA, to provide site civil engineering services, such as preparing and revising

---

[1] Several motions for full or partial summary judgment are also pending, along with some related motions seeking to file surreplies.  Those motions will be addressed separately.

the Major Site Plan and the Erosion & Sediment Control/Stormwater Management Plans.  ECF 216-3; ECF 216-4.

On February 22, 2018, Medline entered into a separate agreement with Gray to design and construct the distribution facility.  ECF 196-5.  To assist with its work, Gray brought in a subcontractor, Allan Myers, to, *inter alia*, provide and install the asphalt pavement and stormwater conveyance system.  ECF 196-6 at 37–39.

York completed construction of the retaining wall around October/November 2017.  ECF 201-18 at 4.  Approximately one month after the wall's construction, GTA observed cracks in it. *Id.* at 3.  GTA conducted an initial investigation of the wall's cracking and issued a report of its findings on December 14, 2018.  ECF 201-21.  GTA determined that the retaining wall failed because of hydrostatic (*i.e.*, water) pressure behind the wall.  ECF 201-21 at 7 ("It is our opinion that the wall movement has occurred due to an increase in hydrostatic pressure behind the 50-foot-deep reinforced zone, an increase in mass of the retained soil and a reduction of the shear strength due to the presence of water.").

Medline, through legal counsel, retained an independent engineering firm, SESI, to investigate the failure of the retaining wall and to make recommendations about remediation.  ECF 232-5.  SESI reviewed documents related to the construction project and performed site walk-throughs on January 9, 2019 and February 2, 2019.  ECF 232-6 at 8, 13.  SESI produced a preliminary report on March 13, 2019, documenting its observations and conclusions.  ECF 232-6 ("Preliminary Report").  In SESI's opinion, the wall failed due to a combination of factors including the buildup of hydrostatic pressure behind the wall.  ECF 232-6 at 3.  SESI recommended removal and reconstruction of the wall.  *Id.* at 34.

Medline followed SESI's recommendation and SESI performed a forensic deconstruction of the wall in the spring of 2019.  ECF 201-22.  During this deconstruction, SESI documented its observations and provided its findings and conclusions in various reports: a May 15, 2019 report regarding the stormwater conveyance piping and structure, ECF  202-5 ("Stormwater Report"); a July 31, 2019 report summarizing its pavement evaluation, ECF 17-8 ("Pavement Report"); and an August 1, 2019 report of its global evaluations, ECF 201-23 ("Global Evaluation Report"). More than two years later, SESI issued a Supplemental Global Evaluation Report.  ECF 202-1 ("Supplemental Global Evaluation Report").  Mr. Protasiewicz served as the principal engineer and lead author of each report.

During the deconstruction of the retaining wall, SESI uncovered a stormwater conveyance pipe that served to transport water from behind the retaining wall to a drainage basin in the southwest corner of the property.  ECF 201-23 at 48–52.  Based on its observations of the pipe, SESI concluded that the "stormwater runoff . . . was infiltrating into the bedding stone under the stormwater pipes via leaks in the pipes and structures, and from lateral infiltration of water from the bioretention basin."  *Id.* at 52.  SESI also observed the permeable nature of the asphalt installed by Allan Myers and sent samples of the asphalt off for testing by a third-party laboratory.  ECF 17-8 at 3.

Based on these and other findings, in its Supplemental Global Evaluation Report, SESI enumerated numerous alleged failings of the third-party and counterclaim Defendants that were a "direct and substantial cause of the failure of the retaining wall."  ECF 202-1 at 71–77, 77.  SESI further concluded that the work of MRA, Allan Myers, York, and GTA was defective and "not performed with a reasonable degree of care, skill and ability which is normally employed by

contractors in their industry and location." *Id.* at 70, 76, 77.  MRA, Allan Myers, York, and GTA now challenge the reliability of these conclusions and seek to exclude them from consideration.

## II.   LEGAL STANDARDS

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony.  A qualified expert may give testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In essence, the trial court must ensure the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  In *Daubert*, the Supreme Court provides five non-exhaustive factors a court may weigh in making this assessment: (1) "whether a theory or technique ... can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the technique's operation," and (5) whether the technique or theory has gained "general acceptance."  509 U.S. at 592–94; *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 452 (4th Cir. 2010).  However, ultimately, the inquiry is "a flexible one" and relevant factors can vary with the needs of each case.  *Daubert*, 509 U.S. at 594.

For the proffered evidence to be sufficiently reliable it "must be derived using scientific or other valid methods" and not based on mere "belief or speculation." *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (first quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); then quoting *Bryte ex rel. Bryte v. Am.*

*Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005)). The court's analysis focuses on experts' methods, not their conclusions, but an expert opinion that relies on "assumptions which are speculative and not supported by the record," is inadmissible. *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

For the proffered opinion to be relevant, it "must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Casey*, 823 F. Supp. 2d at 340 (quoting *Daubert*, 509 U.S. at 591).  Expert testimony "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Anderson v. Home Depot U.S.A., Inc.*, No. 2615, 2017 WL 2189508, at *4 (D. Md. May 16, 2017) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)).

The proponent of the expert testimony bears the burden of establishing admissibility, or "coming forward with evidence from which the trial court could determine that the evidence is admissible under *Daubert*." *Anderson*, 2017 WL 2189508, at *3 (quoting *Main St. Am. Grp. v. Sears, Roebuck, & Co.*, No. CIV 08-3292, 2010 WL 956178, at *3 (D. Md. Mar. 11, 2010)); *see also Casey*, 823 F. Supp. 2d at 340; *Daubert*, 509 U.S. at 592 n.10 (explaining admissibility must be established by a "preponderance of proof").

In determining the admissibility of expert testimony, the court considers two "guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).  On the one hand, Rule 702 was "intended to liberalize the introduction of relevant expert

evidence," and the court need not ensure the expert's proposed testimony is "irrefutable or certainly correct." *Id.* (explaining that admissible expert testimony can still be vigorously tested before the jury by "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" (citing *Daubert*, 509 U.S. at 596)).  On the other hand, "due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'"  *Id.* (quoting *Daubert*, 509 U.S. at 595).  The court must determine whether the disputed expert testimony "has greater potential to mislead than to enlighten."  *Id.*  If so, the testimony should be excluded.  *Id.*; *see also Casey*, 823 F. Supp. 2d at 340 (noting such testimony would be barred by Federal Rule of Evidence 403).

## III.  DISCUSSION

### A.  York's Motion to Exclude

York presents two key arguments in its motion to exclude the expert testimony of Mr. Protasiewicz.  First, York argues that Mr. Protasiewicz fails to testify or present evidence regarding York's liability for the wall failure.  ECF 196-1 at 6; ECF 260 at 4.   Although York packages this argument as one of relevancy, ECF 260 at 4, this argument is in fact appropriate for a motion for summary judgment, not a motion to exclude expert testimony.  Typically, to determine relevancy, the court will determine whether the expert evidence would assist a fact finder to resolve a factual dispute.  *See Casey*, 823 F. Supp. 2d at 340.  York does not argue that Mr. Protasiewicz's opinions and evidence are irrelevant under this legal standard.  Rather, York focuses on the absence of specific opinions and evidence, and argues that their absence somehow makes the proffered evidence irrelevant because Medline cannot prove its case.  ECF 260 at 3–4.  Again, a lack of sufficient evidence to support a claim is determinative in a motion for summary judgment, not a motion to exclude expert testimony.   In its reply, York critiques Medline's Opposition for

including analysis copy-and-pasted from its response to York's Motion for Partial Summary Judgment. ECF 260 at 3. Given York's summary-judgment-style argument, however, such a response by Medline is unsurprising.

Second, York argues that Mr. Protasiewicz's opinions are "speculative" and therefore inadmissible. ECF 196-1 at 7 ("expert opinion testimony must be excluded when it is based upon mere 'belief or speculation'" (citing *Casey*, 823 F. Supp. 2d at 340)). To support this argument, York relies on a portion of Mr. Protasiewicz's deposition where he notes that it would be "speculation" to guess the historic soil and hydrostatic conditions surrounding the retaining wall:

> Q:   Okay. So my question to you is if that evaluation had been performed as you believe it should have been, you cannot opine to a reasonable degree of engineering certainty that that would have disclosed a concerning level of hydrostatic pressure in the retained soils in December of 2017, correct?
>
> A:   If the movement in the wall had been monitored appropriate and it was – the movement was manifesting at a significant rate, that would have been cause for concern. There could have been an investigation completed into what was the reason for the movement occurring. But this is – this was speculation as to whether or not the outward movement from the buildup of hydrostatic pressure was starting to manifest at that point or if this settlement – or the cracking was a result of settlement that was occurring from the soils that were present below the wall.
>
> Q:   Right. And my simple questions to you is since it's speculation, you cannot opine to a reasonable degree of engineering certainty that the assessment you say should have occurred would have disclosed hydrostatic pressure of a concerning level, correct?
>
> A:   Yeah, as indicated, it would be speculation what could have been present at that time. There would have had to have been formal investigation to determine what the conditions were. But nonetheless there should have been a formalized program for monitoring to determine it if was a concern.

ECF 196-15 at 405:4–406:8 (objections omitted).

As explained, York completed construction of the wall around October/November 2017. ECF 201-18 at 32:15–21. York's subcontractor observed cracking in the wall approximately a month later. *Id.* at 31:8–11. Medline retained SESI in January 2019, and SESI first completed a

site investigation in January 2019. ECF 255-13; ECF 255-14 at 8. For this reason, Mr. Protasiewicz explained that he could not possibly know, *i.e.*, "it would be speculation," to guess the cause of the wall's initial cracking because he did not personally observe or investigate the wall in 2017.

York argues that this portion of his deposition demonstrates that Mr. Protasiewicz's opinions are speculative and therefore inadmissible. However, York mischaracterizes Mr. Protasiewicz's testimony. In this part of the deposition, Mr. Protasiewicz does not concede that his opinions are speculative. Rather, he is refusing to provide an answer to a deposition question that *would be* speculative. Mr. Protasiewicz refuses to guess at the initial cause of the cracking in 2017 because he had no personal observations or historic reports of the wall to review. If anything, Mr. Protasiewicz's refusal to draw a conclusion without knowing underlying facts strengthens his general credibility.

In sum, York does not present argument to warrant the exclusion of Mr. Protasiewicz's expert testimony.

### B. MRA and GTA's Motion to Exclude

In a joint motion, MRA and GTA primarily attack Mr. Protasiewicz's credentials as a relevant expert. They argue that he does not possess the requisite technical background to testify about the standard of care for either MRA—a site civil engineering firm, or GTA—a geotechnical engineering firm. They emphasize the discrepancy between his engineering background and that of MRA, critique his methods, and highlight inconsistencies in the calculations he employed. Finally, MRA and GTA identify testimony Mr. Protasiewicz failed to include, such as a review of the contractor and subcontractor agreements and an analysis of the resulting damages incurred by Medline. They argue that his testimony is therefore irrelevant or insufficiently grounded in facts.

These latter arguments, like York's arguments discussed above, challenge the legal sufficiency of Medline's claims and are more appropriate for resolution in the parties' motions for summary judgment.  This Court addresses MRA's and GTA's remaining arguments below.

### i.   Standard of Care for a Site Civil Engineer

MRA asserts that Mr. Protasiewicz is a geotechnical engineer—not a site civil engineer—and therefore he cannot testify as to the relevant standard of care for MRA, a site civil engineering firm.  Medline counters that even if Mr. Protasiewicz is not a site civil engineer, he is the lead author of the SESI reports, which include the findings and conclusions of other experts, such as site civil engineers.

Indeed, "[c]ourts in this circuit and across the country have consistently held that an expert may rely on the work of others when preparing an expert report, particularly when it is the sort of work that is reasonably relied upon by experts in the relevant area of expertise." *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, 858 F. Supp. 2d 505, 512 (D. Md. 2012) (citing *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612–13 (7th Cir.2002)). Thus, "it is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert; and it is apparent from the wording of Rule 703 that there is no general requirement that the other expert testify as well." 285 F.3d at 613.  For example, a physician may rely on a radiologist's reading of an x-ray when providing her expert testimony as a physician, even if she herself could not interpret the x-ray.  *See id.* (citing the Committee Notes to the 1972 Proposed Rule 703).  However, the physician may not become the radiologist's spokesperson, testify as a radiology expert, or vouch for the truth of what the radiologist reported. *Cf. id.* (citing *Matter of James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992)).

In this case, Mr. Protasiewicz was the lead engineer at SESI working on the Medline construction project when he authored the SESI reports.  ECF 215 at 20.  He is not the only individual who worked on those reports.  As he explains, "[t]here is no way SESI's work on this project could have been completed by a single individual."  ECF 219-3 (Decl. Justin Protasiewicz) at 5.  As a result, he worked with a team of experts to compile the reports and relied on a site civil engineer, Anthony Castillo, to evaluate the performance of MRA as a site civil engineer.  *Id.*; *see also* ECF 196-15 44:9 – 45:1 (describing how Mr. Castillo assisted with the site civil evaluations in the report).  To determine whether Mr. Protasiewicz may now testify about Mr. Castillo's evaluations regarding the standard of care for a site civil engineering firm, the critical question is whether Mr. Castillo's evaluations are "the sort of work that is reasonably relied upon by" geotechnical engineering experts such as Mr. Protasiewicz, or whether he is merely vouching for the truth of Mr. Castillo's conclusions.  858 F. Supp. 2d at 512.  To answer this, we look to Mr. Protasiewicz's technical qualifications and experience.

Mr. Protasiewicz graduated from Fairleigh Dickinson University with a Bachelor of Science Degree in Engineering in 2010.  ECF 219-3 at 2.  He has worked as a full-time employee at SESI since 2008.  *Id.*  He obtained his New Jersey engineering license in 2016 and became a partner at SESI in 2017.  He subsequently obtained his Maryland engineering license in 2019.  ECF 196-14 at 286:3.  In sum, he has over 18 years of experience in the construction industry and 13 years of engineering experience.  ECF 219-3 at 3.

Mr. Protasiewicz has a considerable geotechnical engineering[2] background.   In his declaration, he describes his relevant geotechnical experience, including conducting "hundreds of geotechnical evaluations, investigations," and designs, using geotechnical instruments, providing field observations, and managing geotechnical projects directly.   *Id.*   Mr. Protasiewicz also has significant experience relating to the construction of retaining walls.   He has observed and designed the construction of dozens of retaining walls as part of a team.   *Id.*   And he has used software programs to analyze global stability, seepage, and other aspects of retaining wall design. *Id.* at 4.

Mr. Protasiewicz, however, is not a site civil engineer.[3]   ECF 196-14 (Decl. Protasiewicz) at 158:1–11 ("Q: Would you hold yourself out to the public as a site civil engineer?"   "A: I wouldn't – no, I mean, I do from time-to-time take on site civil items, but I don't practice it regularly.").   Although he has worked with site civil engineers on projects at SESI, *id.*, he would not hold himself out as a site civil engineer and has not engaged in the type of work performed by MRA in this case.   *See* ECF 196-15 at 218 ("Q: In your career have you ever been responsible for signing and sealing an erosion and sediment control plan similar to the erosion and sediment control plan developed by MRA for the property?"   "A: No, not that I'm aware of.").

---

[2] Geotechnical engineering is a sub-discipline of civil engineering and is the "application of the sciences of soil mechanics and rock mechanics, engineering geology and other related disciplines to civil engineering construction."   *Geotechnical Engineering*, SCI. DIRECT (2022), https://www.sciencedirect.com/topics/earth-and-planetary-sciences/geotechnical-engineering (citing D.P. Giles, ENCYCLOPEDIA OF GEOLOGY (2005)).

[3] As described by MRA, "The fundamental element in quality site engineering is proper site grading. It provides the most efficient use of the site, creates building lots that drain properly, balances earthwork quantities so costs are minimized and optimizes the design of efficient road, sewer, and storm drain systems."   *Site Engineering*, MORRIS & RITCHIE ASSOCIATES, INC. (2022), https://mragta.com/home-page/civil-site-utility-engineering/site-engineering/.

Thus, his partners, not Mr. Protasiewicz, appear to have completed the site civil portion of the SESI reports, such as analyzing whether MRA satisfied their requisite standard of care as site civil engineers.  *See* ECF 219-3 at 5 ("Although I authored and signed the [SESI Reports], I was assisted by multiple team members in collecting data, investigation, research, reviewing relevant data, analysis, preparing designs and preparing and drafting these reports."); *Id.* at 6 ("Castillo was integral in the evaluations we completed for the stormwater management system.").  When asked about the site-civil-specific conclusions in the SESI report, Mr. Protasiewicz acknowledges that they are the conclusions of his partner, Mr. Castillo, who is a site civil engineer.  ECF 196-15 at 44:4–16 ("…[T]here are specific instances in which the standard of care was not upheld in our opinion." "Q: Okay. When you say our opinion, who are you referring to?" "A: Myself, my partners who assisted with the evaluations that I completed."  "Q: Who are the partners assisted with the evaluation on whose behalf you're testifying today?" "A: As it related to site civil, my partner Tony Castillo assisted with the evaluations.").

Mr. Protasiewicz also appears unfamiliar with the software and calculations used by Mr. Castillo, his site civil engineer partner.  *See* ECF 195-15 at 218:20–219:17 ("Q: Do you know the names of the software that you believe that site civil engineers utilize for the purposes of running calculations for the purposes of sizing micro bioretention facilities and other stormwater management facilities?"  "A: I believe I answered this earlier, and I indicated that I was not aware of the software that's specifically utilized for those items which is why I worked with my partner who is a site civil designer to evaluate these systems.").

Thus, Mr. Protasiewicz himself is not qualified to give expert testimony on the standard of care expected by a site civil engineering firm, such as MRA, because this is beyond his own personal expertise as a geotechnical engineer.  Although his work as a geotechnical engineer has

crossed paths with site civil engineers, none of Mr. Protasiewicz's experience involves analyzing the standard of care of a site civil engineer, as he is attempting to do here.  His case is distinct from the physician-radiologist example because Mr. Protasiewicz's expertise does not require analysis of the standard of care of site civil engineers.  Here, he is the merely the lead engineer who compiled a collection of expert testimonies, but this compilation does not authorize him to report on the truth of his partners' expert conclusions. And his inability to answer substantive questions about the site civil evaluations performed make him an inappropriate expert witness on these issues.

For this reason, Mr. Protasiewicz's testimony regarding the standard of care for MRA as a site civil engineer is excluded.[4]

### ii.    Standard of Care for a Geotechnical Engineer

GTA makes a similar argument as above to exclude Mr. Protasiewicz from testifying on the standard of care for GTA, a geotechnical engineering firm. As described above, however, Mr. Protasiewicz has substantial geotechnical engineering experience.  To discredit him as a viable witness, GTA points to Mr. Protasiewicz's relatively recent indoctrination as a licensed engineer and notes that he did not hold a Maryland engineering license at the time GTA completed its work on the wall in 2017.  ECF 198-1 at 11–12.  GTA also critiques Mr. Protasiewicz's methods, highlighting that his calculations differ from those presented in a well-regarded textbook in the

---

[4] This holding does not necessitate the wholesale exclusion of the SESI Reports.  As far as this Court can tell, the report is authored by a variety of experts who completed appropriate and relevant analyses within their expertise.  This holding does, however, call into question how Medline will be able to introduce the portions of those reports that are not sufficiently tied to Mr. Protasiewicz's own geotechnical expertise or analyses.

geotechnical engineering field, and finds analogous portions of his calculations that inexplicably differ from one another.  ECF 198-1 at 15–16.

To begin with Mr. Protasiewicz's licensing, the law does not require an expert to hold a Maryland license to testify as an expert witness.  Rather, the requirement is that his testimony be relevant and reliable.  If Mr. Protasiewicz did not hold an engineering license at all, this might be evidence that his testimony would not be reliable.  But the fact that he held a New Jersey engineering license during the time of the wall's construction does not undermine his reliability. For one, Mr. Protasiewicz currently holds a Maryland engineering license and was familiar with Maryland engineering fundamentals at the time of his testimony.  Second, Mr. Protasiewicz has testified to the similarity and universality of engineering standards of care across states.  ECF 196-15 at 20:14–21:1 ("I mean I believe a standard of care is something that's, you know, universal in the industry.").  Medline is welcome to refute this argument with specific examples of how New Jersey and Maryland engineering standards differ (if such examples exist), but the mere fact that Mr. Protasiewicz was licensed in a nearby state in 2017 does not necessitate the exclusion of his testimony as unreliable.

Turning to GTA's arguments regarding the discrepancies in Mr. Protasiewicz's calculations, this argument again does not sufficiently undermine his reliability as an expert.  In Mr. Protasiewicz's deposition, counsel for Medline inquired about why Mr. Protasiewicz seemingly used two different equations for two identical components of a formula.  ECF 196-15 at 299:18–301:11.  Specifically, as part of his analysis, Mr. Protasiewicz calculated the hydrostatic pressure the wall could withstand before experiencing a sliding failure.  Without explanation, Mr. Protasiewicz used two different sub-formulas to calculate the same type of driving force.  *See* ECF 198-7 at 4; ECF 196-15 at 306:11–15 (acknowledging the difference without explanation).

Mr. Protasiewicz could not at the time, and Medline has not since, provided an explanation for this difference.  *See* ECF 196-15 at 306–18.

Further, Mr. Protasiewicz's equation differs from the equation provided by a standard textbook in the geotechnical engineering field to calculate the same force.  Mr. Protasiewicz was unable to provide an explanation at the time of his deposition because he needed time to review the equation that he has utilized two years prior.  ECF 196-15 at 313:3–9.  Medline has not provided any additional explanation of this equation discrepancy in its briefing.  Mr. Protasiewicz explained that there is more than one accepted approach to calculating geotechnical forces, and that he predominantly relied on his field observations, not his calculations, to conclude that the wall experienced a sliding failure.  *Id.* at 319:5–13.

Experts may rely on their own observations as the basis of their conclusions.  *Cf. Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (permitting an expert to draw conclusions through "a set of observations based on extensive and specialized experience.").  Thus, despite the evidence potentially undermining Mr. Protasiewicz's calculations, his expert conclusions regarding the failure of the wall are nonetheless "derived using scientific or other valid methods" rather than his mere "belief or speculation."  *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011).

For these reasons, Mr. Protasiewicz is qualified to present testimony on matters within his expertise, such as the standard of care expected for a geotechnical engineering firm and the mode of failure of the retaining wall.

### C.  Allan Myer's Motion to Exclude

SESI's Supplemental Global Evaluation Report implicates Allan Myers in the failure of the retaining wall by attributing the increased hydrostatic pressure to the allegedly defective

stormwater conveyance system, and alleges that Allan Myers improperly compacted and mixed the asphalt it installed. ECF 202-1 at 76, 86. Allan Myers asserts that Mr. Protasiewicz's testimony should be excluded because (1) he lacks expertise in these areas of engineering and construction, (2) his methods for determining the permeability of the pavement were unreliable, and (3) his conclusions regarding the stormwater system lack factual basis. Allan Myers also argues that he failed to present sufficient facts and data to support his conclusions, and that there is no contractual standard against which he could judge Allan Myers's performance. These latter legal sufficiency arguments are again best reserved for the motion for summary judgment. This Court addresses the other arguments in turn.

### i.    Lack of Expertise – Asphalt

In its Pavement Report, SESI initially assessed the appropriateness of the asphalt mix used in construction of the parking pad, reporting: "The asphalt mix that was produced by the plant on the days that the Site was being paved contained an improper proportion of components, such as binder, that produced a higher void ratio in the material." ECF 17-8 at 6. The report also concluded that "[t]he pavement was not compacted properly, thus resulting in excessive voids." *Id.* In its Supplemental Global Evaluation Report, SESI re-summarized its conclusions:

> [T]he installation of the defective, permeable pavement at the Site was the result of the following contributory factors:
> 
> …
> 
> 2.  High void ratios/porosity have been documented in the pavement. This is the result of the improper and unspecified mix design, improper placement procedures, improper compaction, or a combination of these items.
> 
> …
> 
> 5.  Proper compaction was not achieved by Gray/Allan Myers for the pavement at the Site based on laboratory testing as compared to the available maximum theoretical data.

ECF 202-1 at 86.

Mr. Protasiewicz was the principal author of these reports and was deposed on these conclusions.  Allan Myers argues that Mr. Protasiewicz is not qualified to opine on whether Allan Myers used an appropriate asphalt mix or whether it properly compacted the asphalt.  It argues he is unqualified because he has never designed an asphalt mix; rather, he has only reviewed asphalt mixes to ensure the appropriate aggregate (*i.e.*, rock) size and has merely observed the construction of asphalt throughout his career.  ECF 204-1 at 29; ECF196-15 at 466:15–467:21.

Medline counters that these observations and experience in analyzing asphalt as a geotechnical engineer are sufficient to render Mr. Protasiewicz qualified to testify on the subject. ECF 231 at 28–29.  Medline further notes that Mr. Protasiewicz has "designed asphalt for projects of this magnitude."  ECF196-15 at 467:7–8.  However, in his deposition, Mr. Protasiewicz clarifies that he has not personally designed the mixes of asphalt for such projects, but rather, he has specified the aggregate size to use in mix designs.  *Id.* at 467:17–21.  Indeed, he further explains that the actual construction of asphalt mixes "is a whole other field of study."  *Id.* at 468:4–6.  From this, it appears that Mr. Protasiewicz's geotechnical engineering background has provided him sufficient knowledge to judge the appropriate size of aggregate used in asphalt, but that he does not have personal work experience, education, or knowledge regarding the appropriate design and construction of asphalt mixes.

When first asked about these conclusions in the reports, Mr. Protasiewicz suggested that his conclusions were only limited to critiques of the asphalt's aggregate size.  ECF 196-15 at

469:5–12.[5]   When presented with the Pavement Report's other conclusions, however, he acknowledged that the report's findings were based on an independent lab's testing and findings. *Id.* at 470: 6–9 ("Q: Is that your opinion?" "A: Well, based on the lab testing that was completed, there were high void ratios in the material.").  Further, he relied on the laboratory to provide the best methodology for evaluating asphalt cores' permeability, ECF 196-15 at 496:7– 497:17, and had not personally investigated or studied the available standards, *id.* at 499:18–500:1.  Although an expert may properly rely on third-party laboratories to perform materials testing "if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject," it is not clear that Mr. Protasiewicz's skillset as a geotechnical engineer includes analyzing laboratory results regarding the permeability of asphalt mixes.

Medline acknowledges that Mr. Protasiewicz lacks first-hand experience in designing asphalt mixes.  ECF 231 at 34.  Medline argues, though, that a lack of first-hand experience is not a basis to exclude but rather only goes to the weight of the expert's testimony.  *Id.* at 33–34.  The cases Medline cites for this proposition, however, are distinguishable.  In those cited cases, the expert did not have direct experience in the specific task at issue, but was nonetheless an expert in that specific field with extensive related knowledge and experience.  *See, e.g.*, *Martin v. Fleissner GmbH*, 741 F.2d 61, 64 (4th Cir. 1984) (noting that the experts did not have direct experience with

---

[5] Medline has filed a motion seeking to file a surreply to reiterate an argument regarding the improper size of the aggregate Allan Myers used.  ECF 267.  Surreplies may be appropriate when the party seeking to file a surreply "would be unable to contest matters presented to the court for the first time in the opposing party's reply."  *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003).  Courts may deny leave to file a surreply, however, where a party "seek[s] merely to re-open briefing on issues" already raised.  *Interphase Garment Solutions, LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 467 (D. Md. 2008).  Here, the argument about aggregate size has been made elsewhere and is irrelevant to the present motion, which seeks to exclude Mr. Protasiewicz's conclusions about the asphalt's mix and compaction, not aggregate size. Accordingly, the motion for leave to file a surreply will be denied.

crimping, but "were knowledgeable in the pertinent areas of engineering design and familiar with the processes used by a crimper"); *see also Adams v. NVR Homes, Inc.*, 141 F. Supp. 2d 554, 567 (D. Md. 2001) (noting the expert had never before analyzed the stigma arising from environmental contamination but the court was "satisfied that the opinion in question [was] grounded upon 'a reliable basis in the knowledge and experience in the discipline.'" (internal quotations omitted)).

In short, although an expert need not have first-hand experience of the specific task at issue, the expert still must be knowledgeable in the relevant field. Here, Mr. Protasiewicz does not point to any expertise in the construction of asphalt, aside from his limited role in analyzing the size of asphalt aggregate. As above, one expert may reasonably rely on the findings of another expert to draw his or her own conclusions if doing so is commonplace in the first expert's practice. Here, however, Mr. Protasiewicz is simply reporting the conclusions of the laboratory and other academic studies as truthful without his own expertise and technical knowledge coming into play.

From Mr. Protasiewicz's own account, his primary role in the analysis of the permeability of the asphalt was supervisory. *Id.* at 475:10–477:16. To prepare the reports, he states that he researched asphalt permeability, read the studies mentioned in the reports, reviewed all documents provided to him regarding the asphalt construction, and studied the reported process of asphalt construction in this case. *Id.* at 477:8–16. Although these actions might make him familiar with the facts of the case and familiar with the findings of the laboratory, none of these actions qualify him to conclude or testify that the asphalt used by Allan Myers had an impermissibly high void ratio, or that it was improperly compacted.

### ii. Unreliability of Methods – Asphalt

Although Mr. Protasiewicz cannot personally testify to the Pavement Report's conclusions regarding the suitability of the asphalt's mix ratio or its compaction, this does not automatically

invalidate the SESI report's underlying conclusions.  Allan Myers attempts to challenge the methods used by SESI, challenging the use of the "O-Ring Test," questioning SESI's sample collection procedures, and faulting the standards applied by the third-party laboratory.  ECF 204-1 at 14–25.  In turn, Medline cites standards used by the Maryland Department of Transportation, miscellaneous academic studies, and corroborating field observations to back its conclusions.  ECF 231 at 19–20; 24–27.

Medline asserts that the correct method is a question of fact and is not appropriate on a motion to exclude.  ECF 231 at 21.  It argues that the questioning of SESI's methods goes to the weight of the credibility of its reports, not its admissibility.  *Id.*  However, this argument misunderstands the role of the Court.  "While district courts have 'broad discretion' in analyzing reliability, 'such discretion does not include the decision "to abandon the gatekeeping function."' . . . Thus, a district court abuses its discretion if it fails to ensure that a proffered expert opinion is 'sufficiently relevant and reliable when it is submitted to the jury.'" *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 282 (4th Cir. 2021) (internal quotations omitted).

First, the parties dispute whether SESI's methods of analyzing the asphalt's design and construction were reliable.  Allan Myers points to the ad hoc and allegedly unprofessional nature of SESI's "O-Ring" test.[6]  ECF 204-1 at 14.  Medline counters that this test was not the basis of SESI's conclusions.  ECF 231 at 24.  Instead, this test merely provided field observations that confirmed further laboratory investigations would be necessary.  *Id.* at 26.  Given that the "O-Ring" test does not provide the basis of Mr. Protasiewicz's conclusions regarding the permeability

---

[6] Mr. Protasiewicz describes this test as placing an "O-ring" on the ground, placing a pipe inside the ring, and then pouring water into the pipe to observe how much and how fast water infiltrated the asphalt.  ECF 196-15 at 476:16–20.

of the asphalt, this Court need not analyze its scientific reliability.  Further, as explained above, experts may rely on their own observations as the basis of their conclusions, *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999), and the "O-Ring" test more appropriately falls into the category of field observations.

Allan Myers also takes issue with the standard applied in collecting samples and testing the permeability of the asphalt.  It argues that ASTM D5084-90, the standard used by the laboratory, was out of date and not properly applicable to asphalt.  ECF 204-1 at 22–25.  It further argues that SESI should have taken six-inch-diameter samples of the asphalt rather than three inches, and that it failed to use an industry-approved collection methodology and instead relied on a random sampling of the asphalt.  *Id.* at 21; 25–26.

Medline first explains that it had to use three-inch samples because the asphalt was not thick enough for larger samples.  ECF 231 at 28.  Medline further explains that SESI used its professional judgment in selecting the location of the asphalt samples based on the conditions of the site, and that the proposed ASTM method is not the only acceptable industry collection method. *Id.* at 27.  Finally, Medline argues that simply because ASTM D5084-90 is listed for "soil and rock" does not indicate that it is inappropriate for asphalt, and its selection by the laboratory as the appropriate standard demonstrates that it is an accepted scientific method.  *Id.* at 31.

"To determine whether an opinion of an expert witness satisfies *Daubert* scrutiny, courts may not evaluate the expert witness' conclusion itself, but only the opinion's underlying methodology." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017).  In assessing the validity of the methodology employed by a proposed expert witness, a court may consider whether the expert witness' theory or technique: (1) "can be or has been tested"; (2) "has been subjected to peer review and publication"; (3) "has a high known or potential rate of error"; and (4) is generally

accepted "within a relevant scientific community." *Id.* at 195 (citing *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)).

The methods employed by the laboratory, although perhaps not the ones preferred by Allan Myers, are indeed scientifically recognized. The laboratory employed the ASTM D5084, *Standard Test Methods for Measurement of Hydraulic Conductivity of Saturated Porous Materials Using a Flexible Wall Permeameter*. ECF 196-15 at 496:2–21. The American Society for Testing and Materials ("ASTM") is an independent standards organization, and "[w]hile lacking the legal authority of federal regulations, they provide detailed design standards which reflect systematic testing and safety certification." *Milanowicz v. The Raymond Corp.*, 148 F. Supp. 2d 525, 533 (D.N.J. 2001) (citing *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 537 (7th Cir. 2000)). As for the methods of asphalt sampling collection, the failure to abide by a non-compulsory standard does not justify exclusion of SESI's findings and conclusions.

### iii.   Stormwater system

In its Supplemental Global Evaluation Report, SESI concluded that a buildup of hydrostatic pressure caused the wall's failure and that the "failings of Gray and its subcontractor Allan Myers [causing a leaking stormwater system] were a direct and substantial cause of the failure of the retaining wall." ECF 202-1 at 76. Allan Myers argues that this conclusion is based entirely on speculation because Mr. Protasiewicz cannot account for the volume of water that leaked out of the stormwater conveyance system. ECF 204-1 at 30; ECF 196-15 340:18–341:3.

Similar to York's "speculation" argument above, Allan Myers mischaracterizes Mr. Protasiewicz's refusal to calculate a specific volume of water as indicative of his lack of knowledge. Mr. Protasiewicz refuses to provide a precise volume of water because no such measurements were available or possible. Instead, he relied on his visual observations and

23

quantitative field tests to conclude that the amount of water coming from the stormwater system significantly contributed to the problem.  ECF 196-15 344:2–6, 12–13; *see also* ECF 201-23 at 48–52 (reporting photos and observations of the stormwater conveyance system's apparent leaks during the retaining wall's deconstruction).   Thus, his conclusions are not based on mere speculation.  Allan Myers is welcome to challenge and question his methods, but experts may rely on their own observations as the basis of their conclusions.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999).   Thus, this Court will not exclude SESI's conclusion or Mr. Protasiewicz's testimony that the stormwater system significantly contributed to the hydrostatic pressure behind the retaining wall.

## IV.   CONCLUSION

For the reasons stated above, York's motion to exclude the expert testimony of Mr. Protasiewicz, ECF 196, will be DENIED;  GTA and MRA's motion to exclude, ECF 198, will be GRANTED IN PART AND DENIED IN PART; and Allan Myers's motion to exclude, ECF 204, will be GRANTED IN PART and DENIED IN PART.   Specifically, Mr. Protasiewicz's testimony regarding (1) the standard of care for MRA as a site civil engineer, (2) the suitability of the asphalt mix used, and (3) the suitability of the asphalt's compaction will be excluded as beyond the scope of his expertise.  The remainder of the motions to exclude will be denied.  Medline's motion to file a surreply, ECF 267, will also be DENIED.  A separate Order follows.


Dated: January 6, 2023                                    _____/s/_____
                                                          Stephanie A. Gallagher
                                                          United States District Judge