## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **GRAY CONSTRUCTION, INC.** | * |
| | * |
| | * |
| **Plaintiff / Counterclaim Defendant** | * |
| | * |
| **v.** | * |
| | * |
| **MEDLINE INDUSTRIES, INC.** | * |
| | * |
| **Defendant / Counterclaim Plaintiff** | * |

---

| | | |
|---|---|---|
| **MEDLINE INDUSTRIES, INC.** | * | |
| | * | |
| | * | |
| **Third-Party Plaintiff** | * | |
| | * | **Civil Case No.: SAG-19-03405** |
| **v.** | * | |
| | * | |
| **YORK BUILDING PRODUCTS CO., INC.,** | * | |
| *et al.* | * | |
| **Third-Party Defendants** | * | |

---

| | |
|---|---|
| **YORK BUILDING PRODUCTS CO., INC.,** | * |
| | * |
| **Third-Party Counterclaim Plaintiff** | * |
| | * |
| **v.** | * |
| | * |
| **MEDLINE INDUSTRIES, INC.** | * |
| | * |
| **Third-Party Counterclaim Defendant** | * |
| | * |

\* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

This case, in relevant part, seeks to apportion costs relating to a failed retaining wall. Gray Construction, Inc. ("Gray"), a contractor hired by Medline Industries, Inc. ("Medline") to construct a distribution facility on property it purchased from York Building Products Co., Inc. ("York"),

sued Medline for breach of contract, wrongful termination, enforcement of a mechanic's lien, and violation of Md. Code Real Property Art. § 9-303. ECF 1. Medline filed counterclaims against Gray and third-party claims against York, York's subcontractors, Morris & Ritchie Associates, Inc. ("MRA") and Geo Technology Associates, Inc. ("GTA"), and Gray's subcontractors, Allan Myers, L.P. ("Allan Myers") and DGS Construction, LLC T/A Schuster Concrete Construction ("Schuster"), ECF 51.[1] This Court dismissed Medline's breach of express and implied warranty claims against York, ECF 98, and York filed a third-party counterclaim against Medline for declaratory judgment, ECF 106.

This opinion addresses three pending summary judgment motions and two motions for leave to file surreplies.[2] Specifically, York filed a partial summary judgment motion, ECF 197, which Medline opposed, ECF 235, and York replied, ECF 261. GTA and MRA jointly filed a summary judgment motion, ECF 199, which Medline opposed, ECF 226, and GTA/MRA replied, ECF 259. Medline then moved to file a surreply, ECF 265, and GTA/MRA opposed, ECF 268. Allan Myers filed a summary judgment motion, ECF 205, which Medline opposed, ECF 246, and Allan Myers replied, ECF 264. Medline again moved to file a surreply, ECF 266, Allan Myers opposed, ECF 271, and Medline replied, ECF 273.

This Court has reviewed those filings and held a motions hearing on February 28, 2023 as to the matters involving GTA and Medline. As to the other motions, this Court finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons explained below, York's Motion for Partial Summary Judgment, ECF 197, is GRANTED IN PART and DENIED IN PART;

---

[1] Schuster and Medline have settled, and the Court terminated Schuster as a third-party defendant. *See* ECF 98.

[2] Other dispositive motions will be addressed in a separate opinion.

GTA/MRA's Motion for Summary Judgment, ECF 199, is GRANTED IN PART and DENIED IN PART; Allan Myers's Motion for Summary Judgment, ECF 205, is DENIED; and both of Medline's Motions for Leave to File a Surreply, ECF 265 and 266, are GRANTED.

## I.   BACKGROUND

### Summer 2017 – The Property

York, a successor to a sand and gravel company, held title to a 128.5-acre property in Cecil County, Maryland ("the Property"). ECF 196-3 at 2. In the summer of 2017, it entered into preliminary negotiations with Medline, which wanted to acquire property to construct a large distribution facility. In June 2017, York[3] hired GTA, a geotechnical engineering firm, to perform a site visit, characterize the subsurface conditions of the Property, analyze the feasibility of the proposed building construction, and produce a report of its findings and recommendations. ECF 196-9 ("York/GTA Agreement"). Pursuant to the agreed scope of services, GTA collected 70 samples from around the property and performed laboratory testing of the subsoil samples. *Id.* at 4; ECF 196-8 at 3.

On July 20, 2017, GTA produced a geotechnical engineering report that contained the results of its field explorations and laboratory analyses. ECF 196-8 ("GTA Report"). In the report, GTA concluded:

> Based upon the results of this study, it is our opinion that construction of the proposed improvements is feasible, given that

---

[3] Some of the agreements are signed by "Stewart Properties" instead of York. *E.g.*, ECF 196-9. During his deposition, Ryan Woerner, Vice President of Construction and Development at Stewart Properties, explained that the entities are affiliated. ECF 236-1 at 14:4–25 ("Stewart Properties is owned by Stewart Associates Land Development and Stewart Associates Land Development is a subsidiary company of York Building Products."). For the purposes of this Memorandum Opinion, this Court will refer to "York" when discussing agreements signed by these affiliated entities. This shorthand is not intended to minimize any distinction between the two entities, should such a distinction become relevant as the case proceeds.

> the following recommendations are observed, and that the standard
> level of care is maintained during construction; however, it is
> anticipated that certain findings of the investigation may complicate
> construction and escalate the cost of the development. The findings
> include plastic soils, and soils wet of their optimum moisture content
> . . . , the potential for encountering groundwater, perched water, or
> weathered rock during [stormwater management] construction.

ECF 196-8 at 13. Throughout its report, GTA highlighted the potential for construction complications due to underground water pressures. *E.g.*, *id.* at 16. In addition, GTA recommended constructing a retaining wall on the Property. *Id.* at 21–22. GTA suggested that it be retained by York in the future to provide the wall's design. *Id.* at 26.

York acted on GTA's offer of additional services with respect to the wall. On August 21, 2017, York completed an Extra Work Authorization Form for GTA to "[p]repare construction drawings for the proposed retaining wall based on site and/or grading plans prepared by Morris & Ritchie Associates, Inc." ECF 196-10 (collectively with ECF 196-9, "York/GTA Agreements").

### September 2017 – Purchase and Sale Agreement

Medline is a privately held manufacturer and distributor of medical supplies, operating more than forty distribution centers in North America. ECF 51 at 10. Medline was interested in purchasing the Property from York to construct a medical distribution facility. On September 1, 2017, Medline entered into a Purchase and Sale Agreement to purchase the Property from York. ECF 196-3 ("Purchase and Sale Agreement"). The Purchase and Sale Agreement required York to complete certain on-site work to deliver the Property in "pad-ready" condition by October 31, 2017. *Id.* at 12, 32, 34. This "pad-ready" work included procuring appropriate permits, installing erosion and sediment controls, completing mass grading with appropriate water management, clearing topsoil, and, most relevant to this case, installing a retaining wall. *Id.* at 31–33. Medline and York agreed that the retaining wall would be constructed "per approved plans . . . in accordance with the GTA Report dated July 20, 2017." *Id.* at 31; *see also* ECF 196-8. With respect

to the wall design, the Purchase and Sale Agreement clarified that York "will be responsible to ensure wall design will allow for future installation of fencing. Wall design will be prepared and inspected by Geo-Technology Associates, Inc." ECF 196-3 at 31–32.

### November 2017 – Construction of the Retaining Wall

To execute the "pad-ready" work, York had brought in a subcontractor, MRA, to provide site civil engineering services, such as preparing and revising the Major Site Plan and the Erosion & Sediment Control/Stormwater Management Plans. ECF 227-6 ("York/MRA Agreement"). York also brought in another subcontractor, Griffith Brothers (not a party to this case), to construct the actual wall.

York completed construction of the retaining wall around the end of October/beginning of November 2017. ECF 201-18 at 4; *see also* ECF 197-8 at 2. Approximately one month after the wall's completion, GTA observed "some minor cracking along the face of the wall." *Id.* at 3.

### November 2017 – Amendment to the Purchase and Sale Agreement

York did not complete all of the pad-ready work by October 31, 2017. ECF 201-4 at 71:9–11. On November 17, 2017, Medline and York amended their Purchase and Sale Agreement to give York additional time to complete the pad-ready work, thereafter referred to as the "post-closing" work. *See* ECF 196-4 ("PSA Amendment"). The parties agreed to have York complete post-closing work by February 15, 2018. *Id.* at 3. The parties also entered into a Post-Closing Escrow Agreement. *Id.* at 4. Pursuant to this agreement, York deposited $2,004,530 in escrow. *Id.* at 16. If York failed to complete the post-closing work by February 15, 2018, Medline would have the right to take over and use the escrowed funds to complete the work. *Id.* at 17. The Post-Closing Escrow Agreement explained, "In the event of a takeover by [Medline], Escrow Holder shall disburse to [Medline] that portion of the Escrow Funds required to complete the General Post-

Closing Work or Sewer Post-Closing Work, as applicable, in accordance with the terms of this Agreement." *Id.* at 17. The Post-Closing Escrow Agreement further required that prior to any of the escrow funds being disbursed, Medline would provide written notice regarding the amount to be disbursed and a detailed statement of the items and contractors used to complete the post-closing work. *Id.* at 17–18.

York again failed to complete the post-closing work by February 15, 2018. Around March 2018, Medline elected to take over the project. ECF 196-12 at 33:12–16.

### *February 2018 – Medline Hires Gray to Complete Work and Build Facility*

On February 22, 2018, Medline entered into a separate agreement with Gray to design and construct the distribution facility ("Medline/Gray Agreement"). ECF 196-5 at 48. The facility would be over 1 million square feet. *Id.* at 77. The Medline/Gray Agreement anticipated the site would be in a "graded, pad-ready condition" by commencement of Gray's work, but acknowledged that the preparatory work was still underway. *Id.* at 81; *see also* ECF 195-3 at 2, ¶¶ 6, 7.

To assist with its work, Gray brought in various subcontractors. It signed an agreement with Allan Myers, dated February 21, 2018, to provide and install the asphalt pavement and stormwater conveyance system. ECF 196-6 at 37–39 ("Gray/Allan Myers Agreement"). Gray also subcontracted with GTA on February 28, 2018 to continue providing geotechnical engineering, testing, and inspection services on the project. ECF 228-1.

As described above, however, the pad-ready work faced numerous delays and York did not timely complete the work. Thus, when Gray arrived to begin construction of the distribution facility, the Property was not in proper condition to begin construction. ECF 195-3 at 2, ¶ 10. Medline hired Gray to take over York's unfinished post-closing work. ECF 201-7 at 15:8–18:8.

***November 2018 – Retaining Wall Failure***

In November 2018, GTA observed signs of wall movement both at the top and bottom of the year-old wall. ECF 201-18 at 6. During a site visit on November 6, 2018, GTA observed cracks in the surface grade approximately 75 feet behind the radius of the wall, as well as more and wider cracks at the base of the retaining wall, some of which extended vertically upwards to two-thirds of the wall's height. *Id.* at 7–8. In November 2018, approximately a year after the wall's completion, Gray first informed Medline about the cracking in the retaining wall. ECF 201-20; ECF 196-12 at 104:17–22.

GTA conducted an initial investigation of the wall's cracking and issued a report of its findings on December 14, 2018. ECF 201-21. GTA determined that the retaining wall failed because of hydrostatic (*i.e.*, water) pressure behind the wall. ECF 201-21 at 7 ("It is our opinion that the wall movement has occurred due to an increase in hydrostatic pressure behind the 50-foot-deep reinforced zone, an increase in mass of the retained soil and a reduction of the shear strength due to the presence of water."). Although there is some dispute as to when the wall precisely failed, the parties agree that the wall had failed by November 2018. ECF 196-15 at 374:4–378:10; ECF 199-1 at 4.

***January 2019 – SESI Investigation***

Medline retained an engineering firm, SESI Consulting Engineers ("SESI"), to investigate the failure of the retaining wall and to make recommendations about remediation. ECF 232-5. SESI's engineers reviewed documents related to the construction project and performed site walk-throughs on January 9, 2019 and February 2, 2019. ECF 232-6 at 8, 13. SESI's engineers produced a preliminary report on March 13, 2019, documenting their observations and conclusions. ECF 232-6 ("Preliminary Report"). That report concluded that the wall failed due to a combination of

factors including the buildup of hydrostatic pressure behind the wall. ECF 232-6 at 3. The report recommended removal and reconstruction of the wall. *Id.* at 34.

Medline followed those recommendations and SESI's engineers performed a forensic deconstruction of the wall in the spring of 2019. ECF 201-22. SESI's engineers documented their observations and provided findings and conclusions in various reports: a May 15, 2019 report regarding the stormwater conveyance piping and structure, ECF 202-5 ("Stormwater Report"); a July 31, 2019 report summarizing the pavement evaluation, ECF 17-8 ("Pavement Report"); and an August 1, 2019 report of global evaluations, ECF 201-23 ("Global Evaluation Report"). More than two years later, SESI's engineers issued a Supplemental Global Evaluation Report. ECF 202-1 ("Supplemental Global Evaluation Report"). Justin Protasiewicz served as the principal engineer and lead author of each report.

During the deconstruction of the retaining wall, SESI's engineers uncovered a stormwater conveyance pipe that transported water from behind the retaining wall to a drainage basin in the southwest corner of the Property. ECF 201-23 at 48–52. Based on observations of the pipe, SESI's engineers concluded that the "stormwater runoff . . . was infiltrating into the bedding stone under the stormwater pipes via leaks in the pipes and structures, and from lateral infiltration of water from the bioretention basin." *Id.* at 52. SESI's engineers also observed the permeable nature of the asphalt installed by Allan Myers and sent samples for testing by a third-party laboratory. ECF 17-8 at 3.

Based on these and other findings in the Supplemental Global Evaluation Report, SESI's engineers enumerated numerous alleged failings of the third-party and counterclaim Defendants that were a "direct and substantial cause of the failure of the retaining wall." ECF 202-1 at 71–77, 77. The report further concluded that the work of MRA, Allan Myers, York, and GTA had been

defective and "not performed with a reasonable degree of care, skill and ability which is normally employed by contractors in their industry and location." *Id.* at 70, 76, 77.

## II.   LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case

"necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.   DISCUSSION

### A.   *York's Motion for Partial Summary Judgment*

#### i.   **Medline's Breach of Contract Claim (ECF 51, Count VI)**

In its Complaint, Medline presents three theories as to how York breached the parties' contract: failure to properly design the wall, ECF 51 ¶ 128; failure to properly construct the wall, *id.* ¶ 129; and failure to indemnify Medline for subsequent losses, *id.* ¶ 130. In its motion for partial summary judgment, York contests its liability for the first two theories—alleged wall design defects and construction defects.[4]

York first asserts that it cannot be held liable for breach of contract under Medline's first theory—improper wall design—because it did not contract to design the wall. ECF 197-1 at 8–11. Rather, the contracting parties agreed that York would construct the wall pursuant to GTA's design. *Id.* Medline counters that even if GTA were responsible for designing the wall, York remains liable for an improper design because GTA was York's subcontractor. ECF 235 at 23.

---

[4] In its opposition, Medline asserts that York is liable for breach of contract under the indemnity clause of the PSA Amendment. ECF 235 at 18–21. However, York brings a partial summary judgment motion on the breach of contract claim and does not challenge this third theory—failure to indemnify. *See* ECF 261 at 3. Accordingly, this Court need not consider whether York is liable under the indemnity provision of the PSA Amendment at this time.

In the Purchase and Sale Agreement dated September 1, 2017, the two parties agreed to have York construct a retaining wall on the property. ECF 196-3 at 31. The two parties further agreed that construction of the wall would "be installed per approved plans on the south end of the site and in accordance with the GTA Report dated July 20, 2017." *Id.* The Purchase and Sale Agreement further stated that "[w]all design will be prepared and inspected by [GTA]." *Id.* at 32. Thus, this Court finds that York had no contractual duty to design the retaining wall—the parties agreed to use GTA's wall design. York's contractual obligations ended at ensuring the wall's construction complied with GTA's recommendations.

The fact that York previously hired and paid for GTA's design services does not change this conclusion. At the time of the Purchase and Sale Agreement, Medline was in an equal bargaining position with York to review and accept GTA as the wall's designer. In fact, Medline had been involved with GTA's prior inspection of the Property before the Purchase and Sale Agreement was executed. *See, e.g.*, ECF 227-2, 227-3. With that history, Medline expressly agreed to use GTA's design of the wall. The Purchase and Sale Agreement in no way placed a duty on York to review, approve, or guarantee GTA's wall design. In contrast, as York acknowledges, York *is* liable for Griffith Brothers's performance because York did have a contractual obligation to ensure construction of the wall pursuant to GTA's criteria, and York used Griffith Brothers to complete that assignment. *See* ECF 261 at 4 n.1. Any breach of contract claims brought by Medline against York must be for failing to construct the wall pursuant to GTA's recommendations.

York further asserts that it is entitled to summary judgment as to Medline's second theory—improper wall construction. ECF 197-1 at 12. But Medline has identified an example of how York failed to follow GTA's recommendations, as contractually obligated. Specifically, Medline has presented expert testimony from Mr. Protasiewicz that York and Griffith Brothers did

not install geogrid layers in accordance with GTA's project plans. ECF 202-1 at 77 (explaining that only twenty of the twenty-one recommended geogrid layers were installed). Mr. Protasiewicz identifies this deviation as a "contributing factor" to the wall's failure.[5] ECF 202-1 at 71. Thus, Medline has established a genuine issue of material fact about whether York breached its contract by failing to construct the wall in accordance with GTA's design.

In short, summary judgment is warranted as to Medline's breach of contract claim against York for improper wall design because York had no such contractual duty. However, Medline's breach of contract claim against York for failure to follow GTA's recommendations and design in the wall's construction survives summary judgment.

### ii.    Medline's Negligence Claim (ECF 51, Count VII)

As explained above, York did not owe any contractual duty to design the retaining wall. It likewise owed Medline no duty of care with respect to the wall's design, which both parties jointly delegated to GTA. This leaves only Medline's allegation that York breached a tort duty when it improperly constructed the wall.

In its motion for partial summary judgment, York argues that it cannot be held liable for negligence with respect to the wall's construction, contending that Mr. Protasiewicz's testimony is inadmissible. ECF 197-1 at 12. However, this Court denied York's motion to exclude the expert testimony, concluding that Mr. Protasiewicz's refusal to guess at the amount of water leaking from the stormwater conveyance system did not render his testimony speculative. *See, e.g.*, ECF 275 at 9. York further argues that Mr. Protasiewicz's testimony regarding causation is insufficient to link York's construction of the wall to its failure. ECF 196-1 at 8.

---

[5] This Court ruled, in a separate opinion, that Mr. Protasiewicz's testimony about the design and construction of the retaining wall is admissible.  *See* ECF 275 at 16.

To prove any of its claims, Medline must prove that York's action (or inaction) caused Medline's alleged damage. *Cory v. Whisman, Grygiel & Giordano*, No. 06-CV-02694, 2012 WL 13001305, at *8 (D. Md. Nov. 29, 2012) (breach of contract damages must be proven with reasonable certainty); *Neal v. United States*, 599 F. Supp. 3d 270, 290 (D. Md. 2022) (the loss or injury proximately resulted from the defendant's negligence); *Donalds v. Ethicon, Inc.*, No. 20-CV-1659, 2021 WL 6126297, at *10 (D. Md. Dec. 28, 2021) (breach of implied or express warranty requires proof of causal relationship between the defect and the injury).

Medline argues York should have stopped construction to investigate once it noticed the wall settling. ECF 202-1 at 76. York argues that Medline has not presented any evidence that its failure to stop and investigate caused the wall's ultimate failure. Mr. Protasiewicz testifies that York's construction subcontractor improperly used fiberglass shims, failed to halt construction upon observing the wall's ongoing movement, and failed to recognize that the wall was settling as it was being built. ECF 202-1 at 76. Mr. Protasiewicz further avers that these actions were inconsistent with the skill and ability normally employed by professional engineers and were a direct and substantial cause of the failure of the retaining wall. *Id.* at 77. He specifically states in the Supplemental Global Evaluation Report, that "[t]he settlement of the wall during construction should have resulted in the stoppage of the wall and implementation of proper corrective measures." *Id.* at 76. Given that Mr. Protasiewicz is qualified to testify on the mode of the wall's failure, *see* ECF 275 at 16, these conclusions are admissible. Thus, Medline has presented sufficient evidence on which a jury could reasonably find that York's negligent construction of the wall caused the wall to fail.

### iii.    York's Declaratory Judgment Claim (ECF 106, Count I)

York filed a counterclaim against Medline, seeking declaratory judgment as to the funds remaining in the Post-Closing Escrow Agreement. ECF 106. In its motion for partial summary judgment, York argues it is entitled to the remaining escrow funds. ECF 197-1 at 12. It points to the PSA Amendment, which reads: "Upon completion of all of the Post-Closing Work, the Escrowed Funds will be released to [York] unless the Post-Closing Work is performed by [Medline], in which case, only any portion of the Escrowed Funds remaining after completion of the Post-Closing Work will be released to [York]." ECF 196-4 at 5. From this language, York reasons that it is entitled to the entirety of the escrowed funds, because Medline completed the post-closing work but never submitted the necessary written statements for reimbursement from escrow funds.

In response, Medline points to the Post-Closing Escrow Agreement, which reads: "In the event of a takeover by [Medline], Escrow Holder shall disburse to [Medline] that portion of the Escrow Funds required to complete the General Post-Closing Work . . . ." ECF 196-4 at 17. Thus, Medline reasons that the Escrow Holder "shall" disburse the portion of the escrow funds required to complete the post-closing work, and only then is York entitled to the remaining funds. Further, it notes that the amount of the post-closing work remains in dispute, as evidenced by the claims between Medline and its contractors, and so it cannot yet know how much to seek from escrow funds. ECF 235 at 33.

"Where the language of a contract is unambiguous, the Court construes the contract based upon its plain language." *Turner Constr. Co. v. N. Am. Specialty Ins. Co.*, No. 21-CV-02549, 2022 WL 2238922, at *2 (D. Md. June 22, 2022). It would be a strained reading to conclude that York is entitled to all of the escrow funds in the event York and Medline disagree about the post-closing

costs, or in the event Medline fails to properly submit for reimbursement. This contradicts the plain purpose of the Post-Closing Escrow Agreement and would grant York a windfall, given that Medline had to complete the post-closing work at its own cost. It is a more harmonious reading of the PSA Amendment and the Post-Closing Escrow Agreement that York is entitled to the remaining portion of the escrow funds after completion of the post-closing work *and* Medline's recovery for said work costs.

Further, the Post-Closing Escrow Agreement states that "in the event of a conflict between the terms of this [Post-Closing Escrow Agreement] and the [Purchase and Sale Agreement], this [Post-Closing Escrow Agreement] shall control." ECF 196-4 at 20. To the extent the PSA Amendment comports with York's reading, it would conflict with the plain reimbursement requirement of the Post-Closing Escrow Agreement: "In the event of a takeover by [Medline], Escrow Holder *shall* disburse to [Medline] that potion of the Escrow Funds required to complete the General Post-Closing Work . . . ." ECF 196-4 at 17. The Post-Closing Escrow Agreement's disbursement requirement takes precedence. Although York may ultimately be entitled to some or all of the remaining escrow funds, resolution of that question depends on the resolution of issues before this Court.

For these reasons, York's motion for partial summary judgment on its declaratory judgment counterclaim is denied.

### B.     *GTA/MRA's Motion for Summary Judgment*

Medline brought breach of contract, negligence, and breach of express warranty claims against GTA and MRA. For its claims against MRA, Medline relies on its direct contractual relationship with MRA, *see* ECF 17-7 ("Medline/MRA Agreement"), as well as its status as a third-party beneficiary to the York/MRA Agreement. ECF 51 ¶¶ 182–83. However, Medline never

directly contracted with GTA. Therefore, Medline relies on its position as a third-party beneficiary to the York/GTA Agreements to bring its breach of contract claim against GTA. *See* ECF 51 ¶ 153. Given the two Third-Party Defendants' disparate contractual relationships with Medline, the Court discusses each party separately in turn, after resolving a dispute over a surreply.

### i.   Medline's Surreply (ECF 265)

In their briefing, GTA/MRA note that Medline relies on the Purchase and Sale Agreement to bring its claims against them. Specifically, GTA/MRA assert in their Reply: "In the instant case, the only affirmative claims asserted by Medline against either GTA or MRA relate to duties allegedly arising under the Purchase and Sale Agreement." ECF 259 at 7.

Medline disagrees with the inclusion of "only" in this statement and seeks to file a surreply to address that point.[6] ECF 265. Surreplies may be appropriate when the party seeking to file a surreply "would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003). Courts may deny leave to file a surreply, however, where a party "seek[s] merely to re-open briefing on issues" already raised. *Interphase Garment Solutions, LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 467 (D. Md. 2008).

Because GTA/MRA used the "only" language for the first time in their reply, it is appropriate to permit additional briefing on this issue. Medline's Amended Counterclaim expressly alleges that, through the York/GTA Agreement, GTA had an obligation to perform its

---

[6] In its surreply, Medline also wrote, "Medline's claims against GTA and MRA were not made pursuant to the Purchase and Sale Agreement." ECF 265 at 2. This plainly contradicts its initial allegations. *See* ECF 51 ¶ 154. At the motions hearing, Medline clarified that it does rely on the Purchase and Sale Agreement to the extent it serves as evidence of GTA's obligations under the York/GTA Agreements and subsequent oral agreements. Medline conceded that there is no written contract binding GTA to the terms of the Purchase and Sale Agreement.

work in accordance with multiple documents: (1) the Purchase and Sale Agreement; (2) the York/GTA Agreements; (3) the GTA Report dated July 20, 2017; and (4) "contract documents, contract specifications, applicable laws, applicable standards, quality assurance procedures, permits and the project site plans." ECF 51 ¶ 154. Similarly, Medline alleges that, through the York/MRA Agreement and the Medline/MRA Agreement, MRA had an obligation to perform its work in accordance with a similar list of documents. ECF 51 ¶ 183. In short, Medline expressly relies on the Purchase and Sale Agreement, along with several other documents, to bring its claims. Regardless, this Court has considered the surreply briefing and will grant the motion permitting its filing.

### ii.    Medline's Claims Against GTA (ECF 51, Counts X–XIII)

Medline brought claims against GTA as a third-party beneficiary to the York/GTA Agreements. As noted above, the Amended Complaint alleges that pursuant to the York/GTA Agreements, GTA had an obligation to perform its work in accordance with multiple documents: (1) the subsequent Purchase and Sale Agreement; (2) the York/GTA Agreement itself; (3) the GTA Report dated July 20, 2017; as well as "contract documents, contract specifications, applicable laws, applicable standards, quality assurance procedures, permits and the project site plans." ECF 51 ¶ 154. Medline also alleges that pursuant to the York/GTA Agreement, GTA had an obligation to ensure the work performed "was of good quality, new, free from defects in workmanship and materials." *Id.* Medline further alleged that GTA breached these obligations by failing to properly

design and inspect the construction of the Retaining Wall.[7] *Id.* ¶ 155. Medline repeats many of these allegations to support its negligence, breach of express warranty, and breach of implied warranty claims against GTA. *Id.* ¶¶ 158–176.

In its motion for summary judgment, GTA argues that Medline cannot bring claims for improper wall construction and oversight because Medline purchased the Property (including the retaining wall) from York in "AS-IS" condition. ECF 199-1 at 6. Specifically, Section 6.2 of the Purchase and Sale Agreement reads:

> <u>Disclaimer</u>. Purchaser [Medline] acknowledges that prior to Closing, Purchaser will have independently and personally inspected the Property and that Purchaser has entered into this Agreement based upon its ability to make such examination and inspection. PURCHASER ACKNOWLEDGES THAT PURCHASER IS PURCHASING THE PROPERTY IN "AS-IS, WHERE-IS" CONDITION "WITH ALL FAULTS" AS OF THE CLOSING AND, EXCEPT FOR THE WARRANTIES AND REPRESENTATIONS SET FORTH IN THIS AGREEMENT . . . .

ECF 196-3 at 15.

Medline argues that GTA cannot rely on provisions of the Purchase and Sale Agreement because it was not a party to this agreement. ECF 226 at 26. As noted above, GTA's relationship and contractual obligations—written or oral—pursuant to the Purchase and Sale Agreement are presently unclear and remain a factual dispute for trial. Therefore, this Court will not dismiss GTA's argument simply because it was not a signing party to the Purchase and Sale Agreement.

---

[7]  Medline's Amended Complaint does not accurately reflect Medline's present theory of liability as counsel described it at the motions hearing. There is no written obligation in the York/GTA Agreements, ECF 196-9 and ECF 196-10, that obligated GTA to inspect the wall or to perform in accordance with the future Purchase and Sale Agreement. Rather, Medline now argues that the written contract between GTA and York must have been orally modified to cause GTA to perform additional services. Given that GTA does not presently challenge its obligation to perform under the Purchase and Sale Agreement, this Court does not reach the scope of GTA's contractual obligations.

Nonetheless, GTA cannot rely on the "AS-IS" provision to avoid liability for a few reasons. First, as this Court has previously explained, the "AS-IS" clause in the Purchase and Sale Agreement is expressly qualified in that same provision to except "THE WARRANTIES AND REPRESENTATIONS SET FORTH IN THIS AGREEMENT[.]" *See* ECF 97 at 25 (citing the Purchase and Sale Agreement, ECF 196-3 at 15). Those warranties include the execution of "all agreements, instruments, and documents provided for in this Agreement," which incorporates the scope of work in Exhibit C of the Agreement. Purchase and Sale Agreement § 6.1.5.

Further, the PSA Amendment expressly modified Medline's liability. On November 17, 2017, Medline and York amended their original Purchase and Sale Agreement to provide York additional time to complete the work (given that it missed the original October 31, 2017 deadline). This PSA Amendment attached a new exhibit to the original agreement that outlined York's "post-closing work." Although the retaining wall's construction was already completed, the "post-closing work" included the installation of the retaining wall. ECF 196-4 at 10. The PSA Amendment also added indemnification language, protecting Medline against losses related to defective post-closing work: "SELLER AND SHALL INDEMNIFY, DEFEND AND HOLD PURCHASER . . . HARMLESS FROM AND AGAINST ANY AND ALL DAMAGES . . . ARISING OUT OF OR RELATING TO THE PERFORMANCE OF THE POST-CLOSING WORK." PSA Amendment § 11(c).

On their face, these two provisions appear at odds with one another. On the one hand, Medline purchased the Property "AS-IS," but then York agreed to indemnify Medline for any resulting loss from the post-closing work, some of which was already complete at the time of the closing. Indeed, the incongruity of the provisions reflects the less-than-stellar drafting of the PSA Amendment. The original agreement anticipated that York would complete the work prior to

19

closing, giving Medline an opportunity to review all of the pad-ready work. Although Medline conducted some due diligence prior to closing, it was unable to inspect unfinished work and certainly could not inspect the entire "pad-ready" site. ECF 196-13 at 264:8–11. The delayed work forced Medline to purchase a Property without the benefit of a complete inspection. Thus, the PSA Amendment, through the indemnification provision, transferred the burden of guaranteeing the work from Medline to York. In short, the "AS-IS" provision did not emerge unscathed from the PSA Amendment, when read together with its plain language.  At best, the resulting contract is ambiguous and the terms of the parties' understanding should be explored at trial.

Finally, GTA challenges Medline's ability to bring its claims, incorporating its arguments from its motion in limine. ECF 199-1 at 11. This Court has admitted Mr. Protasiewicz's testimony about the design and construction of a retaining wall because he is a geotechnical engineer. *See, e.g.*, ECF 275 at 9, 14, 16. Accordingly, there is a genuine issue of material fact as to whether GTA's design met the applicable professional standards.

In short, this Court rejects GTA's arguments for summary judgment.

### iii.   Medline's Claims Against MRA (ECF 51, Counts XIV–XVII)

As described above, Medline brought claims against MRA as a contracting party to the Medline/MRA Agreement, *see* ECF 17-7, and as a third-party beneficiary to the York/MRA Agreement. ECF 51 ¶¶ 182–83. Medline alleges that pursuant to these agreements, MRA had an obligation to perform its work in accordance with multiple documents and had an obligation to ensure the work performed "was of good quality, new, free from defects in workmanship and materials." *Id.* ¶ 183. Medline further alleged that MRA breached these obligations by "designing the bioretention basin adjacent to the storm water transmission lines on the east side of the building in a defective fashion, with that defective design resulting in additional storm water being injected

into the bedding stone beneath the 48" pipe and ultimately the soils behind the Retaining Wall." *Id.* ¶ 184. Medline repeats these allegations for its negligence, breach of express warranty, and breach of implied warranty claims against MRA. *Id.* ¶¶ 186–202.

In a separate opinion, this Court excluded Mr. Protasiewicz's testimony in relevant part. Specifically, this Court explained that Mr. Protasiewicz has substantial geotechnical engineering experience, ECF 275 at 14, which is directly relevant to offering expert testimony regarding the standard of care for a geotechnical engineering firm, such as GTA, *id.* at 16. However, this Court found that he is not qualified to give expert testimony on the standard of care expected by a site civil engineering firm, such as MRA. *Id.* at 13. Thus, this Court excluded his testimony regarding the standard of care for MRA. *Id.* at 14.

To bring a claim of professional malpractice, a plaintiff generally bears the burden to produce expert testimony from which the trier of fact can determine the standard of skill and care ordinarily exercised by a professional engaged in that kind of work and in that locality. *See Crockett v. Crothers*, 264 Md. 222, 224–25 (1972). Only in "instances in which the negligence is so gross or that which was done so obviously improper or unskillful" may expert testimony not be required. *Id.* at 224. Medline asserts that a lay person could understand that MRA's actions caused the wall's failure. ECF 226 at 33. Even if a layperson could understand that MRA's actions caused the failure of the wall, this would not prove that MRA's actions amounted to a breach of its professional standard of care. In particular, given that Medline points the finger at a wide range of potential culprits for the wall's failure, the case's complexity requires expert testimony to determine whether parties acted in accordance with their duties. Without the testimony of a qualified expert, Medline cannot present evidence to show breach of duty by MRA.

Medline asserts that even if it has failed to present evidence of a breach of duty, this only negates its negligence claim, and its breach of contract, express warranty, and implied warranty claims should survive. ECF 226 at 32. But as noted, its "improper design" argument also underlies its breach of contract and breach of express warranty claims. ECF 51 ¶ 184 (alleging MRA breached its contractual duty by "designing the bioretention basin adjacent to the storm water transmission lines on the east side of the building in a defective fashion"); ¶ 188 (alleging MRA has breached its duty of care by "designing the bioretention basin adjacent to the storm water transmission lines on the east side of the building in a defective fashion"); ¶ 193 (alleging MRA breached the express warranty by "designing the bioretention basin adjacent to the storm water transmission lines on the east side of the building in a defective fashion"). For its breach of express warranty claim specifically, Medline relies on a provision of the York/MRA Agreement that promised the work would be "conducted in a manner consistent with that level of care and skill ordinarily exercised by members of its profession practicing under similar circumstances in the same or similar locality, in the same period of time." *Id.* ¶ 192. For its breach of implied warranty claim, Medline alleges that "MRA breached the implied warranty of fitness for intended purpose because, due to the defects and failings in MRA's work as identified herein, the work is not fit for its intended purpose . . . ." *Id.* ¶ 201. Thus, each of these claims rely on a showing that MRA designed the bioretention basin in a defective manner and breached its professional duty of care.

Medline cannot prove these claims without Mr. Protasiewicz's expert testimony, or expert testimony from someone else who has not been timely designated.[8]

For these reasons, summary judgment will be granted for MRA as to Medline's third-party claims, ECF 51, Counts XIV–XVII.

### C.    *Allan Myers's Motion for Summary Judgment (ECF 51, Counts XVIII–XXI)*

Medline did not directly contract with Allan Myers. Rather, to bring its breach of contract claim against Allan Myers, it relies on its status as a third-party beneficiary to the Gray/Allan Myers Agreement. ECF 51 ¶ 206. Medline's position is far stronger than that it advances against GTA, however. In the Gray/Allan Myers Agreement, Allan Myers expressly bound itself to all documents between Medline and Gray, and Allan Myers assumed "all the obligations and responsibilities which Gray, by those documents, assumes toward [Medline]." ECF 196-6 at 14, § 8.1. This included surveying, excavation, and fill placement on the Property. *Id.* at 37. In its Amended Counterclaim, Medline alleges that Allan Myers failed to fulfill its duties under the Gray/Allan Myers Agreement by (1) failing to properly install or repair asphalt pavement, and (2) failing to properly install or repair stormwater controls. ECF 51 ¶ 208. Medline repeats these allegations in its negligence and breach of warranty claims. *Id.* ¶¶ 212, 217, 225.

---

[8] In its briefing, Medline seems to refer to SESI as a separate expert in addition to Mr. Protasiewicz. *E.g.*, ECF 226 at 32. In its expert witness disclosure, Medline plainly listed Mr. Protasiewicz as an expert. ECF 244-4 at 1. In that disclosure, it further stated that it "previously disclosed that SESI is an expert witness for Medline in this case." *Id.* at 2. During the motions hearing, Medline acknowledged there is no formal expert disclosure of SESI or anyone other than Mr. Protasiewicz. The Federal Rules of Civil Procedure require that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. Proc. 26(a)(2)(A). Medline can only introduce evidence through its sole designated expert, Mr. Protasiewicz. Therefore, his excluded testimony will not otherwise be admissible at trial.

### i.     Failure to Repair Asphalt

In its motion for summary judgment, Allan Myers first argues Medline cannot bring claims for failure to make repairs because it made all repairs identified by Kimley-Horn and Associates, ECF 205-1 at 15, 17, 19, the firm engaged by Medline to investigate and assess the status of the installed pavement, ECF 51 ¶ 58. Medline disputes this, arguing that Allan Myers's own project manager, Curtis Wargo, conceded that Allan Myers did not remove and replace insufficiently thick asphalt. ECF 246 at 22. In the deposition, Mr. Wargo explains that Allan Myers did find a few spots where it was less than the required three-inch thickness, and that it remedied this issue by thickening the wearing course. ECF 244-6 at 120:7–12. Although Medline is technically correct that Allan Myers "did not remove and replace that asphalt to put in a base course that was the proper thickness," ECF 246 at 22, Allan Myers is also correct that it took action to remedy the defect. Thus, both parties have presented evidence on whether Allan Myers properly remedied a defect in its work, and this remains a disputed question of fact.

### ii.     Failure to Properly Install Asphalt

Next, for Medline's asphalt-related claims, Allan Myers asserts that Medline failed to present expert evidence regarding any breach of duty. ECF 205-1 at 15, 17, 18–19; *see also* Allan Myers's Motion in Limine to Exclude Justin Protasiewicz's Unqualified Opinion Testimony, ECF 204-1. In a Memorandum Opinion, ECF 275, this Court considered Mr. Protasiewicz's expertise regarding opinions offered against Allan Myers. ECF 275 at 16–24. Upon reviewing Mr. Protasiewicz's professional background and expertise, this Court concluded that he was not qualified to testify regarding the appropriateness of the asphalt mix nor its method of compaction. Thus, Medline cannot use this evidence to bring a claim against Allan Myers for improper installation of asphalt pavement.

In its motion in limine, however, Allan Myers did not challenge Mr. Protasiewicz's ability to testify on the aggregate (*i.e.*, rock) size of the asphalt. *See* ECF 272 at 2 (reiterating that the aggregate size issue "is not the opinion it is challenging" in its motion in limine). Indeed, Mr. Protasiewicz has some experience reviewing asphalt mixes to ensure the appropriate aggregate size. ECF 204-1 at 29; ECF196-15 at 466:15–467:21. Medline has brought its claims against Allen Myers in part based on the aggregate size. ECF 246 at 22. As noted in the Supplemental Global Evaluation Report, ECF 202-1 at 86, Allan Myers used aggregate bases larger than recommended in the GTA Report. Specifically, the GTA Report called for 9.5 mm aggregate surface course, 12.5 mm intermediate course, and 12.5 mm base course. *See* ECF 196-8 at 23. However, Allan Myers used 12.5 mm, 19 mm, and 25 mm courses, respectively. ECF 202-1 at 86. The Supplemental Global Evaluation Report concludes that "[t]he large aggregate size contributed to the permeable pavement." ECF 202-1 at 86. For these reasons, Medline has presented evidence that Allan Myers breached its contractual obligations and duty. ECF 246 at 22. Given aggregate size is within Mr. Protasiewicz's expertise, a reasonable jury could find Allan Myers improperly installed the asphalt.

In response, Allan Myers argues that Medline is estopped from relying on the GTA recommended aggregate size because Medline instructed bidders to disregard GTA's recommendations. ECF 264 at 5. In the Request for Proposal ("RFP") process, Medline included the GTA Report along with a separate report by Hillis-Carnes Engineering Associates ("Hillis-Carnes Report"). However, the two reports conflicted. The GTA Report required three different layers of asphalt and identified the aggregate size for each layer, ECF 196-8 at 23, but the Hillis-Carnes Report only required two courses and did not identify the recommended aggregate size. Given this disparity, one of the potential bidders asked Medline which report should control. In a

Q&A provided to potential bidders, Medline confirmed that "the flexible pavement sections provided in the Hillis Carnes report, and as shown on the MRA plans will be followed in lieu of what was recommended in the earlier GTA report." ECF 264-4 at 3–4.

In its surreply,[9] Medline argues that its Q&A response was limited to the two-course vs. three-course discrepancy, and that its response did not eliminate the aggregate size specifications in the GTA Report. ECF 266-1 at 2–3. However, there is no such explicit limitation in Medline's RFP response. The extent Medline intended the Hillis-Carnes Report to override the GTA Report is a disputed fact question for trial.

### iii.   Failure to Properly Install Stormwater Controls

In the Supplemental Global Evaluation Report, Mr. Protasiewicz concluded that Allan Myers improperly installed the stormwater controls and the resulting defects were "a direct and substantial cause of the failure of the retaining wall." ECF 202-1 at 76. The Supplemental Global Evaluation Report identified fractures and cuts in the stormwater piping, which it concluded caused leaks and a buildup of water pressure behind the retaining wall. *Id.*

In its motion for summary judgment, Allan Myers argues that Medline cannot present evidence of breach of duty or causation with respect to the stormwater system, arguing that Medline has either not presented evidence or that the evidence presented is inadmissible. ECF 205-1 at 15–16; *see also* Allan Myers Motion in Limine, ECF 204-1 at 30.

In its motion in limine, Allan Myers argued Mr. Protasiewicz's testimony was speculative because he could not account for the precise volume of water that leaked from the stormwater

---

[9] Medline filed a motion for leave to file a surreply to address this issue. ECF 266. Given that Allan Myers raised the conflicting reports for the first time in its Reply, this Court grants Medline's motion and considers the additional briefing. *See Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003).

system. *Id.*; ECF 196-15 at 340:18–341:3. This Court rejected this argument, concluding that his refusal to speculate an unknowable volume of water did not undermine his field observations and quantitative tests. ECF 275 at 23–24. Allan Myers further argues that, even if his testimony is admissible, Medline cannot conclude that the stormwater system's failures were a substantial contributing factor without knowing the amount of water that actually leaked from the stormwater system. ECF 205-1 at 16. This Court rejects this argument for similar reasons. Although Medline's case would be stronger if it could state the precise volume of water that leaked from the stormwater system, such degree of evidence is not necessary to prove its claim.

Allan Myers more broadly argues that Medline could not prove causation because it failed to present any facts or data showing the alleged defects existed prior to the wall's failure. ECF 204-1 at 32. However, upon review of the record, Medline presents Mr. Protasiewicz's field test results, photos, and testimony as a basis to conclude that the stormwater system's leaks substantially caused the wall's failure. ECF 201-22; ECF 201-23 at 48–52; ECF 202-5; ECF 202-1 at 58–59. Further, the reported cause of the wall's failure was a buildup of water pressure behind the wall, so evidence that the stormwater system behind the wall was leaking provides a link between Allan Myers's alleged negligence and the wall's failure. Thus, Medline has presented evidence sufficient to survive a motion for summary judgment.

## IV.   CONCLUSION

For the reasons stated above, York's Motion for Partial Summary Judgment, ECF 197, is GRANTED IN PART and DENIED IN PART; GTA/MRA's Motion for Summary Judgment, ECF 199, is GRANTED IN PART and DENIED IN PART ; Allan Myers's Motion for Summary Judgment, ECF 205, is DENIED, and Medline's Motions for Leave to File a Surreply, ECF 265 and 266, are GRANTED.

A separate Order follows.

Dated: March 1, 2023

_____/s/_____
Stephanie A. Gallagher
United States District Judge