## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **GRAY CONSTRUCTION, INC.** | * | |
| | * | |
| | * | |
| **Plaintiff / Counterclaim Defendant** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **MEDLINE INDUSTRIES, INC.** | * | |
| | * | |
| **Defendant / Counterclaim Plaintiff** | * | |
| | | |
| **MEDLINE INDUSTRIES, INC.** | * | |
| | * | |
| | * | |
| **Third-Party Plaintiff** | * | |
| | * | **Civil Case No.: SAG-19-03405** |
| **v.** | * | |
| | * | |
| **YORK BUILDING PRODUCTS CO., INC.,** | * | |
| *et al.* | * | |
| **Third-Party Defendants** | * | |
| | | |
| **YORK BUILDING PRODUCTS CO., INC.,** | * | |
| | * | |
| **Third-Party Counterclaim Plaintiff** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **MEDLINE INDUSTRIES, INC.** | * | |
| | * | |
| **Third-Party Counterclaim Defendant** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

This case involves, in relevant part, a dispute between Medline Industries, Inc. ("Medline")

and various contractors and subcontractors. Gray Construction, Inc. ("Gray"), a contractor hired

by Medline to construct a distribution facility, sued Medline for breach of contract, wrongful

termination, enforcement of a mechanic's lien, and violation of Md. Code Real Property Art. ("RP") § 9-303. ECF 1. Medline filed its First Amended Answer along with counterclaims for damages and declaratory judgment against Gray, along with various third-party claims against a series of subcontractors. ECF 51.

This Memorandum Opinion addresses two motions for partial summary judgment filed between Gray and Medline.[1] Gray filed a partial summary judgment motion, ECF 195, which Medline opposed, ECF 248, and Gray replied, ECG 257. Medline filed a partial summary judgment motion against Gray, ECF 200, which Gray opposed, ECF 247, and Medline replied, ECF 262. This Court has reviewed the filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons explained below, both Motions for Partial Summary Judgment, ECF 195 and 200, will be GRANTED IN PART and DENIED IN PART.

## I.     BACKGROUND

### *Pre-Construction Development of the Property*

In fall of 2017, Medline purchased from York Building Products Co, Inc. ("York")a 128.5-acre property in Cecil County, Maryland ("the Property"). Medline planned to build a medical distribution center on site. As part of the Purchase and Sale Agreement, York promised to complete certain on-site work—including the construction of a retaining wall—to deliver the Property in "pad-ready" condition by October 31, 2017. ECF 196-3 at 12, 32. York brought in various subcontractors to execute this work, however it largely failed to complete the pad-ready work by the original deadline. York completed construction of the retaining wall around the end of October/beginning of November 2017. ECF 201-18 at 4; *see also* ECF 197-8 at 2. Approximately

---

[1] This Court will address the motions filed by other parties in a separate opinion.

one month after the wall's completion, one of York's subcontractors observed "some minor cracking along the face of the wall." *Id.* at 3. On November 17, 2017, Medline and York amended their original Purchase and Sale Agreement to give York additional time to complete the work, thereafter referred to as the "post-closing work," and the two parties closed on the Property.

### February 2018 – Medline Hires Gray

As the new Property owner, Medline aimed to construct its medical distribution facility. On February 22, 2018, Medline entered into a separate agreement with Gray to design and construct the distribution facility for a sum of $41,876,605, subject to additions or deletions. ECF 196-5 ("Medline/Gray Agreement" or "Agreement") at 48. The facility would be over 1 million square feet. *Id.* at 77. The Agreement provided for substantial completion of the project by November 20, 2018. *Id.* at 52. The Agreement anticipated that the site would be in a "graded, pad-ready condition" upon Gray's commencement of the work, but acknowledged that the preparatory construction by York was still underway. *Id.* at 81; *see also* ECF 195-3 at 2, ¶¶ 6, 7.

To assist with its upcoming work, Gray brought in its own subcontractors. It signed an agreement with Allan Myers, L.P., dated February 21, 2018, to provide and install the asphalt pavement and stormwater conveyance system. ECF 196-6 at 37–39. Gray also subcontracted with Geo Technology Associates, Inc. ("GTA") on February 28, 2018 to provide geotechnical engineering, testing, and inspection services on the project. ECF 228-1.

Unfortunately, York again failed to complete the post-closing work by February 15, 2018. Around March 2018, Medline elected to take over York's work. ECF 196-12 at 33:12–16. As a result, Gray did not find the Property in "graded, pad-ready condition" when it arrived to begin construction of the distribution facility in early April. ECF 195-3 at 2, ¶ 10; ECF 201-8. Instead, Medline hired Gray to complete York's unfinished post-closing work. ECF 201-7 at 15:8–18:8.

Gray took over the project and work got underway. Throughout that summer, however, the area experienced record amounts of rainfall. *See* ECF 247-19 at 5 (Baltimore Sun article dated July 25, 2018, reporting that "since May 1, more than 28 inches of rain has fallen, 6 inches more than the previous record for that period, from 1989. That is about two-thirds of Baltimore's typical annual rainfall."). Gray kept Medline informed about the rain delays and the effects on its work. ECF 247-19 at 6–8.[2] Ultimately, Gray did not complete the project by the original deadline, and the work continued into the colder winter months. Medline and Gray amended their Agreement to postpone the substantial completion date to December 18, 2019. ECF 195-9.

### *November 2018 – Medline Discovers Retaining Wall Failure*

In November 2018, approximately a year after the wall's completion, Gray first informed Medline about cracking in the retaining wall. ECF 201-20; ECF 196-12 at 104:17–22. GTA conducted an initial investigation and determined it failed because of hydrostatic (*i.e.*, water) pressure behind the wall. ECF 201-21 at 7. In January 2019, Medline retained an engineering firm, SESI Consulting Engineers ("SESI"), to investigate the failure of the retaining wall and to make recommendations about remediation. ECF 232-5.

---

[2] *See also* ECF 247-16 (documenting the "unseasonably wet weather" and noting the resulting work delays in an email dated June 28, 2018); ECF 247-17 ("Kate – I just wanted to update you on last week's rain events," email dated July 30, 2018); ECF 247-19 (reporting the "record breaking rainfall conditions," sharing the methodology used by Gray to calculate the rain impact, and attaching the Baltimore Sun article, email dated August 10, 2018); ECF 247-20 ("Kate – just an FYI on the weather this past weekend," email dated August 13, 2018); ECF 247-21 ("Inclement weather continues to hinder our efforts on-site," email dated September 11, 2018); ECF 247-22 ("As you are aware the site has continued to receive record shattering rain events and that is now impacting our ability to move forward with underground work," email dated September 27, 2018); *see also* ECF 247-2 at 3 (Gray updated and provided to Medline a weather impact chart every two weeks starting on May 8, 2018).

*February 2019 – Certificate of Substantial Completion and PCDs*

On February 25, 2019, Medline and Gray signed a Certificate of Substantial Completion, documenting that the contractual work between Medline and Gray was "sufficiently complete in accordance with the Contract Documents so the customer can occupy or utilize the work for its intended use." ECF 201-17. Medline took occupancy of the building and began operating its distribution operation. ECF 196-12 at 360:3–8.

At this point, Gray prepared Project Change Documents ("PCDs") to account for changes in scope of work, additional costs due to weather delays, and other costs it had incurred from working in winter conditions. Medline accepted the majority of these PCDs, *see* ECF 1-7; however, eight PCDs remain in dispute between the parties. *See* ECF 1-8. The disputed amounts are as follows:

| PCD No. | Date | Amount (ECF 202-23) | Description of Change (ECF 1-8) |
|---|---|---|---|
| 14 | 8/15/2018 | $ 52,692.00 | Pad Remediation |
| 18 | 8/7/2018 | 85,663.00 | MDE Site Shutdown |
| 35 | 3/15/2019 | 628,243.00 | Winter Conditions |
| 39 | 3/29/2019 | 68,064.00 | Pick Mod Foundations |
| 41 | 3/15/2019 | 1,252,999.93 | Dewatering and Subgrade Remediation |
| 60 | 4/11/2019 | 55,401.00 | Chesapeake Gas Invoices |
| 71 | 9/24/2019 | 189,470.35 | Impacts Associated with Retaining Wall |
| 72R1 | 11/15/2019 | 94,724.00 | Betterments and Site Improvements to Complete Contract |
| **TOTAL** | | **$ 2,427,257.28** | |

***Winter/Spring 2019 – SESI's Engineers Investigate Retaining Wall Failure***

On March 13, 2019, SESI's engineers produced a preliminary report that concluded the wall failed due to a combination of factors including the buildup of hydrostatic pressure behind the wall. The SESI report recommended the wall's removal and reconstruction. ECF 232-6 at 33–34. On March 18, 2019, SESI's engineers began deconstructing the retaining wall, which exposed the underground stormwater conveyance system installed by Allan Myers (Gray's subcontractor). ECF 201-23 at 36, 48.

During a rain event on April 5, 2019, SESI's engineers observed a substantial amount of stormwater flowing into the area of the deconstructed wall from the bedding stone below the stormwater system's piping. *Id.* at 48. For the next few weeks, SESI's engineers conducted a subsurface investigation to determine the origin of this stormwater. They ultimately concluded that the stormwater came from leaks in the pipes and structures, and from lateral infiltration of water from the bioretention basin. *Id.* at 52. The engineers concluded that this excess stormwater built up behind the retaining wall and contributed to its failure. *Id.*

***Spring and Summer 2019 – SESI Reports***

On April 9, 2019, Medline sent a letter to Gray regarding these initial findings and Medline's potential legal claims against Gray:

> During the deconstruction process, Medline has discovered what may be a failure in either the design or construction of the storm water management system in close proximity to the retaining wall. The storm water management system may be discharging substantial amounts of water into the retained soils behind the wall, which may have caused or contributed to the failure of the retaining wall itself.
>
> The purpose of this correspondence is to put you on notice of potential claims against Gray with regard to its work on the storm water management system (or the Project more generally) and to notify you that as a consequence of the urgent need to rebuild the retaining wall and complete the Project, Medline intends to

promptly proceed with the necessary inspection of and repairs to the
storm water management system.

ECF 202-4.

On May 15, 2019, SESI's engineers produced a report of their findings regarding the
stormwater system. ECF 202-5. The following day, Medline sent this report to Gray and requested
that Gray correct the "defective work promptly, as outlined in Article 11 of our [Agreement]. If
Gray is unable to begin corrective work accordingly, Medline will proceed to do so pursuant to its
rights under Section 7.9." *See* ECF 202-9.

On July 31, 2019, SESI's engineers produced an additional report regarding the pavement
installed by Gray and its subcontractors, asserting that the pavement's permeability contributed to
the buildup of subsurface waters. ECF 202-17. On August 1, 2019, SESI's engineers produced a
global report of the firm's findings. ECF 201-23. Medline sent both of these reports to Gray, which
Gray received within the week. ECF 202-19.

### Summer–October 2019 – Communication Between Gray and Medline

Throughout the summer, Gray had continued to perform additional work requested by
Medline. However, some of that work was impeded by Medline's reconstruction of the wall and
stormwater system. ECF 201-1 at 2–3; *see also* ECF 247-8 at 9 (instructing a fencing subcontractor
to stop working because the site still needed to be regraded from the wall's reconstruction).

During this period, Gray submitted seven applications for payment for this and other work;
however, Medline disputed some of the underlying costs, especially the additional weather-related
costs incurred during the prior winter. *See* ECF 247-8 at 5–6. Medline believed that Gray and its
subcontractors were responsible for the delays that pushed the work into the winter months, and
therefore believed that Gray was responsible for the resulting expenses. *See* ECF 195-20 at 5.
Medline also became concerned about the costs of repairing the concrete, asphalt pavement,

retaining wall, and stormwater conveyance system—expenses that Medline believed Gray had in part caused. ECF 247-8 at 6. As a result, Medline withheld payment for at least three months. ECF 196-12 at 356:24–357:3; ECF 247-8 at 5 (Medline's counsel acknowledging that it was withholding some payments and disputing others).

On August 14, 2019, Gray sent a letter to Medline to request release of the withheld money, taking the position that it was not responsible for the retaining wall's failure. ECF 202-19. In this letter, Gray acknowledged that stormwater system leaks may have contributed to the wall's failure, but asserted "it is clear from the [SESI] report that the primary cause of the failure was defective design and construction by others." *Id.* at 1. Gray acknowledged receipt of the other two SESI reports, but noted it was still reviewing them. *Id.* Gray also summarized the remaining work: "paving and striping of employee parking lot areas . . . , pond conversions, chain link fence erection around ponds, perimeter fencing, lighting, backfill and seed between south wall and sidewalks, finish painting south wall, finish overflow trailer parking lot, civil record drawings, warranty certificates and LEED submittal." *Id.* at 2. At that time, some of Gray's work was still impeded by Medline's reconstruction of the retaining wall. *Id.* Gray estimated that it would complete the work not precluded by the retaining wall's construction by August 31, 2019. *Id.* at 1. It further estimated that once the retaining wall was built and Gray could resume work, it would complete the remainder within 13 weeks. *Id.*

On September 12, 2019, Gray sent a letter to Medline with some of the requested documents and renewed its request for payment. ECF 253-1. The letter stated:

> Medline last paid Gray over 7 months ago. Meanwhile, Medline has had occupancy and use of the Distribution Center for about a year. Gray has continued to perform its remaining site work when and as it is made available by Medline. Gray has spent substantial sums on experts to defend its work from incorrect and unfounded allegations. This includes the very weak claim that, despite flaws in the design

and construction of the retaining wall that predated Gray's work, the
stormwater piping is somehow responsible for "possibly
contributing" to those issues. The good will and patience of Gray
and its subcontractors have been sorely tested.

*Id.* at 3. Along with this letter, Gray sent its own expert report concluding the wall's failure was

not attributable to work performed by Gray or its subcontractors. *Id.* at 2.

On September 23, 2019, Medline responded to Gray's letter and asked for information

about the remaining disputes between the parties, including Gray's position on disputed PCDs 35

and 41, underlying data from Gray's concrete flooring expert, and reports on the installed asphalt.

ECF 201-1 at 2–3. The following day, Gray responded with some of the requested information and

likewise requested the following information as "Needed Direction":

Gray has repeatedly, through me and through Gray staff, requested
direction as to how and when to complete its contract work while
Medline's wall contractor has the site torn up and used up the
available access. You have said that Kate is working this out directly
with Gray people, but that is not true. *Gray has now left the site* and
does not wish to perform bits and pieces of work, especially as these
are getting pushed into another winter season. It seems the best
alternative is to delete the remaining work and work out a credit
change order. Medline's contractor, now on site, can and should
complete the work. Someone has to address this in a meaningful way
now.

*Id.* at 2 (emphasis added).

Medline interpreted this language, *i.e.*, "Gray has now left the site," as Gray abandoning

the project. ECF 247-8 at 5 (letter from Medline's counsel to Gray's counsel). Early the next

month, Medline designated another one of its subcontractors, Alston, as a "General Contractor"

and instructed Alston to reach out to Gray's subcontractors about continuing the work. *Id.* at 10,

12. Katherine Slattery, Medline's project executive, informed one of Gray's subcontractors that

"Gray's recently asked us to finish the scope on our own, which I've asked Alston to do as a

General Contractor on our behalf." *Id.* at 10. On October 10, 2019, Gray first discovered Alston's

outreach to Gray's subcontractors. *Id.* at 7, 9. This resulted in back and forth between the two parties' counsel regarding unpaid invoices, unfinished work, and Gray's continued role on the project. *Id.* at 3–6.

### November 2019 – Contract Termination

On November 4, 2019, Medline sent notice of termination through counsel pursuant to § 13.2.2 (termination for cause). ECF 195-15. Medline explained:

> As identified in substantial correspondence between the parties and in the multiple reports provided by [SESI], Gray has *inter alia*, repeatedly refused or failed to supply enough properly skilled contractors or workers or proper materials; it is guilty of a substantial breach of the Design-Build Documents; it has defaulted and persistently failed or neglected to carry out the Work in accordance with the Design-Build Documents; and it has persistently failed to perform the provisions of the Contract.

ECF 195-15 at 2. Two days later, Gray responded through counsel, noting its "complete and unexpected surprise." ECF 195-16 at 2. It asserted that "[t]he timing of the termination seems directly related to the parties' settlement negotiations." *Id.* Gray denied any material contractual breach. *Id.* at 3–4. The parties resumed negotiations but eventually hit an impasse. *See* ECF 195-7. On November 21, 2019, Medline confirmed that its "termination remains in effect" and requested Gray to leave the site. *Id.*

## II.   LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to

support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.  DISCUSSION

In its Complaint, Gray brought a breach of contract claim for non-payment (Count I), a wrongful and bad faith termination claim (Count II), a petition to establish and enforce a

mechanic's lien (Count III), and a claim for violation of the Maryland Prompt Payment Act, RP § 9-303 (Count IV). ECF 1. In its motion for partial summary judgment, Gray argues that Medline improperly and in bad faith terminated the Medline/Gray Agreement, and seeks summary judgment on its "termination claims," *i.e.*, Count II, and on Medline's claims "regarding the termination."[3] ECF 195-1 at 7; 38.

In its First Amended Answer, Medline brought a breach of contract counterclaim (Count I), a negligence counterclaim (Count II), a breach of express warranty counterclaim (Count III), a breach of implied warranty of fitness for intended purpose counterclaim (Count IV), and a declaratory judgment counterclaim (Count V). ECF 51. In its motion for partial summary judgment, Medline seeks summary judgment, in whole or in part, on each of Gray's four counts, as well as on its own request for declaratory judgment. ECF 200-1 at 8–9, 39–41.

Given the overlapping arguments in the two motions, this Court addresses the two motions together but addresses the parties' arguments for each disputed count separately.

---

[3] In its opposition, Medline states that it "has not asserted a 'termination claim' against Gray." ECF 248 at 38. Gray does not respond to this argument in its reply. Under Rule 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56. Gray may move for partial summary judgment on a portion of Medline's claims. However, as discussed below, this Court declines to find wrongful termination at this stage of the litigation, whether or not Medline brought any termination-related claims.

### A.  Gray's Breach of Contract Claim for Non-Payment (ECF 1, Count I)

In its Complaint, Gray alleged that it performed work for Medline worth $48,722,424,[4] but that Medline has paid only $41,879,233. ECF 1 ¶ 9. Gray brought a breach of contract claim for nonpayment of the difference—$6,843,191. *Id.* ¶ 11. Gray has since revised its request, and now seeks $6,248,845.28.[5]

A portion of this unpaid balance comes from disputed PCDs. Pursuant to the Agreement, changes in work could be executed through a "Change Order." Medline/Gray Agreement § 6. Gray submitted PCDs to Medline, which reviewed, approved, and incorporated them into formal Change Orders. ECF 1-6; ECF 1-7. Medline rejected all or portions of PCDs Nos. 14, 18, 35, 39, 44, 60, 71, and 72R1. ECF 200-1 at 18; ECF 1-10.

In its motion for partial summary judgment, Medline challenges Gray's PCDs relating to "force majeure," *i.e.*, the heavy amounts of rainfall during the spring and summer of 2018 (PCDs 35, 41, and 60). As originally planned, Gray would substantially complete its work by November 2018. However, Gray asserts that the rainfall pushed the work into winter months and caused it to incur unexpected winter-related costs. Gray requested PCD 35 to cover those seasonal needs, such as temporary heat, blankets, hot water, and additives necessary to protect the ongoing work from winter weather. ECF 1-8 at 6. Gray requested PCD 41 to cover costs of dewatering and subgrade

---

[4] Gray states that the original contract price was $41,876,604 (although the Agreement states $41,876,60<u>5</u>, *see* Medline/Gray Agreement, Exhibit D; *id.* § A.1.4.3.1). ECF 1 ¶ 5. Gray asserts that Medline approved Change Orders 1 through 9, valued at $4,358,557. ECF 1-10. Medline and Gray dispute Project Change Documents Nos. 14, 18, 35, 39, 44, 60, 71, and 72R1 (or portions thereof), which Gray initially valued at $3,021,603. *Id.* Gray asserted it owed Medline $534,340 for "work prevented by Medline." *Id.* Gray concluded that the value of the adjusted contract was $48,722,424 (= $41,876,604 + $4,358,557 + $3,021,603 − $534,340). *Id.*

[5] Gray adjusted the values of three of its Project Change Documents (Nos. 41, 71, 72R1), resulting in a value $594,345.72 less than originally estimated. *Compare* ECF 1-10, *with* ECF 202-23.

remediation that was "due to 'force majeure.'" *Id.* at 13. In this PCD request, Gray explained it installed additional support structures because the excessively wet conditions otherwise prevented erection of the building's shell or installment of the exterior pavement. *Id.* Finally, PCD 60 requested the cost of gas for heating the building while working in the colder winter months. *Id.* at 16; ECF 247 at 14.

The Agreement prohibits monetary damages due to delays unless the delays "are caused solely by (a) events of 'force majeure' that are beyond the reasonable control of the Design-Builder," or the parties mutually agree upon the changes. Medline/Gray Agreement § 8.2.7.1. The Agreement states that "[e]vents of 'force majeure' shall consist of the following, to the extent that they are beyond the reasonable control of Design-Builder and cause delay to the Work: Acts of God . . . ." *Id.* § 8.2.7.2.

Medline first argues that rainfall cannot qualify as "force majeure." ECF 200-1 at 24. Of course, not every storm is an act of God. However, Maryland courts have considered exceptional weather events, including rainfall, to constitute an act of God. *See Sentman v. Baltimore & O.R. Co.*, 78 Md. 222 (1893) (holding that the question of whether the heaviest rainfall ever known was an act of God was properly submitted to the jury); *cf. Gleeson v. Virginia Midland Ry. Co.*, 140 U.S. 435, 439 (1891) (rejecting argument that rainfall constituted an act of God because it was not "of extraordinary character"). Further, Gray has submitted evidence regarding the unusual nature of the 2018 rainstorms. For example, Gray attaches a Baltimore Sun article from July 25, 2018 that reported, "Baltimore already has surpassed a 129-year-old record for July rainfall and is on pace for its wettest summer since observations began in 1870." ECF 247-19 at 3. Upon review of Gray's weather-related PCD requests, Ms. Slattery commented that "it is fair to say Gray had to deal with more water from the heavy rain than they could have anticipated." ECF 195-20 at 2.

14

Based on the evidence presented, a reasonable juror could conclude that the exceptional rainfall experienced by Gray from April through October 2018 amounted to an act of God beyond Gray's reasonable control.

Medline next argues that Gray cannot rely on the force majeure provision because the rain events were not the "sole cause" of the delays. ECF 200-1 at 27. This fact-based argument about the heart of the parties' dispute has no place in a motion for summary judgment.  Medline presents evidence to suggest that events, aside from the rain, contributed to the delayed schedule. *E.g.*, ECF 201-9 (letter from Gray to Allan Myers dated July 16, 2018 stating, "It is Gray's contention that any delay in your Letter was caused in whole or in part by [Allan Myers]"); ECF 201-11 (letter from Gray to subcontractor citing failure to provide enough workers). In contrast, Gray presents evidence that the rainfall alone caused the project to be delayed into the winter. *E.g.*, ECF 247-46 at 138:6–9 (expert testimony that the weather was the sole cause of the delays related to Gray's claims of force majeure); *see also* ECF 247-2 at 3 (Gray provided a bi-weekly weather impact chart to Medline). Thus, a reasonable juror could decide in either party's favor and summary judgment is unwarranted.

Next, Medline argues that Gray's force majeure claim fails because it did not provide the proper notice. ECF 200-1 at 29. Under its terms, the Agreement requires written notice within twenty days of Gray knowing about the force majeure event and the resulting delays.[6] Throughout

---

[6] The relevant provision states: "If either party hereto wishes to obtain postponement or delay in its obligations hereunder by reason of Force Majeure, such party shall notify the other party after cessation of the Force Majeure event, in writing, within twenty days (20) after the party claiming the benefit of the provisions of this paragraph has notice of the existence of the events or circumstances giving rise to its claim of Force Majeure, and any failure to provide such notice shall constitute a waiver of any claim for delay or postponement of performance of any obligations hereunder in connection with such Force Majeure." Medline/Gray Agreement § 8.2.2.

the rainy summer, Gray provided numerous updates to Medline about the weather and its resulting delays on the project. *See supra* n.2. Even if Gray did not use the term "force majeure" until an email dated March 15, 2019, ECF 201-6 at 170:36–171:37, the Agreement required no such formality and Medline cannot now argue that it was not on notice of the resulting delays and additional costs incurred by the heavy rainfall. Consequently, Gray provided the requisite written notice to preserve its force majeure claim.

Finally, Medline argues that Gray is only entitled to additional time, not monetary damages. ECF 200-1 at 32. As described above, the Agreement prohibits monetary damages or any adjustment to the contract total cost due to delays *unless* the delays "are caused solely by (a) events of 'force majeure' that are beyond the reasonable control of the Design-Builder," or the parties mutually agree upon the changes. Medline/Gray Agreement § 8.2.7.1. The Agreement's monetary restriction does not apply to force majeure events. To the extent Gray can prove its delays and resulting costs were caused by an act of God, the Agreement would permit monetary recovery.

## B. Gray's Wrongful and Bad Faith Termination Claim (ECF 1, Count II)

Under § 13.2.2.1 of the parties' Agreement, Medline could terminate for cause under specific circumstances:

> **§ 13.2.2.1** The Owner may terminate the Design-Build Contract if the Design-Builder
>
> .1  fails to submit the Proposal by the date required by this Agreement, or if no date is indicated, within a reasonable time consistent with the date of Substantial Completion;
>
> .2  repeatedly refuses or fails to supply and Architect, or enough properly skilled Consultants, Contractors, or workers or proper materials;
>
> .3  fails to make payment to the Architect, Consultants, or Contractors for services, materials or labor in accordance with their respective agreements with the Design-Builder;
>
> .4  repeatedly disregards applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of a public authority;

> .5    is otherwise guilty of substantial breach of a provision of the Design-Build Documents;
>
> .6    defaults or persistently fails or neglects to carry out the Work in accordance with the Design-Build Documents; or
>
> .7    persistently fails to perform the provisions of this Agreement.

On November 4, 2019, Medline cited this provision of the Agreement and sent notice of its termination for cause. ECF 195-15. Medline relied on provisions .2, .5, .6, and .7 of § 13.2.2.1 to terminate the Agreement. *Id.*

In Count II of its Complaint, Gray brought a "Wrongful and Bad Faith Termination" claim. ECF 1 ¶¶ 15–26. Gray now seeks summary judgment on its "termination claims against Medline," *i.e.*, Count II of its Complaint. ECF 195-1 at 6–7. Gray lists various reasons for "wrongful" termination that appear to be a mixture of breach of contract, unjust enrichment, and bad faith claims.

Both Gray and Medline have moved for summary judgment on Count II of Gray's Complaint. *See* ECF 195 and ECF 200-1 at 29 *respectively*. Both parties have presented numerous arguments as to whether Medline terminated the contract improperly or in bad faith. Some, but not all, of those theories survive summary judgment, as addressed below.

### i.    Substantial performance

Gray first asserts Medline's termination was improper because Gray had already substantially performed its contract obligations. ECF No. 195-1 at 24–26. Specifically, Gray argues that Medline could not have terminated for cause because Gray had already substantially performed. To support this argument, Gray cites general principles of contract law, which state there can be no material breach once there is substantial performance. *Id.* at 25 (citing MARYLAND CONSTRUCTION LAW DESKBOOK 138). However, these common law principles apply to "[j]udicially recognized grounds for termination," and are distinct from contract-based reasons for

termination. *See* CONTRACT TERMINATIONS, MARYLAND CONSTRUCTION LAW DESKBOOK 129. Medline does not rely on common law justifications to terminate its contract; it relies on the grounds set forth in the parties' contract itself. ECF 195-15 at 2.

Gray seeks to find a common law principle beyond the terms of the contract that could invalidate Medline's termination for cause. For this, Gray primarily relies on cases from other jurisdictions, which do not control here. ECF 195-1 at 25. *See, e.g.*, *Parkcrest Builders, LLC v. Hous. Auth. of New Orleans*, No. CV 15-1533, 2018 WL 2766067, at *27 (E.D. La. June 8, 2018), *aff'd in part, appeal dismissed in part sub nom. Parkcrest Builders, L.L.C. v. Liberty Mut. Ins. Co.*, 796 F. App'x 852 (5th Cir. 2020) (citing LSA-C.C. Art. 2014, which prohibits termination of a contract once the obligor has rendered substantial performance); *Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 980 F. Supp. 2d 400, 413 (E.D.N.Y. 2013) (applying New York's common law "rule that gives a remedy in cases of substantial performance with compensation for defects of trivial or inappreciable importance has been developed by the courts as an instrument of justice," *Jacob & Youngs v. Kent*, 230 N.Y. 239, 245 (1921)).

Gray does cite one Maryland case, *First Nat. Realty Corp. v. Warren-Ehret Co.*, 247 Md. 652, 656 (1967). There, the Maryland Supreme Court[7] analyzed a contract that required the work to be performed to the "owner's satisfaction." *Id.* at 659. The parties agreed that the work had been substantially performed, but the owner nonetheless concluded it was not to his satisfaction and

---

[7] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the "Court of Appeals of Maryland" to the "Supreme Court of Maryland." The name change took effect on December 14, 2022. *See also* Md. Rule 1-101.1(a) ("From and after December 14, 2022, any reference in these Rules or, in any proceedings before any court of the Maryland Judiciary, any reference in any statute, ordinance, or regulation applicable in Maryland to the Court of Appeals of Maryland shall be deemed to refer to the Supreme Court of Maryland . . . .").

terminated the contract. *Id.* at 656. The contractor argued that termination was not legally warranted because he had substantially performed his side of the contract. *Id.* at 656. In addressing this issue, the Maryland Supreme Court noted that courts have split on how to determine whether work is "to the owner's satisfaction," with some adopting a reasonable person approach, and with others requiring actual satisfaction. The Maryland Supreme Court noted, "even under the latter view, the owner's claim of dissatisfaction must be made in good faith, and this is ordinarily a question of fact for the jury." *Id.* at 659 (citing 13 Am. Jur. 2d, Building and Construction Contracts § 30). Thus, the Maryland Supreme Court inserted (although not expressly) an implied obligation of good faith and fair dealing into its analysis of whether the owner arbitrarily deemed the work not to his satisfaction and unfairly terminated the contract.

*Warren-Ehert* is inapposite for a few reasons. For one, it deals with a different species of contractual provision that requires performance to the owner's satisfaction. Additionally, it does not stand for the proposition that Gray claims. The *Warren-Ehert* Court concluded that it was arbitrary to terminate a contract when the project was substantially performed *and* in compliance with the contractual standards. *Id.* at 662. One could imagine a parallel scenario to *Warren-Ehert* where a project is complete but functionally inadequate; in such circumstances, the owner could arguably terminate without breaching the implied obligation of good faith. Thus, under *Warren-Ehert*, the completion of the contract, on its own, does not signal bad faith or wrongful termination.

Of note, the *Warren-Ehert* Court did comment that "if we were concerned with only the question of substantial performance, this case could be put to rest with the decisions of this Court in *Gamble v. Woodlea Construction Co., Inc.*, 246 Md. 260 (1967), *Evergreen Amusement Corp. v. Milstead*, 206 Md. 610, 621 (1955), *Parker et al. v. Tilghman v. Morgan, Inc. et al.*, 170 Md. 7

(1936) and *Hammaker v. Schleigh*, 157 Md. 652 (1929)." *Warren-Ehert*, 247 Md. at 656–57. In those cases, the Maryland Supreme Court explained:

> In a building contract when the plaintiff, in good faith, performs all that the contract requires, although not at the time or in the manner required, but substantially as agreed, except in respect to those things which he is prevented from performing through the breach or default of the owner, the plaintiff is entitled, when the owner has received the fruits of plaintiff's work, material, and labor, to recover, since full performance has failed in those things which are not of the essence of the contract and since otherwise there would be a forfeiture of the plaintiff's beneficial work, labor, and material to the unjust enrichment of the owner.
>
> *** The mode of ascertaining the real benefit derived by the owner from the substantial performance of the contract where there has been no willful breach going to the essence of the contract, but comparatively slight omissions and defects in performance which can be readily ascertained, measured, and compensated in damages, is ordinarily to estimate the whole work at the price fixed by the contract and to deduct from that amount whatever sum would be required to complete the part of the work left unfinished through the default of the contractor.

*Gamble*, 246 Md. at 265 (citing *Hammaker*, 157 Md. at 668–669). Thus, an argument of substantial performance is effectively an argument of unjust enrichment.

"The question of whether there has been substantial compliance and whether a deviation from contract requirements is wilful or justified, is ordinarily a question for the trier of the facts." *Evergreen Amusement*, 206 Md. at 621. Medline and Gray dispute whether the project was substantially complete, presenting conflicting evidence as to how much of the project remained. *Compare* ECF 195-1 at 12 ¶ 16, 14 ¶ 21 (relying on certification of completion by the parties, Medline's occupancy and use of the building, and Medline's approved payments for Gray's work), *with* ECF 248 at 21 (relying on the estimated percentage of time remaining on the project). Medline and Gray also dispute whether Gray breached the contract prior to Medline's termination.

Ultimately, whether the project was substantially completed, whether Gray breached the contract, and if so, whether Gray's breach goes "to the essence of the contract" are questions of fact inapposite for summary judgment.

### ii.    Waiver of Right to Terminate

Gray next argues that Medline waived the right to terminate the parties' contract by waiting too long to raise its issues. ECF No. 195-1 at 26–27. As originally scheduled, Gray was to substantially complete its work by November 20, 2018. Medline/Gray Agreement § A.2.2. Medline terminated the contract on November 4, 2019, nearly one year later. ECF 195-15.

Under Maryland law, "[i]t is well-established as a general rule that 'the parties to a contract by their conduct may waive the requirements of the written contract.'" *Myers v. Kayhoe*, 391 Md. 188, 205 (2006) (citing *Questar v. Pillar*, 388 Md. 675, 686 (2005)). "Waiver, in general, is 'the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances.'" *Id.* (quoting *Creveling v. GEICO*, 376 Md. 72, 96 (2003). However, "[a] waiver of a contractual provision must be clearly established and will not be inferred from equivocal acts or language." *Id.*

There was no express waiver by Medline. Gray relies on the circumstances to suggest an implied waiver, arguing that Medline permitted Gray to keep working for approximately a year after its alleged breach, without providing any warning that it might terminate the contract. ECF 195-1 at 26. However, the undisputed facts do not support this argument.

In November 2019, Medline cited multiple reasons why it terminated the contract, including: (1) Gray's failure to supply enough properly skilled workers, and (2) Gray's breach of the Design-Build Documents and the Agreement. ECF 195-15. In her deposition, Ms. Slattery

explained that the termination related to "the pace at which progress was made on the building construction particularly of the floor slab and other items outlined in their review of PCDs 35 [Winter Conditions] and 41 [Dewatering and Subgrade Remediation]," as well as other reasons continually discussed between the parties. ECF 196-12 at 357:21–24, 361:6–8. Ms. Slattery also noted that Medline was "stuck on releasing or waiving claims on change orders related to the work relative to the retaining wall." *Id.* at 371:5–7. Based on the November 4, 2019 letter and Ms. Slattery's deposition, Medline's termination of the contract in part related to issues spawning from the retaining wall's failure. Medline first discovered the potential link between Gray's work and the wall's failure in the summer of 2019 when SESI's engineers released their report—only a few months before Medline terminated the contract. Medline immediately raised these issues and shared the SESI reports with Gray. Thus, Medline did not wait nearly a year to raise issues underlying its decision to terminate the contract, and Gray's argument fails.

### iii.   Material Breach by Medline

Gray next asserts that Medline wrongfully terminated the contract because Medline materially breached the contract first by failing to make owed payments. Specifically, Gray asserts that Medline refused to pay Applications Nos. 13–17 for work completed by Gray from March 1, 2019 to July 31, 2019, totaling approximately $2 million. ECF 195-23 at 2; ECF 195-24 at 2.

Under Article 9 of the Agreement, Gray developed a payment schedule allocating the total cost to various stages of the project. Medline/Gray Agreement § 9.2. At least ten days before the date established by this schedule for progress payment, the Agreement required Gray to submit an "Application for Payment," providing evidence of Gray's completed work and right to payment. *Id.* § 9.3.2. For these progress payments, the Agreement required that Medline "shall make

payments on account to [Gray] equal to ninety percent (90%) of the value of the Work completed, . . . , up to the last day of the current calendar month . . . ." *Id.*

Medline withheld payments associated with Pay Applications Nos. 13–17. *See* ECF 247-8 at 5. Gray argues Medline approved these payments and that a failure to pay them amounted to a breach of contract. ECF 195-1 at 27–28. Medline denies approving these Pay Applications. ECF 248 at 27. However, Ms. Slattery testified that these payments "were partially approved" but intentionally withheld from Gray. ECF 196-12 at 352:2–14. Regardless of their approval status, Medline argues that it had a contractual right to withhold payments to protect itself from losses related to the failure of the retaining wall and the "amounts necessary to correct Gray's defective work." ECF 248 at 27–28. This Court agrees.

Under the Agreement, Medline could reject or retroactively nullify an Application for Payment "as may be necessary to protect [Medline] from loss for which [Gray] is responsible because of . . . defective Work, including design and construction, not remedied[.]" *Id.* § 9.5.1. If Medline rejected an Application for Payment, Medline had to issue a written rejection within 14 days of receipt of the application. *Id.* § 9.4. Within 30 days, the Agreement required Medline to indicate the amount it believed was due and provide written explanation for the rejection. *Id.*

Thus, even if Medline approved the Applications for Payment, Medline had a contractual right to reverse that approval to protect itself from loss due to Gray's defective work. Medline presents evidence that Gray's work, and that of its subcontractors, was defective and required costly remediation. *See* ECF 200-1; *see also* ECF 248 at 27. Further, Medline informed Gray that it was withholding the applications pursuant to this contractual provision to cover its potential losses. ECF 247-8 at 6.

23

Gray cites *Shapiro Eng'g Corp. v. Francis O. Day Co.*, 215 Md. 373 (1958) for the proposition that a failure to pay a contractor for work performed amounts to a material breach of contract. However, the contract in *Shapiro* did not include an analogous contractual provision permitting the obligator to withhold payment to protect against loss. Rather, in *Shapiro*, the defendant refused to pay because the plaintiff declared its intention to cease working, which the defendant relied on as an anticipatory breach. *Id.* at 377–78. The Maryland Supreme Court concluded that the plaintiff could not complete the work because it would involve trespass and thus the defendant's refusal to pay was unjustified. *Id.* at 378.

Here, the parties' Agreement includes an express provision permitting Medline to withhold payment to prevent loss from Gray's defective work. Medline and Gray "are bound by the contract itself, construed by the same rules of law which govern all other contracts." *William F. Klingensmith, Inc. v. David H. Snell Landscape Contractor, Inc.*, 265 Md. 654, 660 (1972) (citing *Baltimore & O. R. Co. v. Stewart*, 79 Md. 487 (1894)) (internal quotation marks omitted); *Cf. Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 626 (2017) ("The complex web of contracts that typically undergirds a public construction project should govern because parties have sufficient opportunity to protect themselves (and anticipate their liability) in negotiating these contracts.").

Whether Gray's work was defective remains a factual dispute. But the act of withholding payments to protect itself from loss is contemplated by the Agreement and is not facially a breach of contract.[8] Accordingly, Gray may not pursue that theory of wrongful termination at trial.

### iv.   Failure to Provide Notice and Opportunity to Cure

Gray next argues that Medline failed to provide Gray with the notice required by the contract and failed to provide the opportunity to cure implied by law. ECF No. 195-1 at 28–29. The Agreement requires Medline to give notice of termination. Medline/Gray Agreement § 13.2.2.2. The November 4, 2019 letter stated that "Medline hereby terminates the Contract," but also provided, "Notice is also given that seven days from the date of this correspondence, Medline will exercise its rights under Section 13.2.2.2 of the Contract." ECF 195-15 at 2. Thus, Medline gave the contractually required notice of its termination, which went into effect seven days after the November 4, 2019 letter.

The Agreement provides no express right to cure. *See also* MARYLAND CONSTRUCTION LAW DESKBOOK 129 (2017) (contrasting the notice and cure requirements of an AIA contract, which was used by Medline and Gray, with the Consensus DOCS contract and noting the "more onerous" requirements of the latter). Nonetheless, various treatises have recognized an implied right to cure in construction contracts. 5 BRUNER & O'CONNOR CONSTRUCTION LAW § 18:41 ("Cure is a fundamental common-law right implied in every contract as a matter of law."); *id.* § 18:15 ("The right of a breaching party to be given an opportunity to cure its own material breach

---

[8] Gray makes the same arguments for Medline's rejection of PCDs Nos. 14, 18, 35, 39, 44, 60, 71, and 72R1. ECF 200-1 at 18; ECF 1-10. These arguments have even less force because Medline had not approved those changes in work scope. Even if it had approved them, the Agreement still permits retroactive withholding of payments to cover anticipated loss due to Gray's defective work. Medline/Gray Agreement § 9.5.1.1.

is an ancient equitable principle"); *see also U.K. Const. & Mgmt., LLC v. Gore*, 199 Md. App. 81, 93 (2011) (citing TAMARA MCNULTY, MARYLAND CONSTRUCTION LAW 180 (2007) ("The owner, however, under the terms of most construction contracts must give the contractor notice of the incomplete or defective work and opportunity to cure before it will be entitled to complete or correct the work itself."); TROY MICHAEL MILLER, CONSTRUCTION CHECKLISTS 92 (2008) ("The right to cure is a fundamental contractor right.")); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981) (listing the inability of a party to cure the failure as a factor of the failure's materiality). Some state courts expressly have recognized this implied right to cure. *See e.g.*, *Centerplan Constr. Co., LLC v. City of Hartford*, 343 Conn. 368, 412 (2022) ("Under our common law, when a contract is silent as to notice and cure rights, the right to cure is implied in every contract as a matter of law unless expressly waived."); *McClain v. Kimbrough Const. Co.*, 806 S.W.2d 194, 198 (Tenn. Ct. App. 1990) ("[C]ourts have imposed upon contractors the duty to give subcontractors notice and an opportunity to cure before terminating the contract for faulty performance.").

At least one reported Maryland case has implied a right to cure. In *U.K. Const. & Mgmt.*, the Appellate Court of Maryland primarily addressed an issue of *res judicata*. 199 Md. App. at 95. Nonetheless, the appellate court noted "that a plaintiff may not assert a claim for breach of warranty against a defendant whom he has denied the opportunity to correct the defect," citing many of the above treatises. 199 Md. App. at 93. Thus, this Court will assume that there is an implied right to cure under Maryland law.

Further, the underlying purpose of a notification requirement is to provide an opportunity for the breaching party to cure. *See The Surety's Response to the Obligee's Declaration of Default and Termination: "To Perform or Not to Perform—That Is the Question,"* CONSTR. LAW., January

26

1997, at 8 ("Virtually all termination for default clauses require the owner to give the contractor 'notice of default.' The purpose of this notice is to give the contractor an opportunity to 'cure' the defaults and thereby preclude termination."); *McClain*, 806 S.W.2d at 198 ("Requiring notice is a sound rule designed to allow the defaulting party to repair the defective work, to reduce the damages, to avoid additional defective performance, and to promote the informal settlement of disputes."). If Gray were not permitted to fix the underlying problems, there would be little benefit or purpose to requiring seven days' notice. For these reasons, Medline was required to give Gray an opportunity to cure the breaches before termination.

Medline, however, gave Gray this opportunity. Medline alerted Gray to the potential problems with its work in letters dated April 9, 2019 (ECF 202-4), May 16, 2019 (ECF 202-9), and in early August (*see* ECF 202-19 (letter from Gray acknowledging receipt of additional reports and alleged errors)). Additionally, the termination letter did not go into effect until seven days' time, which also gave Gray an opportunity to remedy the underlying issues. The fact that Gray and Medline continued to negotiate after the termination letter further shows Gray had both notice and an opportunity to cure. As a result, Medline satisfied this implied obligation, which cannot constitute the basis for a wrongful termination claim.

### v.   Improper Justification for Termination

Gray is correct that the Agreement does not permit Medline to terminate for cause because of Gray's refusal to accept a settlement offer. *See* Agreement § 13.2.2. Indeed, the Agreement provides a procedure to resolve disagreements between the parties while ensuring that work continues. *Id.* § 14. However, the parties presently dispute why Medline terminated the contract. Gray believes that Medline terminated because Gray refused to accept the settlement offer. As proof, Gray notes the temporal proximity between the termination letter and the payment disputes

27

between the parties, and highlights a subsequent email from Ms. Slattery with language suggesting the termination was "based on" Gray's refusal to settle. In turn, Medline asserts it relied on the reasons explained in its termination letter, as supported by the defects in Gray's work discovered over the prior summer.

The cause of Medline's termination is a factual dispute for trial. As a result, the issue of whether Medline improperly terminated the Agreement likewise is a factual dispute. Until a factfinder determines why Medline terminated the contract, this Court cannot determine whether Medline's justification was proper.

### vi.   Medline and Schuster Settlement Agreement

On May 29, 2019, while Medline withheld payments to Gray and others as it investigated the cause of the retaining wall's failure, Schuster (Gray's subcontractor) filed a "Petition to Establish and Enforce a Mechanic's Lien" with the Circuit Court for Cecil County, Maryland. ECF 203-19 at 1. Schuster commenced an action in the circuit court and sought to establish and enforce a claimed mechanic's lien against the Property for over $1 million. *Id.* at 2. Medline denied the claims and asserted counterclaims for breach of contract, negligence, breach of express warranty, and declaratory judgment. *Id.* Ultimately, on February 8, 2021, Medline and Schuster settled their claims. *Id.* at 1.[9]

Gray argues that this settlement agreement and release of claims eliminates any legitimate basis for Medline's termination. ECF 195-1 at 31. Presently, Gray is asserting that Medline wrongfully terminated its contract with Gray in November 2019. A subsequent settlement with

---

[9] Medline, through the settlement agreement, released Schuster and Medline "from any and all claims . . . which Medline had or has against [Schuster], arising from or relating to the Project or the Property," including claims related to the "sweating" concrete floor. ECF 203-19 at 3–6.

one of Gray's subcontractors has no bearing on whether Medline wrongfully terminated the Medline/Gray Agreement fifteen months earlier.

### vii.    Bad Faith

Medline and Gray initially disagree about what law governs a bad faith termination claim. *Compare* ECF 200-1 at 36, *and* ECF 262 at 19, *with* ECF 195-1 at 25, 32, *and* ECF 262 at 19. "Maryland contract law generally implies an obligation to act in good faith and deal fairly with the other party or parties to a contract." *Questar Builders, Inc. v. CB Flooring, LLC*, 410 Md. 241, 273 (2009) (citing *Clancy v. King*, 405 Md. 541, 565 (2008)).[10] "That implied obligation governs the manner in which a party may exercise the discretion accorded to it by the terms of the agreement." *Id.* (citing *Julian v. Christopher*, 320 Md. 1, 9 (1990)). "Thus, a party with discretion is limited to exercising that discretion in good faith and in accordance with fair dealing." *Id.*; *see also Port E. Transfer, Inc. v. Liberty Mut. Ins. Co.*, 330 Md. 376, 385 (1993) ("Even when the parties are silent on the issue, the law will impose an implied promise of good faith.").

For explanation of what constitutes a breach of this implied obligation, the Maryland Supreme Court has favorably quoted the Fourth Circuit's summary of Maryland law:

> [T]he covenant of good faith and fair dealing "does not obligate a [party] to take affirmative actions that the [party] is clearly not required to take under [the contract]." *Parker v. Columbia Bank*, 91 Md. App. 346 (1992) (addressing duty of good faith and fair dealing in contracts between lender and borrower). Rather, the duty "simply prohibits one party to a contract from acting in such a manner as to

---

[10] Medline argues *Questar* is irrelevant because it analyzes the enforceability of a termination-for-convenience provision, not a for-cause provision. ECF 262 at 19. Indeed, the *Questar* Court discusses the good faith and fair dealing requirement as a necessary exception to termination-for-convenience provisions. *Questar Builders*, 410 Md. at 268 (noting the exception is necessary "so as not to render a contract illusory"). However, in that opinion, the *Questar* Court also describes general principles of contract law in Maryland, citing cases unrelated to the enforceability of termination-for-convenience provisions. *Id.* at 273. Thus, the obligation to act in good faith and deal fairly applies to contract law generally.

> prevent the other party from performing his obligations under the contract." *Id.* . . . In short, while the implied duty of good faith and fair dealing recognized in Maryland requires that one party to a contract not frustrate the other party's performance, it is not understood to interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise. An implied duty is simply a recognition of conditions inherent in expressed promises.

*Blondell v. Littlepage*, 413 Md. 96, 114 (2010) (citing *Eastern Shore Markets, Inc. v. J.D. Associates, Ltd.*, 213 F.3d 175, 184 (4th Cir. 2000)). "Stated otherwise, under the covenant of good faith and fair dealing, a party impliedly promises to refrain from doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them." *See Clancy*, 405 Md. at 571 (citing *Eastern Shore Markets*, 213 F.3d at 184) (internal quotation marks omitted). Thus, the question before this Court is whether there is a genuine dispute that Medline terminated the contract in bad faith, *i.e.*, "act[ed] in such a manner as to prevent [Gray] from performing [its] obligations under the contract" or "frustrat[ed] the right of [Gray] to receive the fruits of the contract between them." *Blondell*, 413 Md. at 114; *Clancy*, 405 Md. at 571.

Gray first argues there was bad faith because it was willing to continue working. ECF 195-1 at 33. To support this argument, Gray relies on a 1974 case from the Eastern District of Arkansas, *Paul Hardeman, Inc. v. Arkansas Power & Light Co.*, 380 F. Supp. 298, 315 (E.D. Ark. 1974). This case is unpersuasive for a few reasons. First, it applied Arkansas law, not Maryland law. Second, in contrast to Gray's description of the case, the *Hardeman* court did not find bad faith merely because the contractor was willing to continue working. Rather, the *Hardeman* court concluded that the reasons given by the utility company for the termination were pretextual. Although the utility company asserted it terminated the contract because deadlines were not being met, the court found that the utility company sought to terminate the contract because the

contractor had discovered potential legal and factual issues with the bidding process. *Id.* at 314–15. The court concluded that the utility company's pretextual termination was in bad faith. *Id.* at 331. Thus, even under *Hardeman*, the sole fact that Gray promised to keep performing would not prove bad faith.

As discussed above, Gray must show there is no genuine dispute that Medline "act[ed] in such a manner as to prevent [Gray] from performing [its] obligations under the contract" or "frustrat[ed] the right of [Gray] to receive the fruits of the contract between them." *Blondell*, 413 Md. at 114; *Clancy*, 405 Md. at 571. To this end, Gray asserts that Medline's post hoc justification for termination of its contract, *i.e.*, Gray's alleged poor performance and breach, was pretextual. In Gray's view, Medline terminated the contract because it did not want to pay Gray. ECF 195-1 at 33. To support this theory, Gray highlights the conduct of Ms. Slattery, who serves as Medline's Vice President of Building Design and Construction. ECF 196-12 at 13. Specifically, Gray asserts Ms. Slattery "lied to her boss in order to sabotage the settlement discussions and justify the termination" and "schem[ed]" to replace Gray with Gray's competitor, Alston. ECF 195-1 at 33–35. For evidence of this, Gray points to an email from Ms. Slattery to her boss, dated October 11, 2019, where she summarized the relationship and issues between Medline and Gray. ECF 195-18. In this email, she informs her boss that Gray is requesting "about $1.2M" in change orders and that Medline has paid "small pieces" of this. *Id.* She notes that Allan Myers has filed a lien on the property for the value of those change orders, but that "Gray refuses to bond over [them], as they are contractually obligated to do." *Id.* In addition to Ms. Slattery's email, Gray highlights the timing of the termination, noting that the project was substantially done and Gray and Medline were at an impasse about existing payment requests.

In contrast, Medline argues it had a "reasonable business justification" to terminate the Agreement and no reasonable jury could find that Medline's decision was either "malicious" or "arbitrary and capricious." ECF 202-1 at 37 (citing *Richland Wholesale Liquors v. Glenmore Distilleries Co.*, 818 F.2d 312, 316 (4th Cir. 1987)); *see also* ECF 248 at 17, 19 (same). However, Medline relies on an inapposite legal standard. *Richland* applies South Carolina case law, *see Richland*, 818 F.2d at 315, but the Medline/Gray Agreement includes a Maryland choice-of-law provision, *see* Medline/Gray Agreement § 15.1. Nonetheless, Medline presents evidence that Gray or its subcontractors completed defective work. If Gray substantially breached or committed any other error under § 13.2.2.1, as Medline alleges, this would undermine Gray's argument that Medline acted in bad faith when it terminated the Agreement.

In short, both parties have presented evidence about whether Medline's termination was in good faith, and the issue survives both parties' motions for partial summary judgment.

### C. Gray's Claim Under Maryland's Prompt Payment Act (ECF 1, Count IV)

Under Maryland law, "a contractor or subcontractor who does work or furnishes material under a contract shall be entitled to prompt payment," *i.e.*, within seven days from the date specified in the contract or thirty days after the owner takes possession. RP § 9-302. This statutory obligation, however, applies to "undisputed amounts." *Id.* The statute defines "undisputed amount" as "an amount owed on a contract for which there is no good faith dispute, including any retainage withheld." RP § 9-301(f).

The amounts withheld by Medline are clearly disputed. Medline withheld the payments under Section 9.5.1 of the Agreement, which permits Medline to reject a payment request or nullify an existing payment to protect against subsequently discovered defective work. Medline and Gray vigorously disagree about whether Gray's work was defective, and therefore disagree about

whether Medline owes Gray payment for the work. Thus, the amounts at issue are disputed, and prompt payment is not required under RP § 9-302.

Nonetheless, Gray takes issue with the fact that Medline failed to give contractually required fourteen days' notice in withholding the payment. ECF 247 at 39. Regardless of whether Medline provided the proper notice, the underlying amount owed remains disputed. As a result, this Court will grant summary judgment for Medline as to Count IV of Gray's Complaint.

### D. Gray's Petition to Establish and Enforce a Mechanic's Lien (ECF 1, Count III)

On November 15, 2019, Gray issued PCD 72R1 in the amount of $728,875.00 for "Betterments and Site Improvements to Complete Contract." ECF 1-8 at 21. The PCD included improvements to the asphalt pavement and storm sewer system requested by Medline, but not yet executed. *Id.*; ECF 247-26 at 202:8–14. Given the parties' falling out, Gray never completed this work. ECF 247-26 at 211:5–6. Nonetheless, Gray included PCD 72R1's total cost in its petition for a mechanic's lien. ECF 1-10.

Medline highlighted this error during discovery and the deposition of Gray's attorney, Mr. Carpenter. *See* 247-26 at 200:1–203:25. Mr. Carpenter acknowledged the error. *Id.* at 211:13–14. Consequently, Gray revised its answer to Medline's interrogatories and updated the disputed amount requested pursuant to PCD 72R1, as well as PCDs 41 and 71. ECF 202-23 at 14. All changes made to the PCD amounts are as follows:

| PCD No. | Date | Orig. Amt. (ECF 1-10) | Rev. Amt. (ECF 202-23) | Description of Change (ECF 1-8) |
|---------|------|-----------------------|------------------------|----------------------------------|
| 41 | 3/15/2019 | 1,049,132.00 | 1,252,999.93 | Dewatering and Subgrade Remediation |
| 71 | 9/24/2019 | 353,533.00 | 189,470.35 | Impacts Associated with Retaining Wall |
| 72R1 | 11/15/2019 | 728,875.00 | 94,724.00 | Betterments and Site Improvements to Complete Contract |
| **TOTAL** | | **$ 3,021,603.00** | **$ 2,427,257.28** | |

In an affidavit, Mr. Carpenter explained, "I did not realize it at the time [of filing the mechanic's lien petition] some of the work included in PCD 72R1 was not complete. . . . At no time did I willfully and intentionally overstate the amount of Gray's lien claim." ECF 247-2 ¶¶ 8–9.

Courts around the country have held "that if a claimant for a mechanic's lien has wilfully and intentionally exaggerated his claim, he cannot enforce any amount of his claim against the subject property." *Gamble v. Woodlea Const. Co.*, 246 Md. 260, 266 (1967). However, the Maryland Supreme Court has never decided whether this rule applies in Maryland courts. *Id.* at 267 ("This question apparently has never been decided by this Court. We do not reach the question in the present case[.]"). Regardless of whether this rule is recognized in this state, Medline has presented no evidence to suggest that Gray willfully and intentionally exaggerated its claim. Although ultimately mistaken, Gray had specific bases for its original cost estimates. *See* ECF 1-8 at 23 (itemizing PCD 72R1). Gray reported those bases in a transparent manner such that Medline was able to catch the error. And in response, Gray updated its requests, ultimately lowering its requested damages by $594,345.72. On these facts, there is no evidence to suggest Gray intentionally sought to deceive Medline. Medline's motion for summary judgment on this count is therefore denied.

### E.  Medline's Claim for Declaratory Judgment (ECF 51, Count V)

In its First Amended Answer, Medline brought counterclaims against Gray, including a count seeking declaratory relief. Specifically, Medline sought declaratory judgment from this Court that "Medline owes Gray nothing under the Medline/Gray Contract; that the Disputed PCDs are null and void, of no force or effect and that Gray is not entitled to any of the amounts requested in the Disputed PCDs." ECF 51 ¶ 121. In its motion for partial summary judgment on this claim, Medline now seeks summary judgment as to two specific issues with the PCDs: (1) Gray's

adjustment of the value allocated to PCD 41, and (2) Gray's claim for money owed to Schuster under PCD 35.

### i.    Increase of PCD 41

As described above, in its answer to Medline's interrogatories, Gray allocated additional costs to PCD 41, while decreasing costs allocated to PCDs 71 and 72R1. Medline challenges whether this revision to PCD 41 is permissible under the statute. Under the subtitle "Remedial construction of law," the Maryland mechanic's lien statute reads:

> This law is remedial and shall be so construed to give effect to its purpose. Any amendment shall be made in the proceedings, commencing with the claim or lien to be filed and extending to all subsequent proceedings, as may be necessary and proper. However, the amount of the claim or lien filed may not be enlarged by amendment.

RP § 9-112. Medline argues that this provision prohibits enlargement of the lien amount, and therefore, Gray cannot increase the costs it seeks under PCD 41. ECF 200-1 at 39. Gray argues that this reallocation of costs is permissible because the total amount of the lien has not enlarged. ECF 247 at 37. Thus, the question is whether "the amount of the claim or lien" refers to the total amount of the lien or any subdivision created by the parties, such as the individual PCDs.

Maryland courts have not directly addressed this re-allocation issue, perhaps because the accounting error experienced by Gray is (hopefully) unusual. When interpreting a statute, the Court "begin[s] with an examination of the text of a statute within the context of the statutory scheme to which it belongs." *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 169 (2021). "A particular section of a statute must be construed in a manner consistent with the larger statute's object and scope." *Id.* at 169–70.

The Maryland Supreme Court has oft emphasized that the mechanic's lien statute is to be given liberal construction to serve its remedial purpose, particularly when dealing with

35

subcontractors. In a comprehensive review of the statute's history and purpose, Justice Wilner explained:

> The mechanic's lien law has historically been construed "in the most liberal and comprehensive manner in favor of mechanics and materialmen." *T. Dan Kolker, Inc. v. Shure*, 209 Md. 290, 296 (1956) and cases cited therein. Indeed, the law itself provides that it is remedial and is to be construed to give effect to its purpose. § 9-112. . . . [H]owever, that, as a mechanic's lien was unknown at common law and is purely a creature of statute, it is "obtainable only if the requirements of the statute are complied with." *Freeform Pools v. Strawbridge*, 228 Md. 297, 301 (1962); *Aviles v. Eshelman Elec. Corp.*, 281 Md. 529, 536 (1977).

*Winkler Const. Co. v. Jerome*, 355 Md. 231, 246 (1999). Maryland was the first state in the nation to create a mechanic's lien. *Barry Properties, Inc. v. Fick Bros. Roofing Co.*, 277 Md. 15, 17 (1976) (citing Laws of Maryland 1791, ch. 45, § 10). And by so doing, "the primary intent of the General Assembly was to provide those who had contributed work or materials to the construction of a project with some security that they would be compensated for their contribution." *Barry Properties*, 277 Md. at 36.

Although the goal of the statute is to protect the worker, the Maryland courts have historically demanded proper and adequate notice. Prior to 1976, a mechanic's lien attached automatically as soon as the work was completed. *Winkler*, 355 Md. at 247. Nonetheless, the Maryland Supreme Court required that notice of a lien's attachment should "fully and specifically state the particulars of the claim and the nature and kind of work done or materials furnished, and the time when done or furnished, and the amount of the claim." *Dist. Heights Apartments, Section D-E v. Noland Co.*, 202 Md. 43, 51 (1953) (citing *Welch v. Humphrey*, 200 Md. 410, 414 (1952)). The Maryland Supreme Court explained that "[t]he purpose of this notice [was] to inform the property owner of the nature and amount of the claim intended to be fixed as a lien upon his property, in order that he may be able to protect himself in his future dealings with the contractor."

*Id.* Eventually, in 1976, the Maryland Supreme Court held the mechanic's lien, as then written, unconstitutional for failing to give adequate notice to the owner about the lien. *See Barry Properties*, 277 Md. at 31. The Maryland General Assembly promptly re-wrote the statute, ensuring proper notice requirements. *Winkler*, 355 Md. at 249.

Consequently, Maryland courts interpret the statute to strike a balance between the General Assembly's goal of protecting the contractor/subcontractor and the owner's due process rights. *See, e.g.*, *Arfaa v. Martino*, 404 Md. 364, 379 (2008) ("In light of the sometimes conflicting interests of owners in due process on the one hand, and of subcontractors in liberal protection on the other, we interpret RP § 9-105 in a manner that does not absolve the subcontractor of the duty to include in the petition, *inter alia*, an adequate description of the building to which a lien would attach. Simultaneously, however, we may not interpret RP § 9-105 in such a manner that the subcontractor's burden is rendered so difficult, that the subcontractor is prevented from obtaining a mechanics' lien."). From this perspective, the statute's prohibition against enlargement of the lien serves to provide proper notice. Through the petition, the owner has notice of the amount of the lien and knows how much money to reserve. In the present case, Medline does not face any due process concerns because the total amount sought by Gray has only lessened, not increased. [11]

Aside from this backdrop of the statute's history, there is the plain text of the statute. The statute prohibits enlargement of "the amount of the . . . lien." RP § 9-112. It says nothing about

---

[11] At least one Maryland court, in an unreported opinion, has viewed the prohibition against enlargement in light of this notice requirement. *Com. Contractors Grp., Inc. v. FC Gen Real Est., LLC*, No. 0921 Sept. Term 2015, 2016 WL 4261158, at *6 (Md. Ct. Spec. App. Aug. 11, 2016) ("The implication of RP § 9-112 is that a subcontractor cannot simply amend the amount claimed in its original petition. It must send new notice to the owner, and file an amended petition with the new amount after notice has been given."). However, given the opinion's unreported status, this is neither binding precedent nor persuasive authority. *See* Md. Rule 1-104.

any subdivision or allocation created by the parties. Here, "the amount of the . . . lien" has decreased.

Relatedly, the Maryland Rules provide additional guidance about how a party may go about amending its petition. Under the Maryland Rules, "Pleadings in an action to establish a mechanics' lien may be amended . . . , except that . . . no amendment shall be permitted that will increase the amount of the claim or materially alter the description of the land." *See* Maryland Rule 12-303. The plain text of this rule likewise considers only the "amount of the claim," not the cost allocated to a specific task or material. Further, the Rule discusses the amendment of *pleadings* when changing the amount of the lien. Here, Gray need not amend its pleading to adjust the division of costs among the PCDs. To establish a statutory lien, a party must file a petition that sets out: (1) the name and address of the petitioner, (2) the name and address of the owner, (3) a description of the land, (4) proof of required notice, and (5) "[t]he nature or kind of work done or the kind and amount of materials furnished, the time when the work was done or the materials furnished, the name of the person for whom the work was done or to whom the materials were furnished, and the amount or sum claimed to be due, less any credit recognized by the petitioner." RP § 9-105(a). In its revised answer to interrogatories, Gray itemizes the new costs associated with PCD 41, adding costs for "General Conditions," "Builder's Risk Insurance," "Stormwater Management Bond," undisclosed fees, and various markups. ECF 202-23 at 14 n.1. Gray does not need to amend its petition or any pleading to include these costs. As a result, the statute's prohibition on enlargement of the lien's amount does not preclude Gray from now including these costs.

Medline argues that this interpretation of the statute would permit any petitioner to artificially inflate their petition amount and then subsequently amend other claims. ECF 262 at 23. First, Medline is not without a remedy. If any of the costs sought by Gray are unfounded, they can

be challenged and dismissed. Further, although Maryland courts have yet to formally recognize the rule, the general rule across the country protects against intentional inflation of the lien amount. In sum, this Court holds that to ensure adequate notice to the owner and provide security to the contractors, "lien" under the statute refers to the total cost of the lien asserted, and not to a subdivision created by the parties for the purposes of facilitating payment. Medline's motion seeking summary judgment on this issue is therefore denied.

### ii. Money Owed to Schuster

Finally, Medline seeks a declaratory judgment that it does not owe Gray $352,473.00 under PCD 35.[12] Medline argues that this money is for work completed by Schuster but never paid for by Gray. Given Schuster has released all claims against Medline and Gray under the Medline/Schuster Settlement Agreement, Medline argues that Schuster can never seek this money from Gray. ECF 200-1 at 40. In short, Gray has not paid this money and will never owe this money.

Gray presents no evidence that it bore these costs, and it does not dispute that it never paid Schuster for this work. When asked about this charge under PCD 35, Brad Piatt, Gray's Project Manager, testified that this amount had been owed to Schuster. ECF 201-6 at 240:20–24. But, to his best knowledge, Schuster was no longer seeking that amount from Gray given the Schuster/Medline Settlement. *Id.* at 242:17–20.

---

[12] In PCD 35—the Project Change Document seeking recovery of costs incurred due to winter conditions—Gray itemized one cost as "Concrete – Cost To Date" for $352,473.00. ECF 1-8 at 7. In the PCD description, Gray stated that the costs were for "additives necessary to protect office finishes, stone subgrade and concrete from winter weather." *Id.* at 6. When reviewing this PCD, Bart Plunkett, Medline's consultant, summarized this charge as "[c]oncrete costs including accelerator, hot water, finisher overtime, blanketing slabs and subgrade, and removing frost and muck from dolly pads." ECF 195-20 at 5.

As a part of that settlement agreement, Schuster released any claims against Gray as well as Medline. The Medline/Schuster Settlement Agreement reads: "Schuster, . . . release[s] and forever discharge[s] Gray . . . from any claim that Schuster is owed any further compensation whatsoever from Gray under the Schuster Subcontract and/or for materials and/or labor provided by Schuster to the Project or the Property." ECF 203-19 at 5. Gray argues that Medline has put forward no evidence that the settlement's claims compensated Schuster for the concrete-related costs at issue in PCD 35. ECF 247 at 39. Regardless of what work Medline ultimately compensated Schuster for, Schuster has released Gray "from any claim that Schuster is owed any further compensation whatsoever from Gray under the Schuster Subcontract." This broad language includes the concrete work Schuster completed, and the resulting winter-related costs incurred, at issue in PCD 35.

Medline is therefore entitled to declaratory judgment that it does not owe Gray the $352,473.00 listed under PCD 35, and this Court will grant its partial summary judgment motion on that issue.

## IV.   CONCLUSION

For the reasons stated above, Gray's Motion for Partial Summary Judgment, ECF 195, is GRANTED IN PART and DENIED IN PART, and Medline's Motion for Partial Summary Judgment, ECF 200, is also GRANTED IN PART and DENIED IN PART. Specifically:

(1) Count I (Breach of Contract for Non-Payment) and Count III (Petition to Establish and Enforce a Mechanic's Lien) of Gray's Complaint, ECF 1, survive summary judgment in full;

(2) Count II (Wrongful and Bad Faith Termination) of Gray's Complaint, ECF 1, survives summary judgment in part, such that Gray may advance its wrongful

and bad faith termination claims but may not argue: (a) Medline waived its right to terminate the contract, (b) Medline breached the contract by withholding payment to protect itself from losses, (c) Medline failed to provide notice and opportunity to cure, or (d) Medline's settlement with Schuster undermined Medline's justification for termination;

(3) Summary judgment is granted for Medline as to Count IV (Violation of Maryland Prompt Payment Statute) of Gray's Complaint, ECF 1; and

(4) Medline's motion for partial summary judgment as to Count V (Declaratory Judgment) of Medline's counterclaim, ECF 51, is denied to the extent Medline challenges Gray's adjustment of PCD 41, and granted to the extent Medline seeks a declaration that it does not owe Gray the $352,473.00 listed under PCD 35.

A separate Order follows.


Dated: March 1, 2023                                          /s/
                                                    _____
                                                    Stephanie A. Gallagher
                                                    United States District Judge